Andrew G. Deiss (Utah Bar # 7184)
Andrew D. Miller (Utah Bar # 19625)
DEISS LAW PC
10 West 100 South, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
amiller@deisslaw.com

*Attorneys for Plaintiff*

<table>
<tr><td colspan="2" align="center"><strong>IN THE UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF UTAH</strong></td></tr>
<tr><td>

KYLE GARRETT;

*Plaintiff,*

*vs.*

FULL CIRCLE FIBER PARTNERS LLC, *A COLORADO COMPANY, AND* RMWT CONSULTING LLC, *A DELAWARE COMPANY,*

       *Defendant.*

</td><td align="center">

**COMPLAINT**

Case No.

Judge

</td></tr>
</table>

## **PARTIES**

1. Plaintiff Kyle Garrett is an individual residing in Nephi, Utah.

2. Plaintiff Rocky Mountain West Telecom, Inc. ("RMWT") is a Utah corporation with its principal place of business in Nephi, Utah. Plaintiff Kyle Garrett is its sole shareholder.

3. Defendant Full Circle Fiber Partners LLC ("Full Circle") is a Colorado company with its principal place of business in Englewood, Colorado.

4. Defendant RMWT Consulting LLC ("RMWT Consulting") is a Delaware limited liability company.

5. RMWT Consulting is a subsidiary of Full Circle formed for the purpose of acquiring RMWT's business from RMWT and Mr. Garrett.

6. This Court has personal jurisdiction because the Defendants do business in the State of Utah, and this action arises from their contacts with the state.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because there is perfect diversity of parties and the amount in controversy is greater than $75,000.

8. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the State of Utah.

## GENERAL ALLEGATIONS

10. Rocky Mountain West Telecom, Inc. ("RMWT") is a telecommunications service provider originally started in 1996 by Plaintiff Kyle Garrett.

11. RMWT has provided telecommunications services nationwide and has operated as many as five different offices to coordinate contracts and bids.

12. RMWT was widely considered a successful and reliable service provider and had notable clients including AT&T, Google, Verizon, Comcast, and others.

## I.   The Sale & Acquisition of RMWT

13. In or about August 2022, Full Circle Fiber Partners ("Full Circle") reached out to Mr. Garrett expressing an interest in buying his company.

14. Over the course of the period August 2022 to March 2023, Mr. Garrett negotiated the sale of RMWT to Full Circle with Wayne Davis and Thomas Barnes ("the Negotiation Period").

15. Wayne Davis was Full Circle's Chief Executive Officer.

16. Thomas Barnes was Full Circle's Chief Financial Officer.

17. Mr. Garrett offered to sell RMWT to Full Circle for $9 million on the condition that he would still have a hand in how the company was run for some time.

18. Full Circle represented to Mr. Garrett that both of his proposed terms were achievable and reasonable.

19. Throughout the Negotiation Period, Mr. Garrett repeatedly emphasized that he wanted to receive a total sum of $9 million for the sale of RMWT.

20. On February 8th, 2023, Mr. Garrett stated in an email to Mr. Davis, "I need to have a better guarantee on getting me to the 9M. That is what I originally wanted." *See* Exhibit A, Email dated Feb 8 2023.

21. On February 9th, 2023, Mr. Davis responded and said "[b]ottom line is that I want you to feel good about the deal, the same as we do." *See* Exhibit A, Email dated Feb 8 2023.

22. The parties eventually settled on a $9 million acquisition deal comprised of a $5.5 million upfront payment and a $3.5 million earn-out provision.

23. The acquisition deal was structured such that RMWT would sell its entire business to a wholly-owned subsidiary of Full Circle, Defendant RMWT Consulting LLC ("RMWT Consulting"), but the RMWT entity itself would be left intact.

24. On March 10th, 2023, Mr. Garrett, RMWT, and RMWT Consulting executed an "Asset Purchase Agreement" ("the APA") finalizing the acquisition deal. *See* Exhibit B, Asset Purchase Agreement.

25. The APA provided that RMWT Consulting would pay Mr. Garrett $5,500,000 on the closing date of the sale ("the Closing Payment"). *Id.* at § 1.05(a)(i).

26. The APA further provided that, after conducting its Fiscal 2023 Audit, RMWT Consulting would pay Mr. Garrett a "Contingent Consideration" ("the earn-out provision" or, in reference to the payment itself, "the earn-out payment"), the amount of which was to be adjusted based on RMWT Consulting's fiscal year 2023 Adjusted EBITDA ("the first-year earnings"). *Id.* at § 1.05(a)(ii).

27. The earn-out provision stated that if the first-year earnings were between $2 million and $2.3 million, Mr. Garrett would receive a $2.5 million earn-out payment; if the first-year earnings were greater than $2.3 million, Mr. Garrett would receive a $3.5 million earn-out payment; and if the first-year earnings were $2 million or less, Mr. Garrett would not receive an earn-out payment. *Id.*

28. The APA further provided that at the close of fiscal year 2023, RMWT Consulting would prepare and deliver to RMWT a "Contingent Consideration Calculation Statement", which was to "set[] forth in reasonable detail its determination of [the first-year earnings] and its calculation, accompanied by reasonable documentation, of the resulting Contingent Consideration . . .

together with any applicable financial statements and notes thereto." *Id.*, at § 1.05(b)(i).

29. The Contingent Consideration clause explicitly details that "[d]uring Fiscal 2023, the Buyer shall operate the Business in a commercially reasonable manner and shall not take any actions with the primary intent of avoiding the achievement of the Contingent Consideration."

30. The parties' final acquisition deal also included the execution of a Post Employment Consulting Agreement ("the PECA" or "the consulting agreement") between RMWT Consulting and Mr. Garrett. *See* Exhibit C, Post Employment Consulting Agreement.

31. The PECA stated that Mr. Garrett, would provide consulting services to RMWT Consulting through December 31st, 2023 ("the Term of Agreement"), and be compensated $14,583.33 per month during this period ("the Consulting Fee"). *Id.*

32. The consulting services Mr. Garrett was to provide under the PECA included maintaining current customer relationships, advising on future business development opportunities, and transitioning RMWT operations. *Id.*

## II.    RMWT Consulting Turns Away Work, Loses Customers

33. Nearly immediately after closing, RMWT Consulting began to engage in behavior that would make it impossible for Mr. Garrett to achieve his Contingent Consideration.

34. Still, Mr. Garrett continued to diligently fulfill his end of the agreement, both out of love for the company he raised from the ground up and for a love of the industry that he had spent almost 40 years working in.

35. Throughout 2023, Mr. Garrett witnessed RMWT Consulting turn away work and refuse to pursue available work.

36. On numerous occasions, several of which have been confirmed by RMWT Consulting's current or former employees, RMWT Consulting overtly declined to take on work that was offered, delayed available work, or did not diligently pursue work.

37. The work offers rejected by RMWT Consulting included the following:

| Client | Location(s) | Estimated Profit |
|---|---|---|
| Google | Chubbuck, Idaho; Pocatello, Idaho; Brigham City, Utah | $500,000 |
| Rise Broadband | Texas, Illinois, additional states | $100,000 |
| Emery Telecom | Utah | $100,000 |
| Syringa | Utah & Idaho | $35,000 |
| Calavera | California | $300,000 |
| Uprise | Nevada | $600,000 |
| Cyber Security, South Central, & Tooele | Utah & Idaho | $150,000 |

| Vero | Colorado, Nevada, Idaho, California | Unknown |
|---|---|---|
| Fiber Light | Texas | Unknown |
| TDS | Montana, Washington, additional states | Unknown |
| Connext | Roy, Utah | Unknown |
| Intermountain Infrastructure Group | Washington, Montana, Idaho, Wyoming | Unknown |

38. In total, RMWT Consulting declined to perform work which was estimated to generate at least $1,785,000 in profit.

39. In most cases, RMWT Consulting had the resources to perform these jobs.

40. Even where that was not the case, RMWT Consulting could have obtained the necessary resources with reasonable effort, yet the company's management declined to even attempt to do so.

41. In any event, any lack of adequate resources was attributable, in part, to RMWT Consulting's mismanagement of the business, as described further below.

42. RMWT Consulting's repeated failure to pursue opportunities created the perception among RMWT Consulting's clients that the new company was not interested in bidding on their projects, which caused RMWT Consulting to lose out on future opportunities from those clients.

43. RMWT Consulting also lost out on future opportunities because the work it did take on was performed poorly, and it failed to communicate effectively with clients.

44. For example, in or about July 2023, Mr. Garrett was informed that a representative of a current client, Beehive Telephone Company, Inc., was becoming dissatisfied with the current management practices of RMWT Consulting.

45. This same representative informed Mr. Garrett that if RMWT Consulting did not take better care of Beehive, the "company down the street would get them." *See* Exhibit D, Email dated July 25 2023.

46. In another example, on or about August 8th, 2023, Jeff McKay from Google told Mr. Garrett that, after their recent refusal to make a bid, Google would not be giving RMWT Consulting work in any new areas because they believed that RMWT Consulting was not able to handle it. *See* Exhibit E, Email dated Aug 8 2023.

47. Another client, Rise Broadband, discontinued their relationship with RMWT Consulting because of RMWT Consulting's failure to respond to communications from them.

48. When Mr. Garrett asked why, Rise Broadband cited RMWT Consulting's repeated failures to communicate with them about the status and workflow of current jobs. *See* Exhibit F, Email dated May 29 2024.

49. They also cited RMWT Consulting's unjustifiable increase in the prices of their bids. *See* Exhibit F, Email dated May 29 2024.

50. At the time, Douglas Klunder, the Director of Construction with Rise Broadband, reached out to RMWT Consulting to see if they would reconsider the price they were bidding.

51. Mr. Klunder did this to preserve the relationship between the two companies, which had been reliable and long-standing.

52. Rather than attempting to reciprocate the goodwill, RMWT Consulting failed to respond to Mr. Klunder's communication.

53. This resulted in Mr. Klunder removing RMWT Consulting from Rise Broadband's bidders list, at a time when they were awarding nearly 100 million dollars' worth of work. *See* Exhibit F, Email dated May 29 2024.

54. On or about early November 2023, Mr. Garrett became aware of a lapse in communication that had occurred between RMWT Consulting's Vice President of Engineering, Angie Stern, and client High Quality Installation, LLC ("HQ Installation"). *See* Exhibit G, Email dated Nov 8 2023.

55. To salvage the relationship, Mr. Garrett attempted to organize a meeting with representatives of HQ Installation, RMWT Consulting, and Full Circle.

56. Instead, the COO of Full Circle, Chris May, told Mr. Garrett that he had "dropped the customer." *See* Exhibit G, Email dated Nov 8 2023.

57. This was despite the earning potential of their relationship with HQ Installation, which had offered RMWT Consulting work opportunities for the next 3 to 5 years. *See* Exhibit G, Email dated Nov 8 2023.

58. In or about April 2023, RMWT Consulting engaged in negotiations with Intermountain Infrastructure Group regarding a potential new job for them. *See* Exhibit H, Email dated Apr 14 2023.

59. Just before these discussions concluded, RMWT Consulting failed to finalize their agreement with Intermountain Infrastructure Group for nearly a year, significantly delaying this work. *Id.*

60. Finally, in or about October 2023, Full Circle barred RMWT Consulting from attending trade shows to solicit new clients.

61. RMWT Consulting's mismanagement of client relationships and failure to bid for or seek out new work severely diminished its profitability.

## III.    RMWT Consulting's Diversion to MTC Consulting

62. As noted in the table above, RMWT Consulting could have pursued projects with Vero and Fiber Light but did not.

63. Full Circle's management team gave preference to MTC for these bids instead.

64. RMWT Consulting was well-positioned to obtain that work for itself.

65. Often, members of the RMWT Consulting leadership team including Phil Colby and Angie Sterns directed the company to not bid on certain projects involving MTC at all, or to submit "courtesy" bids designed to make MTC's bids look more attractive.

66. By prioritizing and diverting work to MTC, Full Circle diminished RMWT Consulting's first-year earnings, thereby preventing Mr. Garrett from receiving the full earn-out payment.

67. Additionally, Full Circle forced RMWT Consulting to use MTC employee labor for jobs where RMWT Consulting was the prime contractor.

68. The cost to RMWT Consulting of using MTC employee labor was higher than if it had used its own employee labor.

69. Moreover, the quality of some of the work performed by the MTC employees was unacceptable.

70. In some cases, MTC employees were paid for labor they never performed.

71. RMWT Consulting was required to redo the MTC employees' subpar work and complete the MTC employees' unfinished work at its own expense.

72. Additionally, in cases where RMWT Consulting was required to use MTC employee labor, the share of the profit Full Circle allocated to RMWT Consulting as prime contractor was lower than the industry standard.

73. Requiring RMWT Consulting to use MTC laborers and accept a below-market profit share negatively impacted RMWT Consulting's profitability.

## IV.   RMWT Consulting's Operational and Management Issues

74. Throughout 2023, RMWT Consulting grossly mismanaged its business operations, which resulted in high turnover of management and employees, reduced manpower, and failure to retain established customers.

75. Despite his consulting agreement with RMWT Consulting, Mr. Garrett was repeatedly dismissed from the workplace and prevented from being able to do his job.

76. Finally, in or about May 2023, Phil Colby, Vice President of Special Project and Business Development at Full Circle, sent Mr. Garrett home from RMWT Consulting's office for good and asked him not to come back unless he was called in, because they "had RMWT under control."

77. Mr. Colby also told Mr. Garrett at that time, "not to worry, we are on track to hit the full earnout."

78. Further, RMWT Consulting failed to provide stable leadership.

79. RMWT Consulting had three different leaders between March 10, 2023 and the end of the year.

80. One such leader, Angie Stern, ran RMWT for less than three months, from July 2023 to September 2023.

81. During her employment, Ms. Stern made numerous errors in the management and operation of RMWT Consulting and was fired as a result.

82. On or about October 2nd, 2023, Garrett had a call with Full Circle management team to discuss management changes at RMWT Consulting, during which Chris May admitted that he had made a mistake hiring Ms. Stern.

83. This constant shuffling of leadership was disruptive and destabilizing for RMWT Consulting and its employees and clients.

84. Consequently, RMWT Consulting lost about 14% of its workforce, including employees who had worked for RMWT for over twenty years.

85. Despite having a large outflux of employees, RMWT Consulting made no effort to replace the departing workers.

86. This resulted in a large reduction in manpower, which further inhibited RMWT Consulting's ability to complete current jobs or pursue new jobs.

87. The high attrition rates also had a negative impact on RMWT Consulting's client relations, because many of the employees who left had developed longstanding relationships with the company's customers.

88. This created obstacles for RMWT Consulting as they attempted to retain current clients and gain new ones.

89. The inability to maintain a stable workforce, the constant shuffle of leadership, and deteriorating customer relationships all negatively impacted RMWT Consulting's profitability.

## V.    RMWT Consulting's Failure to Provide Accounting

90. According to the Asset Purchase Agreement's Contingent Consideration clause, "[f]rom the Closing Date until the end of Fiscal 2023, the Buyer shall provide monthly, unaudited statements of EBITDA of the Business within thirty (30) days of the conclusion of each month for the month then ended, prepared in conformity with Accounting Principles." *See* Exhibit B, § 1.05 (b)(iii).

91. During the course of the Contingent Consideration Period, RMWT Consulting was repeatedly delayed in delivering the monthly statements to Mr. Garrett.

92. In one instance, on or about November 1st, 2023, Mr. Garrett inquired about his monthly statement from September, which was overdue. *See* Exhibit I, Email dated Nov 1, 2023.

93. The September statement was not delivered until at least November 7th, 2023.

94. Even after the completion of the 2023 fiscal year, Mr. Garrett had to explicitly request the month-to-month financial statements.

95. Mr. Garrett should have had timely access to this financial information without asking for it for the duration of his Consulting Agreement, but even after requesting it, he was not able to timely review the financials of RMWT Consulting as provided for in the Asset Purchase Agreement.

96. RMWT Consulting's failure to timely provide the required monthly statements inhibited Mr. Garrett from being able to complete his work responsibilities as a consultant for RMWT Consulting.

97. RMWT Consulting's failure to timely provide the required monthly statements also impaired Mr. Garrett's ability to evaluate the company's financial performance.

98. Because RMWT Consulting prevented Mr. Garrett from accessing critical data about the company, he could not participate fully in the management of its affairs.

99. Likewise, Mr. Garrett could not adequately perform his duties under the Consulting Agreement, the purpose of which was to ensure a smooth transition that would maximize RMWT Consulting's profitability, which had a direct impact on Mr. Garrett's earn-out payment.

## VI.    Mr. Garrett Raised Concerns About the Profitability of RMWT

100.    During this period, Mr. Garrett did everything in his power to smoothly transition power from RMWT to RMWT Consulting.

101.   However, Mr. Garrett noted on multiple occasions that RMWT
       Consulting's management practices were harming clients.

102.   To help overcome what he assumed were growing pains, Mr. Garrett
       repeatedly raised concerns about the profitability of RMWT Consulting and
       different operational decisions to different members of RMWT Consulting.

103.   Furthermore, Mr. Garrett went above and beyond in his consulting role at
       RMWT Consulting in an effort to maximize the company's performance.

104.   On more than one occasion, Mr. Garrett used his network of professional
       relationships to solicit new work for RMWT Consulting.

105.   Mr. Garrett even contacted clients that had discontinued their
       relationship with RMWT to see if they had potential work opportunities for
       RMWT Consulting. *See* Exhibit J, Email dated Dec 11, 2023.

106.   Even though Mr. Garrett was consistently bringing in work, there was a
       notable decrease in the profits RMWT Consulting was bringing in.

107.   Starting as early as April 24th, 2023, Mr. Garrett began to express his
       concerns to RMWT Consulting's administrative group. *See* Exhibit K, Email
       dated Apr 24, 2023.

108.   On or about July 20th, 2023, Barnes told Mr. Garrett not to worry about his
       earnout numbers.

109.   Barnes reassured Mr. Garrett and told him that "[RMWT Consulting] will work with [Mr. Garrett] to make the numbers."

110.   Barnes also told Mr. Garrett that he only needed to be involved with the operations of RMWT Consulting "at an arm's length."

111.   On or about August 25th, 2023, Mr. Garrett had a call with multiple members of the RMWT Consulting team, including Davis and May.

112.   During this call, Wayne represented that "Full Circle has never ever not paid out an earnout."

113.   On information and belief, Kevin Manweiler, from whom Full Circle acquired the business now known as MTC Consulting, did not receive his earnout payment from Full Circle.

114.   In a meeting with Wayne Davis and Thomas Barnes, on October 12th, 2024, Davis and Barnes said that "[Mr. Garrett] should have no problem reaching the minimum tier of [his] earnout."

115.   In this same meeting, Davis and Barnes reassured Garrett that "Full Circle has always paid earnouts even if the numbers were not always there."

116.   In an email sent on November 9th, 2023, Mr. Garrett organized a meeting with May, Davis, and Barnes to discuss his concerns.

117.   In an email response dated the same day, May said that "[they] see a good path toward your earn out [sic]." *See* Exhibit L, Email dated Nov 9, 2023.

118.   In that meeting, May re-emphasized that he believed he had found a way to "help Mr. Garrett achieve his earnout."

119.   After that meeting, Mr. Garrett repeatedly asked May to share his new ideas for profitability in a multitude of emails from November of 2023 to January of 2024.

120.   Neither May nor anyone else within the leadership at RMWT Consulting and Full Circle acknowledged this request.

121.   On or about November 10th, 2023, Mr. Garrett had a call with May.

122.   During this call, May re-emphasized that Garrett "was going to get an earnout and that he did not need to worry about it."

123.   May again reassured Mr. Garrett by saying that he and Davis had "come up with a plan to make sure Mr. Garrett would get his earnout."

124.   May even proposed extending the period of the Contingent Consideration to February of 2024.

125.   The period of the Contingent Consideration was never extended which disallowed further profits to apply to Garrett's earnout calculation.

126.   On or about November 14th, 2023, Davis said in an email to Mr. Garrett that "[it] is always [Full Circle's] goal to have our earnouts achieved." *See* Exhibit M, Email dated Nov 14, 2023.

127.   Even though May had expressed his willingness to help Mr. Garrett, there was no effort made by May or anyone at RMWT Consulting to help Mr. Garrett maximize the profitability of RMWT Consulting.

128.   As the end of his consulting agreement neared, Mr. Garrett repeatedly offered to stay on board at RMWT Consulting as a consultant.

129.   Mr. Garrett had hoped that if he stayed with RMWT Consulting for a little while longer, he may be able to help RMWT Consulting become more profitable.

130.   However, this request was denied by members of the Full Circle administrative team.

131.   Even though his consultation agreement had ended, Mr. Garrett asked to keep his email live so that he could send related emails to RMWT Consulting, including potential bids and different job opportunities.

132.   Mr. Garrett did this as an offering of goodwill, further highlighting that Mr. Garrett wanted what was best for RMWT Consulting and its future success.

133.   In a final attempt to continue working with Full Circle, Mr. Garrett organized a call with Davis concerning his employment.

134.   In this call, Davis said that there wasn't anything further for Mr. Garrett to do and he could go ahead and retire.

135.    When asked about Mr. Garrett's earnout, Davis said "[d]o not worry, you're going to get all your earnout. . . . [W]e want to pay you out."

136.    On or about January 29th, 2024, Davis confirmed that Garrett's relationship with RMWT Consulting had come to an end.

137.    Mr. Garrett finished cleaning out his office on January 30th, 2024.

## VII.    RMWT Consulting Pays No Contingent Consideration

138.    On May 17th, 2024, Thomas Barnes of RMWT Consulting sent Mr. Garrett the Contingent Consideration Calculation Statement. *See* Exhibit N, Contingent Consideration Calculation Statement.

139.    The Contingent Consideration Calculation Statement read, in part, "[b]ased on Buyer calculation of achievement of Adjusted EBITDA of $1,687,617, as detailed in Exhibit B hereto, Buyer determined that Sellers have not met the minimum threshold to achieve any Contingent Consideration."

140.    Had the Adjusted EBITDA been only $312,383 higher (i.e., $2 million total), Mr. Garrett would be entitled to $2.5 million in Contingent Consideration.

141.    If the Adjusted EBITDA were $612,383 higher (i.e., $2.3 million total), Mr. Garrett would be entitled to payment of the full Contingent Consideration in the amount of $3.5 million.

142.    On June 16th, 2024, Mr. Garrett's prior counsel sent a letter to RMWT

Consulting alleging that RMWT Consulting had not conducted business in a

commercially reasonable matter to avoid payment of the Contingent

Consideration and demanding that the Contingent Consideration be paid out

in full ("the Demand Letter").

143.    In a response letter dated July 12th, 2024, RMWT Consulting denied the

claims alleged in the Demand Letter and refused to negotiate a settlement to

the dispute.

## VIII.    RMWT Consulting's Unauthorized Access and Use of Mr. Garrett's Property

144.    During the time Mr. Garrett provided consulting services for RMWT

Consulting, the company's IT department installed software on his personal

laptop computer which enabled them to remotely access the data stored on

that computer.

145.    The parties agreed that Mr. Garrett's laptop was his own personal

property and was not acquired by RMWT Consulting pursuant to the APA. *See*

Exhibit B, § 1.01(a), Schedule 1.02(b)(7).

146.    When the consulting agreement terminated, Mr. Garrett requested that

the software be removed from his laptop.

147.   RMWT Consulting's IT department refused to remove the software from Mr. Garrett's laptop.

148.   RMWT Consulting employees had used the software in the past to access data on Mr. Garrett's laptop.

149.   Because he was concerned about the privacy of his personal data, Mr. Garrett was forced to purchase a new laptop which did not have RMWT Consulting's tracking software.

150.   Additionally, on or about September 17th, 2024, Mr. Garrett discovered that RMWT Consulting employees had been using his signature stamp to sign checks and other banking documents without his knowledge or consent. *See* Exhibit O, Aug 21 2024 Check.

151.   On September 18, 2024, Mr. Garrett contacted RMWT Consulting and Full Circle's leadership and requested they stop using his signature stamp and remove him as a signatory to RMWT Consulting's bank accounts and requesting that they confirm they had done so by September 23, 2024. *See* Exhibit P, Email dated Sep 18, 2024.

152.   On September 18, 2024, Chris May responded to Mr. Garrett's email and denied that his signature stamp had been used.

153. Mr. Garrett never received any confirmation that RMWT Consulting had stopped using his signature stamp and removed him from company bank accounts, even after attempting to follow up on September 27, 2024.

## FIRST CAUSE OF ACTION – FRAUDULENT INDUCEMENT

### (Against All Defendants)

154. During negotiations regarding the sale of RMWT, Plaintiff repeatedly emphasized that he expected to be paid $9 million.

155. Defendants' representatives made repeated assurances that this was a reasonable and achievable purchase price.

156. Defendants further represented that they intended to manage RMWT Consulting in a reasonable manner, with an aim to maximize the company's profitability.

157. These representations were material because they would directly affect the size of Plaintiff's earn-out payment.

158. These representations were false, because Defendants, in fact, intended to divert business to Full Circle's other subsidiaries, pay RMWT Consulting below-market rates for prime contractor services, turn down revenue opportunities for RMWT Consulting, and perform substandard work for its clients.

159.   Defendants represented to Plaintiff that he would have an active role in the management of RMWT Consulting through their consulting agreement, in order to ensure a smooth transition and maximize the company's success and profitability.

160.   This representation was material because it provided reassurance that Plaintiff would, through his own efforts, contribute to the maximization of RMWT Consulting's profitability and, in turn, the size of his earn-out payment.

161.   This representation was false, because Defendants did not intend to use Plaintiff's consulting services to assist in the management of RMWT Consulting and, in fact, wanted to minimize his involvement in the company.

162.   After the sale of the business was closed, Defendants repeatedly represented to Plaintiff that he would receive an earn-out payment.

163.   These representations were material because it reinforced Plaintiff's decision to sell his business to Defendants.

164.   These representations were false because RMWT Consulting's first-year earnings fell well short of even the minimum tier of the earn-out provision.

165.   Defendants also represented that they were operating RMWT Consulting in a commercially reasonable manner and that his consulting services were largely not required.

166. These representations were false, because RMWT Consulting was being grossly mismanaged by a revolving door of senior leaders chosen by or affiliated with Full Circle, and losing many employees and clients as a result.

167. This representation was material because they reinforced Plaintiff's decision to sell his business to Defendants.

168. Defendants knew, or should have known, that these representations were false because they were aware of their plans for RMWT Consulting after closing the acquisition deal with Plaintiff and they were in control of RMWT Consulting and had access to its financial data.

169. These representations were made for the sole purpose of inducing Plaintiff to sell RMWT's business to Defendants for less than fair market value.

170. Plaintiff reasonably relied on Defendants' representations, in part because they had experience with such acquisitions in the past.

171. Plaintiff's reliance on Defendants' representations induced him to sell RMWT's business to Defendants for less than market value, which was to his detriment.

172. As a result of Defendants' fraudulent inducement of Plaintiff, he has been injured in an amount to be determined at trial, but which is at least $3.5 million, or the value of his full earn-out provision.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

## (Against RMWT Consulting LLC)

173.   The Asset Purchase Agreement is a valid and enforceable contract between Mr. Garrett and RMWT Consulting LLC.

174.   The Post Employment Consulting Agreement is also a valid and enforceable contract between Mr. Garrett and RMWT Consulting LLC.

175.   RMWT Consulting had an obligation under Section 1.05(b)(ii) of the APA to operate the business it was acquiring from Plaintiff and RMWT in a commercially reasonable manner.

176.   RMWT Consulting also had an obligation under the same section of the APA to not take any actions primarily intended to avoid the achievement of the Contingent Consideration.

177.   As alleged at length herein, RMWT Consulting did not operate the business in a commercially reasonable manner, in breach of this contractual obligation.

178.   As likewise alleged at length herein, many management decisions were made in the operation of RMWT Consulting which have no apparent purpose other than to avoid making an earn-out payment to Plaintiff, in breach of this contractual obligation, including turning down revenue opportunities and

failing to seek new ones, accepting below-market rates for prime contractor work, and using subpar contract labor.

179.   These actions also include instructing Plaintiff early on to largely withdraw from providing consulting services pursuant to the parties' Post Employment Consulting Agreement, which was formed in order to avoid the exact sorts of problems RMWT Consulting subsequently experienced, which negatively impacted its first-year earnings.

180.   RMWT Consulting also had an obligation under Section 1.05(b)(iii) to provide monthly accounting statements within thirty days of the end of each month.

181.   RMWT Consulting repeatedly failed to provide timely monthly accounting statements, in breach of this contractual obligation.

182.   Plaintiff fully performed his obligations under both the APA and the PECA.

183.   As a direct and proximate result of RMWT Consulting's breaches of contract, Mr. Garrett has suffered damages in an amount to be proven at trial, but which is estimated to be at least $3.5 million, or the full value of Plaintiff's earn-out payment.

## THIRD CAUSE OF ACTION – ACCOUNTING

## (Against RMWT Consulting LLC)

184.   Plaintiffs reallege and incorporate herein by reference each of the

preceding paragraphs as if set forth herein.

185.   While Mr. Garrett was working as a consultant for RMWT, RMWT

Consulting received all the revenue, kept all the accounts, and made all the

disbursements.

186.   The amount of receipts, disbursements, and profits are solely within the

knowledge of RMWT Consulting.

187.   As a direct result of RMWT Consulting's refusal to timely provide monthly

EBITDA statements as well as the final Contingent Consideration Calculation

Statement, as the Asset Purchase Agreement requires, Plaintiff has been

injured.

188.   Moreover, as a direct result of RMWT Consulting's obfuscation regarding

its management principles with its other companies, Full Circle Fiber

Partners and MTC, Plaintiff does not know how much he is owed.

189.   Plaintiff is entitled to an equitable accounting of how much they are owed.

## FOURTH CAUSE OF ACTION – UNJUST ENRICHMENT

### (Against All Defendants)

190.   As alleged herein, Defendants engaged in various acts which depressed RMWT Consulting's first-year earnings.

191.   Defendants knew that by depressing RMWT Consulting's first-year earnings, they were conferring on themselves a benefit by avoiding an earn-out payment to Plaintiff.

192.   Full Circle knew that this benefit came at Plaintiff's expense, because he expected to be paid the fair market value of the business he sold to Defendants.

193.   It would be unjust for Defendants to retain the value of benefit they conferred upon themselves through their mismanagement of RMWT Consulting.

194.   Accordingly, Plaintiff requests a restitution award in the amount of $3.5 million, or the full potential value of the earn-out payment.

## FIFTH CAUSE OF ACTION – IDENTITY THEFT/COMMUNICATIONS FRAUD (UTAH CODE §§ 76-6-1102 & 78B-6-1701)

### (Against All Defendants)

195.   RMWT Consulting has knowingly and intentionally used Plaintiff's personal identifying information, namely his signature stamp, on financial and other official documents.

196.   RMWT Consulting's use of Plaintiff's personal identifying information was done with fraudulent intent, including to indicate that he was still associated with the company long after their relationship had terminated.

197.   As alleged herein, Defendants have otherwise devised schemes and artifices to defraud Plaintiff.

198.   These schemes and artifices operated by false and fraudulent pretenses, representations, promises, and material omissions.

199.   In the operation of these schemes and artifices, Defendants communicated amongst themselves and with others.

200.   Plaintiff has been harmed by RMWT Consulting's use of his personal identifying information and Defendants' schemes and artifices to defraud him, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION – CIVIL CONSPIRACY

### (Against All Defendants)

201.   Defendants and others combined with each other in a meeting of the minds to accomplish the fraudulent objects described more fully herein, including without limitation the deliberate mismanagement of RMWT Consulting to avoid making an earn-out payment to Plaintiff.

202.   As described more fully herein, Defendants have performed wrongful, overt acts in furtherance of those fraudulent objects, including without limitation identify theft and fraudulent misrepresentations.

203.   As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") (18 U.S.C. §§ 1961-68)

### (Against All Defendants)

204.   RMWT Consulting and Full Circle each constitute enterprises engaged in interstate and/or foreign commerce.

205.   Alternatively, the entities listed in the previous paragraph constitute enterprises whose activities affect interstate and/or foreign commerce.

206.   Additionally, Defendants collectively constitute an association-in-fact

enterprise, as they all participated in furthering a common purpose of

acquiring RMWT's business for less than fair market value; they have

relationships with each other; and the duration of their associations is

sufficient to permit them to pursue the common purpose.

### *Bank Fraud*

207.   As alleged herein, Defendants have used Plaintiff's signature stamp to sign

documents for banks and other financial institutions on behalf of RMWT

Consulting.

208.   This was done without Plaintiff's knowledge or authorization.

209.   This conduct has continued well after the termination of the parties'

relationship.

210.   Use of Plaintiff's signature stamp represented to banks, financial

institutions, and others that Plaintiff was affiliated with RMWT Consulting

and personally authorized the transactions in question.

211.   By obtaining money, funds, credits, assets, securities, or other property

owned by, or under the custody and control of, financial institutions by

means of false or fraudulent pretenses, representations, or promises,

Defendants have committed bank fraud in violation of 18 U.S.C.A. § 1344.

### *Wire Fraud*

212.   As alleged herein, Defendants have engaged in one or more schemes or artifices to defraud Plaintiff or obtain their money or property.

213.   Most, if not all, of these schemes involved frequent use of interstate wire communications, including emails and phone or video calls.

214.   Some of the emails are attached as exhibits to this complaint and cited throughout.

215.   By using interstate wire communications for the purpose of executing schemes and artifices to defraud and obtain the money and property of another, Defendants have committed wire fraud, in violation of 18 U.S.C.A. § 1343.

### *RICO Violations*

216.   The allegations set forth above demonstrate that Defendants have engaged in a pattern of racketeering activity.

217.   Each Defendant has either conducted or participated, directly or indirectly, in the conducting of affairs one or more of the enterprises identified above through a pattern of racketeering activity, in violation of 18 U.S.C.A. § 1962(c).

218.   Each defendant has received income derived, directly or indirectly, from a pattern of racketeering activity and used and/or invested, directly or

indirectly, at least part of such income, or the proceeds thereof, to acquire

interests in, establish, or operate one or more of the enterprises identified

above, in violation of 18 U.S.C.A. § 1962(a).

219.   Full Circle has maintained its direct interest in and control of RMWT

Consulting through a pattern of racketeering activity, in violation of 18

U.S.C.A. § 1962(b).

220.   Full Circle directly or indirectly acquired its interest in and control of

RMWT Consulting through a pattern of racketeering activity, in violation of

18 U.S.C.A. § 1962(b).

221.   As a direct and proximate result of Defendants' violations of 18 U.S.C.A. §

1962(a)-(c), Plaintiffs have been injured in an amount to be determined at

trial.

222.   Plaintiffs are further entitled to treble damages and reasonable attorneys'

fees, as authorized by 18 U.S.C.A. § 1964(c).

**EIGHTH CAUSE OF ACTION – RICO CONSPIRACY (18 U.S.C.A. § 1962(c))**

**(Against All Defendants)**

223.   As alleged in Plaintiffs' seventh cause of action, Defendants have engaged

in various violations of 18 U.S.C.A. § 1962(a)-(c).

224.   Additionally, as alleged in Plaintiffs' sixth cause of action, Defendants

conspired with one another to commit many of the same acts referenced in

Plaintiffs' seventh cause of action.

225.   By conspiring with each other to violate 18 U.S.C.A. § 1962(a)-(c),

Defendants have further violated 18 U.S.C.A. § 1962(d).

226.   As a direct and proximate result of Defendants' violations of 18 U.S.C.A. §

1962(d), Plaintiffs have been injured in an amount to be determined at trial.

227.   Plaintiffs are further entitled to treble damages and reasonable attorneys'

fees, as authorized by 18 U.S.C.A. § 1964(c).

## NINTH CAUSE OF ACTION – VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA") (18 U.S.C.A. § 1830)

### (Against All Defendants)

228.   Defendants refused to remove remote access software from Plaintiff's

personal computer after their relationship terminated and after he requested

that such software be removed.

229.   Defendants have thereby knowingly accessed a protected computer

without authorization.

230.   Alternatively, Defendants have thereby knowingly exceeded their

authorized access to a protected computer.

231.   On information and belief, Defendants obtained information from Plaintiff's computer through such conduct, in violation of 18 U.S.C.A. § 1830(a)(2)(C).

232.   Additionally, or alternatively, on information and belief, Defendants did so knowingly and with the intent to defraud Plaintiff, and obtained something of value thereby, in violation of 18 U.S.C.A. § 1830(a)(4).

233.   Alternatively, Defendants have attempted or conspired to commit one or more of these statutory violations.

234.   Defendants' conduct described in this cause of action has caused damage and loss to Plaintiffs in an amount to be proved at trial, but which includes the cost of purchasing a new computer free of Defendants' software.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks the Court for relief as follows:

1.   That damages be awarded to Plaintiff in an amount to be determined at trial, but believed to be at least $3,500,000;

2.   That treble damages be awarded as allowed by law including Utah Code § 78B-6-1701 and 18 U.S.C.A. § 1964(c);

3.   That exemplary damages be awarded of up to twice actual damages pursuant to Utah Code Ann. § 13-24-4;

4.  That punitive damages be awarded under Utah Code § 78B-6-1701 and other applicable law;

5.  That the Court award Plaintiffs their attorney fees and costs of court as allowed by law; and

6.  Such other and further relief as the Court may deem just and proper.

*Respectfully submitted* this 6th day of November, 2024.

DEISS LAW PC

*/s/ Andrew D. Miller*
Andrew D. Miller
Andrew G. Deiss
*Counsel for Plaintiff*