# EXHIBIT B

**ASSET PURCHASE AGREEMENT**

*by and among*

**ROCKY MOUNTAIN WEST TELECOM, INC.,**

**KYLE GARRETT**

*and*

**RMWT CONSULTING LLC**

**Dated as of March 10, 2023**

## TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE ........................................................................... 1
    Section 1.01    Purchase and Sale of Assets .................................................. 1
    Section 1.02    Excluded Assets ................................................................... 3
    Section 1.03    Assumed Liabilities ............................................................. 3
    Section 1.04    Excluded Liabilities ............................................................. 4
    Section 1.05    Purchase Price; Contingent Consideration ........................... 6
    Section 1.06    Working Capital Adjustment ................................................ 8
    Section 1.07    Cooperation ....................................................................... 12
    Section 1.08    Tax Treatment of Contingent Consideration ...................... 12
    Section 1.09    Allocation of Purchase Price .............................................. 12
    Section 1.10    Withholding Tax ................................................................ 13
ARTICLE II CLOSING .............................................................................................. 13
    Section 2.01    Closing .............................................................................. 13
    Section 2.02    Closing Deliverables .......................................................... 13
    Section 2.03    Escrow .............................................................................. 15
ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER AND THE
    OWNER ........................................................................................................ 15
    Section 3.01    Organization and Authority of Seller; Enforceability ......... 15
    Section 3.02    No Conflicts; Consents ...................................................... 16
    Section 3.03    Purchased Assets ............................................................... 16
    Section 3.04    Fixed Assets; Tangible Personal Property .......................... 17
    Section 3.05    Intellectual Property .......................................................... 17
    Section 3.06    Inventory .......................................................................... 18
    Section 3.07    Financial Statements .......................................................... 19
    Section 3.08    Taxes ................................................................................ 20
    Section 3.09    Material Contracts ............................................................. 20
    Section 3.10    Customers ......................................................................... 22
    Section 3.11    Suppliers and Subcontractors ............................................ 23
    Section 3.12    Seller Employees ............................................................... 23
    Section 3.13    Compliance With Legal Requirements ............................... 25
    Section 3.14    Permits ............................................................................. 26
    Section 3.15    Actions; Settlements ......................................................... 27
    Section 3.16    Insurance .......................................................................... 27
    Section 3.18    Liabilities ......................................................................... 28
    Section 3.19    Environmental Matters ...................................................... 28
    Section 3.20    Information Privacy and Data Security ............................... 28
    Section 3.21    Affiliate Transactions ........................................................ 29
    Section 3.22    Solvency ........................................................................... 30
    Section 3.23    Real Property .................................................................... 30
    Section 3.24    Government Contracts. ....................................................... 31
    Section 3.25    Brokers ............................................................................. 31
    Section 3.26    COVID .............................................................................. 32
    Section 3.27    Accounts Receivable ......................................................... 32

## TABLE OF CONTENTS
(continued)

Page

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 32
    Section 4.01    Organization and Authority of Buyer; Enforceability ...................... 32
    Section 4.02    No Conflicts; Consents ..................................................................... 32
    Section 4.03    Legal Proceedings ............................................................................ 33
    Section 4.04    Brokers ............................................................................................. 33
    Section 4.05    Sufficiency of Funds. ....................................................................... 33
    Section 4.06    Solvency. .......................................................................................... 33
    Section 4.07    Legal Proceedings. .......................................................................... 33
    Section 4.08    Independent Investigation. ............................................................... 33
ARTICLE V COVENANTS ............................................................................................... 33
    Section 5.01    Public Announcements ..................................................................... 33
    Section 5.02    Bulk Sales Laws ............................................................................... 34
    Section 5.03    Tax Matters. ...................................................................................... 34
    Section 5.04    Transfer Taxes ................................................................................. 36
    Section 5.05    Employees ......................................................................................... 36
    Section 5.06    Post-Closing Operation of the Business ........................................... 36
    Section 5.07    Restrictive Covenants ...................................................................... 37
    Section 5.08    Seller Release ................................................................................... 39
    Section 5.09    Further Assurances. .......................................................................... 39
    Section 5.10    Purchased Contracts Requiring Consent ........................................... 40
ARTICLE VI INDEMNIFICATION ................................................................................. 41
    Section 6.01    Survival ............................................................................................ 41
    Section 6.02    Indemnification of Buyer ................................................................. 41
    Section 6.03    Indemnification of Seller ................................................................. 42
    Section 6.04    Procedure ......................................................................................... 42
    Section 6.05    Determination of Claims; Payment; Right to Offset ........................ 45
    Section 6.06    Exceptions ........................................................................................ 45
    Section 6.07    Limitations on Indemnification ........................................................ 47
    Section 6.08    Sole and Exclusive Remedy ............................................................ 47
    Section 6.09    Tax Treatment of Indemnification Payments ................................... 48
    Section 6.10    Effect of Investigation ..................................................................... 48
    Section 6.11    Materiality Scrape ............................................................................ 48
ARTICLE VII MISCELLANEOUS ................................................................................. 49
    Section 7.01    Expenses .......................................................................................... 49
    Section 7.02    Notices ............................................................................................. 49
    Section 7.03    Headings .......................................................................................... 50
    Section 7.04    Severability ...................................................................................... 50
    Section 7.05    Entire Agreement ............................................................................. 50
    Section 7.06    Successors and Assigns .................................................................... 50
    Section 7.07    Third-Party Beneficiaries ................................................................. 50
    Section 7.08    Amendment and Modification .......................................................... 50
    Section 7.09    Waiver ............................................................................................. 50
    Section 7.10    Governing Law ................................................................................. 51
    Section 7.11    Submission to Jurisdiction ............................................................... 51

# TABLE OF CONTENTS
(continued)

**Page**

Section 7.12    Waiver of Jury Trial ........................................................... 51
Section 7.13    Specific Performance; Injunctive Relief ............................ 51
Section 7.14    Counterparts ...................................................................... 51
Section 7.15    Construction ....................................................................... 51

APPENDIX A ....................................................................................... Definitions

Schedule 1.01(a) ..............................................................................Fixed Assets

Schedule 1.01(e) ..................................................................................... Permits

Schedule 1.01(f) .................................................... Tangible Personal Property

Schedule 1.01(l) ............................................................Operating Bank Accounts

Schedule 1.01(m) ...........................................................Assumed Capital Leases

Schedule 1.02(b) ................................................................Excluded Assets

Schedule 1.02(d) ............................................................Excluded Contracts

Schedule 1.02(e) ......................................................Excluded Bank Accounts

Schedule 1.02(f) ................................................. Excluded Accounts Receivable

Schedule 1.04 .............................................................Excluded Liabilities

Schedule 1.05(a) .............................................................. Wire Information

Schedule 2.02(a)(vi) ........................................................Required Consents

Schedule 5.05 ....................................................................Acquired Employees

Schedule Appendix-1 .....................................................Debt-Like Items

EXHIBIT A ..................................................................... Adjusted EBITDA

EXHIBIT B .......................................................................Allocation Schedule

EXHIBIT C ..................................................................... Escrow Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of March 10, 2023, is entered into among (i) Rocky Mountain West Telecom, Inc., a Utah corporation ("**Seller**"), (ii) Kyle Garrett, an individual (the "**Owner**"), and (v) RMWT Consulting LLC, a Delaware limited liability company ("**Buyer**"). Each of Seller, Buyer, and the Owner are sometimes referred to herein as a "**Party**" and together, as the "**Parties**." Terms in this Agreement that are capitalized but not defined herein shall have the meanings assigned to them in Appendix A.

## RECITALS

**WHEREAS**, the Seller is in the business of the provision of outside and inside plant engineering, drafting, permitting, inspection, project management and related services to the telecommunications industry (the "**Business**");

**WHEREAS**, the Seller is a private company and the Owner is the sole record and beneficial owner of all of the outstanding equity of the Company;

**WHEREAS**, Seller and the Owner wish to sell to Buyer, and Buyer wishes to purchase from Seller, all of Seller's rights, title and interest in and to the Purchased Assets (as defined herein), subject to the terms and conditions set forth herein; and

**WHEREAS**, the Owner agrees to the Purchase Price and other terms herein and acknowledges that the covenants and agreements to which they are subject in this Agreement are reasonable and necessary to protect the legitimate interests of Buyer and its Affiliates with respect to its acquisition of the Business from Seller as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets**. Pursuant to the terms and conditions set forth herein, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer, and Buyer purchases from Seller, all of Seller's right, title and interest in, to and under the Purchased Assets free and clear of any mortgage, lien, option, security interest, pledge, deed of trust, easement or right of use, servitude, right of way, conditional sales contract, encroachment, restriction on transferability or other claim, charge or encumbrance of a similar nature ("**Encumbrances**"). "**Purchased Assets**" means all of the assets, properties, contractual rights, goodwill, going concern value, rights and claims of Seller that relate to, or are or have been used by or in, the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Seller (other than the Excluded Assets), including each of the following assets:

(a)     the fixed assets listed on Schedule 1.01(a) attached hereto (the "**Fixed Assets**");

(b)     all of Seller's rights, interest and privileges under the Material Contracts listed or identified on Schedule 3.09(a), all other contracts with customers, all orders and contracts with vendors and subcontractors, all leases for real and personal property, and all other contracts and agreements entered into by Seller in connection with the Business (including pending customer orders and works in progress) except for contracts relating to the Excluded Liabilities, but including all rights, benefits, deposits, claims or causes of action with respect to the Purchased Contracts (collectively, the "**Purchased Contracts**");

(c)     all inventories, finished goods, raw materials, work in progress, packaging, supplies and parts (collectively, the "**Inventory**");

(d)     all work in progress with respect to services provided by Seller;

(e)     all accounts receivable, other than the Excluded Accounts Receivable;

(f)     the permits, registrations, approvals, consents, authorizations, licenses, variances and permissions listed on Schedule 1.01(f) attached hereto ("**Permits**"), to the extent transferable under applicable Legal Requirements;

(g)     all tangible personal property (whether as owner, lessor, lessee or otherwise), including, without limitation, all machinery, equipment, instruments, tools, furniture, office equipment, cars, trucks, forklifts and other vehicles (the "**Tangible Personal Property**") and including the Tangible Personal Property listed on Schedule 1.01(g));

(h)     all third-party property and casualty insurance proceeds, and all rights to third-party property and casualty insurance proceeds;

(i)     all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold or services provided to Seller or to the extent affecting any of the Purchased Assets;

(j)     all rights and interests of Seller in and to the Leased Real Property;

(k)     books, records, information, lists and files of Seller relating to the Business (the "**Books and Records**"), including, without limitation, with respect to current, former and prospective customers;

(l)     all bank accounts to which customers make direct payments or are otherwise used in the operation of the Business, the bank name and address, account number, use and authorized persons for each such account as listed on Schedule 1.01(l) attached hereto (the "**Operating Bank Accounts**"), other than the Excluded Bank Accounts;

(m)     "**Assumed Capital Leases**" means those capital leases to be assumed at Closing by Buyer (including amounts outstanding under such respective capital leases) and set forth on Schedule 1.01(m).

(n)     all Seller Intellectual Property; and

(o)     the goodwill and other intangible assets associated with the Business, including the goodwill associated with the Intellectual Property.

Notwithstanding anything to the contrary herein, Buyer is not a successor in interest to Seller and nothing in this Section 1.01 shall obligate Buyer to assume any liability, whether or not related to the Purchased Assets or otherwise, unless Buyer expressly assumes such liability pursuant to the terms and conditions of Section 1.03.

**Section 1.02   Excluded Assets**.   Notwithstanding anything in Section 1.01 to the contrary, the Purchased Assets shall exclude the following assets, properties, rights and interests of Seller (collectively, the "**Excluded Assets**"):

(a)     all Tax refunds (or credits in lieu of Tax refunds) relating to any taxable period or portion thereof ending on or before the Closing Date (such taxable period or portion thereof, a "**Pre-Closing Tax Period**"), whenever refunded, subject to 5.03(b)(vi), including, without limitation, any Employee Retention Credit relating to wages paid by the Company prior to the Closing Date;

(b)     those assets set forth on Schedule 1.02(b) attached hereto;

(c)     the rights which accrue or will accrue to Seller or the Owner under this Agreement or the Ancillary Transaction Documents;

(d)     any contracts that are not Purchased Contracts which are set forth in Schedule 1.02(d) attached hereto;

(e)     all bank accounts to which customers do not make direct payments and are not otherwise used in the operation of the Business, the bank name and address, account number, use and authorized persons for each such account as listed on Schedule 1.02(e) attached hereto (the "**Excluded Bank Accounts**"); and

(f)     the accounts receivable set forth on Schedule 1.02(f) attached hereto (the "**Excluded Accounts Receivable**").

**Section 1.03   Assumed Liabilities**.  At the Closing, Buyer shall assume and be liable for, and pay, perform and discharge when due, the following liabilities of Seller (collectively, the "**Assumed Liabilities**"), but only to the extent the existence of such liabilities or the particular facts and circumstances that give rise to such liabilities do not or would not constitute a breach of any of Seller's representations and warranties hereunder or otherwise give rise to a claim for indemnification by Buyer hereunder:

(a)     those liabilities related to the Purchased Assets (other than the Purchased Contracts) arising on or after the Effective Time, but solely to the extent such liabilities relate to actions, activities and events that occur after the Effective Time;

(b)     the obligations of Seller under the Purchased Contracts but solely to the extent that such obligations are required to be performed after the Effective Time (other than any liability arising out of or relating to a breach or default that occurred prior to the Effective Time); and

(c)     Seller's trade accounts payable (not including accrued payroll liabilities, which shall be Excluded Liabilities pursuant to Section 1.04(b)) to the extent accounted for in the calculation of Closing Working Capital.

For the avoidance of doubt, the Assumed Liabilities specifically exclude any Excluded Liabilities and any liabilities arising out of or relating to Seller's and/or the Owner's actions or failures to act prior to the Closing Date.

**Section 1.04   Excluded Liabilities**.   Notwithstanding anything herein to the contrary, Buyer is not assuming or agreeing to be liable for, or agreeing to pay, perform or discharge any liabilities or obligations of Seller or the Owner of any kind, whether known or unknown, contingent, matured or otherwise, whether or not currently existing or hereinafter created, and whether or not arising out of or relating to the Purchased Assets or the Business, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**").   The Excluded Liabilities shall at and after the Closing remain the sole and exclusive responsibility of Seller or the Owner, as applicable.   Without limiting the generality of the foregoing, the Excluded Liabilities shall include the liabilities of Seller set forth on Schedule 1.04 attached hereto and any liabilities arising out of or relating to:

(a)     Seller's and the Owner's ownership and use of the Purchased Assets and the operations of Seller prior to the Effective Time, including, without limitation, any liabilities of any director or officer of Seller arising from or related to actions prior to the Effective Time;

(b)     Seller's employment of any past, current or future employee or independent contractor, including, without limitation, payroll taxes, social security taxes, any liabilities associated with any claims for wages or other bonuses, benefits (including, without limitation, liabilities for workers' compensation, unemployment compensation, or other employment-based claims and liabilities on account of maintenance and termination of any employee benefit plan), paid leave, severance payments due pursuant to contract or Legal Requirements, termination, Taxes or any other compensation or taxes associated with misclassification of independent contractors or employees, or other payments;

(c)     any debts, obligations or liabilities of Seller under any pension, profit sharing, savings, retirement, health, medical, life, disability, dental, deferred compensation, stock option, bonus, incentive, severance pay, group insurance or other similar employee plans or arrangements, or under any policies, handbooks, custom or practice of Seller, or any employment agreements between Seller and any Seller Employee, whether express or

implied, applicable to any Seller Employee at any time through and including the Closing Date;

(d)     the Excluded Assets;

(e)     Seller's obligations under this Agreement;

(f)     the Owner's obligations under this Agreement;

(g)     the Purchased Contracts to the extent (i) arising in the first instance prior to the Effective Time, or (ii) arising after the Effective Time but relating to a breach of a Purchased Contract by Seller or the Owner prior to the Effective Time;

(h)     accounts payable to any suppliers, vendors and customers of Seller to the extent not expressly accounted for in the calculation of Closing Working Capital;

(i)     any services or other work product produced, sold or delivered by Seller or the Owner to customers prior to the Effective Time;

(j)     all liabilities in respect of services performed by Seller or the Owner prior to the Effective Time;

(k)     all environmental costs and liabilities, to the extent arising out of or otherwise related to (i) the ownership or operation by Seller of (A) the Leased Real Property (or any condition thereon) on or prior to the Effective Time (including (i) the release or continuing release of any Hazardous Material, regardless of by whom, or (ii) any noncompliance with Environmental Laws), (B) the Business on or prior to the Effective Time, or (C) the Excluded Assets or any other real property formerly owned, operated, leased or otherwise used by Seller or (ii) from the offsite transportation, storage, disposal, treatment or recycling of Hazardous Material generated by and taken offsite by or on behalf of Seller prior to and through the Closing Date;

(l)     (A) Taxes imposed with respect to the Business, the Purchased Assets, or the operations or activities of Seller or the Owner for any Pre-Closing Tax Period, determined in accordance with Section 5.03(a), (B) Seller's and the Owner's portion of Transfer Taxes, determined in accordance with Section 5.04, (C) Taxes of Seller or the Owner for any period, (D) Taxes resulting from any loans, deferrals or programs under any COVID Relief Acts, as in effect from time to time, (E) Taxes resulting from the payments made to Seller pursuant to this Agreement or any payments made to the Owner in connection with the transactions contemplated by this Agreement, (F) Taxes resulting from any acquisition of any personal goodwill, and (G) Taxes of any Person imposed upon Buyer as a transferee or successor, by contract or pursuant to any Legal Requirements, which Taxes relate to an event or transaction occurring on or before the Closing Date (such Taxes, collectively, the "**Pre-Closing Taxes**");

(m)     all liabilities and obligations in respect of any pending or threatened Action, or any claim arising out of, relating to or otherwise in respect of (i) the operations of Seller to the extent such Action or claim relates to such operations on or prior to the Closing Date,

(ii) any Excluded Asset, or (iii) any employee of Seller with respect to their employment by Seller;

(n)    Seller 's non-compliance with any applicable Legal Requirement; and

(o)    any breach of warranty or similar claim relating to services provided by Seller prior to the Effective Time.

**Section 1.05   Purchase Price; Contingent Consideration**.

(a)    Purchase Price.  In consideration for the Purchased Assets, Buyer shall pay to the Owner, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule 1.05(a), an aggregate purchase price of up to Nine Million Dollars ($9,000,000), subject to the earnouts, conditions, and adjustments as provided in this Agreement (the aggregate amount actually paid by Buyer shall be referred to herein as the "**Purchase Price**"), as follows:

(i)    on the Closing Date, the amount of Five Million Five Hundred Thousand Dollars ($5,500,000), less (A) the Working Capital Escrow Amount (as hereinafter defined) and (B) the Indemnity Escrow Amount (as hereinafter defined) (the "**Closing Payment**"); and

(ii)    following the close of the 2023 fiscal year of the Business ("**Fiscal 2023**"), after the Fiscal 2023 Audit, if Adjusted EBITDA for Fiscal 2023 (calculated in the same manner as fiscal year 2022 Adjusted EBITDA and as further described in Exhibit A, as verified by the Fiscal 2023 Audit) (A) exceeds Two Million Dollars ($2,000,000) but is less than Two Million Three Hundred Thousand Dollars ($2,300,000), Two Million Five Hundred Thousand Dollars ($2,500,000) or (B) exceeds Two Million Three Hundred Thousand Dollars ($2,300,000), Three Million Five Hundred Thousand Dollars ($3,500,000) (such amount actually paid pursuant to this Section 1.05(a)(ii), if any, being referred to herein as the "**Contingent Consideration**").

(b)    Contingent Consideration.

(i)    Upon the conclusion of its Fiscal 2023 Audit of the Business, but no later than April 30, 2024, Buyer shall prepare and deliver to the Seller (and its counsel pursuant to Section 7.02) a written statement (a "**Contingent Consideration Calculation Statement**") setting forth in reasonable detail its determination of Adjusted EBITDA of the Business for Fiscal 2023 and its calculation, accompanied by reasonable documentation, of the resulting Contingent Consideration (the "**Contingent Consideration Calculation**"), together with any applicable financial statements and notes thereto. Seller will have thirty (30) days after receipt of the Contingent Consideration Calculation Statement (the "**Contingent Consideration Review Period**") to review the Contingent Consideration Calculation Statement and the Contingent Consideration Calculation set forth therein.  During the Contingent Consideration Review Period, the Seller and its Representatives shall have the right to inspect Buyer's books and records

during normal business hours at Buyer's offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of Adjusted EBITDA of the Business for Fiscal 2023 and the resulting Contingent Consideration.  Prior to the expiration of the respective Contingent Consideration Review Period, the Seller may object to the Contingent Consideration Calculation Statement by delivering a written notice of objection (a "**Contingent Consideration Objection Notice**") to Buyer.  The Contingent Consideration Objection Notice shall specify the items in the Contingent Consideration Calculation disputed by Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute.  If the Seller fails to deliver a Contingent Consideration Objection Notice to Buyer prior to the expiration of a Contingent Consideration Review Period or provide written notice of acceptance of the Contingent Consideration Calculation set forth in the Contingent Consideration Calculation Statement, then the Contingent Consideration Calculation set forth in the Contingent Consideration Calculation Statement shall be final and binding on the parties.  If the Seller timely delivers a Contingent Consideration Objection Notice, Buyer and Seller shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of Adjusted EBITDA of the Business and Contingent Consideration.  If Buyer and Seller are unable to reach agreement within thirty (30) days after such a Contingent Consideration Objection Notice has been given, all unresolved disputed items shall be promptly referred to the Arbiter for resolution in accordance with the dispute mechanics set forth in <u>Section 1.06(d)</u>.  Upon the final determination of the Contingent Consideration, if any, pursuant to the terms of this <u>Section 1.05(b)(i)</u> and <u>Exhibit A</u>, Buyer shall have five (5) Business Days to pay to Seller any such amount of the Contingent Consideration, subject to any right of offset by Buyer.

(ii)    During Fiscal 2023, the Buyer shall operate the Business in a commercially reasonable manner and shall not take any actions with the primary intent of avoiding the achievement of the Contingent Consideration.

(iii)    From the Closing Date until the end of Fiscal 2023, the Buyer shall provide monthly, unaudited statements of EBITDA of the Business within thirty (30) days of the conclusion of each month for the month then ended, prepared in conformity with Accounting Principles.

(c)    <u>Estimated Closing Indebtedness</u>.  On behalf of Seller, and at the direction of Seller, Buyer shall deliver payment to the appropriate parties in respect of the Estimated Closing Indebtedness of Seller as of the Closing (excluding any Assumed Capital Leases), if any, pursuant to payoff letters or invoices delivered by such parties to Buyer and Seller or otherwise, in form and substance reasonably satisfactory to Buyer and Seller.

(d)    <u>Estimated Closing Transaction Expenses</u>.  On behalf of Seller, and at the direction of Seller, Buyer shall deliver payment by wire transfer or delivery of other immediately available funds to the accounts designated by Seller or the applicable payees to the appropriate parties in respect of the Estimated Closing Transaction Expenses, pursuant to payoff letters or invoices (or similar documentation) delivered by Seller or such parties to Buyer and Seller, in form and substance reasonably satisfactory to Buyer and

Seller, to satisfy in full any monies owed by Seller in connection with the transactions contemplated in this Agreement.  Amounts paid on behalf of Seller in accordance with this Section 1.05(d) shall be deemed made immediately prior to Closing by Seller for all purposes of this Agreement.

(e)     Offset.  Buyer's payment of the amount of the Contingent Consideration is subject to Buyer's right of offset pursuant to Section 6.05 and Section 1.06(f); provided, however, that the Contingent Consideration shall not in any respect constitute a cap or limit on the indemnity obligations of Seller pursuant to Article VI.

**Section 1.06   Working Capital Adjustment**.

(a)     Closing Adjustment.

(i)     Attached as Schedule 1.06(a)(i) hereto is a statement (the "**Estimated Closing Statement**") setting forth an estimated consolidated balance sheet of the Business as of the Effective Time, prepared in according with the Accounting Principles, and Seller's good-faith estimate of each of the following:

(A)     the Closing Transaction Expenses (the "**Estimated Closing Transaction Expenses**");

(B)     the Closing Indebtedness (the "**Estimated Closing Indebtedness**");

(C)     the Closing Cash on Hand (the "**Estimated Closing Cash on Hand**"); and

(D)     the Closing Working Capital (the "**Estimated Closing Working Capital**").

(ii)     Upon the terms and subject to the conditions set forth in this Agreement, the Closing Payment paid by Buyer to Seller on the Closing Date shall be (a) increased by the amount, if any, by which the Estimated Closing Working Capital exceeds the Target Closing Working Capital, (b) decreased by the amount, if any, by which the Target Closing Working Capital exceeds the Estimated Closing Working Capital, (c) decreased by the Estimated Closing Indebtedness, (d) decreased by the Estimated Closing Transaction Expenses, and (e) increased by the Estimated Closing Cash on Hand.

(iii)     In no event will any amount included in the calculation of: (x) Estimated Closing Transaction Expenses, Estimated Closing Indebtedness, Estimated Closing Cash on Hand or Estimated Closing Working Capital, on the one hand, or (y) Closing Transaction Expenses, Closing Indebtedness, Closing Cash on Hand or Closing Working Capital, on the other, be included in any such other calculations within such subsections (x) and (y) to the extent doing so would result in double counting.

8

(b)     Preparation of Closing Statement.  Within one-hundred twenty (120) days after the Closing Date, Buyer shall prepare, or cause to be prepared, and deliver to Seller a written statement (the "**Closing Statement**") that shall include a consolidated balance sheet of the Business as of the Effective Time prepared in accordance with the Accounting Principles and a good-faith calculation of the following and a statement of the Net Adjustment Amount:

(i)     the Closing Transaction Expenses;

(ii)     the Closing Indebtedness;

(iii)     the Closing Cash on Hand; and

(iv)     the Closing Working Capital.

(c)     Acceptance of Statement; Dispute Procedures.

(i)     During the thirty (30) day period following Buyer's delivery of the Closing Statement to Seller (the "**Review Period**"), Buyer shall provide Seller reasonable access to the relevant books and records and employees of Buyer for the purpose of facilitating Seller' review of the Closing Statement.  The Closing Statement shall become final and binding at the end of the last day of the Review Period, unless prior to the end of the Review Period, the Seller delivers to Buyer a written notice of disagreement (a "**Notice of Disagreement**") specifying the nature and amount of any and all items in dispute as to the amounts set forth in the Closing Statement.  Seller shall be deemed to have agreed with all items and amounts in the Closing Statement not specifically referenced in a Notice of Disagreement provided prior to the end of the Review Period.

(ii)     During the thirty (30) day period following delivery of a Notice of Disagreement by Seller to Buyer (the "**Resolution Period**"), such parties in good faith shall seek to resolve in writing any differences that they may have with respect to the computation of the amounts as specified therein.  Any disputed items resolved in writing between Seller and Buyer within the Resolution Period shall be final and binding on the parties for all purposes hereunder (absent fraud).  If Seller and Buyer have not resolved all such differences by the end of the Resolution Period, Seller and Buyer shall submit, in writing, such differences to the Arbiter. The "**Arbiter**" shall be Grant Thornton LLP, who is an expert in accounting for businesses that are similar to the Business and not an arbitrator, or, in the event not available or not a Neutral Accounting Firm, a Neutral Accounting Firm selected by mutual agreement of Buyer and Seller; provided, however, that: (i) if, within fifteen (15) days after the end of the Resolution Period, such parties are unable to agree on a Neutral Accounting Firm to act as the Arbiter, then each party shall select a Neutral Accounting Firm and such firms together shall select the Neutral Accounting Firm to act as the Arbiter, and (ii) if any party does not select a Neutral Accounting Firm within ten (10) days of written demand therefor by the other party, then the Neutral Accounting Firm selected by the other party shall act as the Arbiter.

9

A "**Neutral Accounting Firm**" means an independent accounting firm of nationally recognized standing that is not at the time it is to be engaged hereunder rendering services to any party, or any Affiliate of any party, and has not done so within the three (3) year-period prior thereto.

(iii)     The parties shall arrange for the Arbiter to agree in its engagement letter to act in accordance with this Section 1.06(c)(iii). Each party shall present a brief to the Arbiter (which brief shall also be concurrently provided to the other party) within thirty (30) days of the appointment of the Arbiter detailing such party's views as to the correct nature and amount of each item remaining in dispute from the Notice of Disagreement (and for the avoidance of doubt, no party may introduce a dispute to the Arbiter that was not originally set forth on the Notice of Disagreement). Within thirty (30) days of receipt of the brief, the receiving party may present a responsive brief to the Arbiter (which responsive brief shall also be concurrently provided to the other party). Each party may make an oral presentation to the Arbiter (in which case, such presenting party shall notify the other party of such presentation, and the other party shall have the right to be present (and speak) at such presentation), within forty-five (45) days of the appointment of the Arbiter. The Arbiter shall have the opportunity to present written questions to either party, a copy of which shall be provided to the other party. The Arbiter shall consider only those items and amounts in Seller's and Buyer's respective calculations that are identified as being items and amounts to which Seller and Buyer have been unable to agree. In resolving any disputed item, the Arbiter may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. In resolving any disputed item, the Arbiter shall look solely to the definitions set forth in this Agreement, including the definitions of Closing Working Capital, Cash on Hand, Transaction Expenses and Indebtedness. The Arbiter shall make a written determination within sixty (60) days of its appointment as to each such disputed item, which determination shall be final and binding on the parties for all purposes hereunder absent manifest error. The fees and expenses of the Arbiter and of any enforcement of the determination thereof, shall be borne by Seller, on the one hand, and Buyer, on the other hand, in inverse proportion as they may prevail on the matters resolved by the Arbiter, which proportionate allocation shall be calculated on an aggregate basis based on the relative dollar values of the amounts in dispute and shall be determined by the Arbiter at the time the determination of such firm is rendered on the merits of the matters submitted.

(d)     Adjustment and Payment. The "**Net Adjustment Amount**" shall equal zero (0):

(i)     minus, the amount, if any, by which the Closing Transaction Expenses exceed the Estimated Closing Transaction Expenses;

(ii)     plus, the amount, if any, by which the Estimated Closing Transaction Expenses exceed the Closing Transaction Expenses;

(iii)    minus, the amount, if any, by which the Closing Indebtedness exceeds the Estimated Closing Indebtedness;

(iv)    plus, the amount, if any, by which the Estimated Closing Indebtedness exceeds the Closing Indebtedness;

(v)    minus, the amount, if any, by which the Estimated Closing Cash on Hand exceeds the Closing Cash on Hand;

(vi)    plus, the amount, if any, by which the Closing Cash on Hand exceeds the Estimated Closing Cash on Hand;

(vii)    minus, the amount, if any, by which the Estimated Closing Working Capital exceeds the Closing Working Capital; and

(viii)    plus, the amount, if any, by which the Closing Working Capital exceeds the Estimated Closing Working Capital.

(e)    Once a final determination of the Net Adjustment amount occurs, then Seller and Buyer shall promptly, but in no event less than three (3) Business Days of final determination of the Net Adjustment Amount, provide joint written instructions to the Escrow Agent pursuant to the provisions of this Section 1.06(e), and if required pursuant to the provisions of this Section 1.06(e), Seller or Buyer, as appropriate, shall pay the remainder of the Net Adjustment Amount to the other party, by wire transfer of immediately available funds within five (5) Business Days of final determination of the Net Adjustment Amount to such account or accounts as may be designated in writing by the party entitled to such payment at least one (1) Business Day prior to such payment date. If the Net Adjustment Amount is positive, Buyer shall pay the Net Adjustment Amount to Seller, and Seller and Buyer shall provide joint written instructions to the Escrow Agent to deliver to Seller 100% of the Working Capital Escrow Amount (including any accrued interest thereon).  If the Net Adjustment Amount is negative but less than the Working Capital Escrow Amount (in absolute values), then Seller and Buyer shall provide joint written instructions to the Escrow Agent to deliver such Net Adjustment Amount to Buyer and the remaining Working Capital Escrow Amount to Seller (and any interest thereon shall be split pro rata by Buyer and Seller).  If the Net Adjustment Amount is negative and such negative amount equals or exceeds the Working Capital Escrow Amount (in absolute values), then Seller and Buyer shall provide joint written instructions to the Escrow Agent to deliver to Buyer 100% of the Working Capital Escrow Amount (including any accrued interest thereon), and, at Buyer's election, (i) Seller shall pay the remainder of the Net Adjustment Amount to Buyer, or (ii) Buyer, at its sole discretion, may offset such amount from the Contingent Consideration.

(f)    Any payments made pursuant to this Section 1.06 shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Legal Requirements.

(g)    Except as otherwise expressly provided herein, the dispute resolution provisions of this Section 1.06 will not apply to, and the scope of the Arbiter's authority

herein will not extend to, any dispute of the parties relating to the interpretation, breach or enforcement of any other provision of this Agreement.

(h)    The rights or remedies of either party against the other party in respect of a breach of any representations or warranties contained in this Agreement shall not be prejudiced by any adjustment made pursuant to this Section 1.06; provided, however, in no event shall Buyer or Seller be entitled to any duplicative recovery as a result of the rights and remedies afforded herein.

**Section 1.07    Cooperation**.    Buyer and Seller will, and will use their respective commercially reasonable efforts to cause their respective accountants to, cooperate and assist as requested in the preparation of the Closing Statement and the calculation of the Closing Working Capital by the other party and the Arbiter, including the making available to the extent necessary of books, records, work papers, and personnel.

**Section 1.08    Tax Treatment of Contingent Consideration**.

(a)    Any Purchase Price that is Contingent Consideration is and shall for all purposes be treated by the parties as contingent payment for the Purchased Assets and Assumed Liabilities for U.S. federal income and other applicable income Tax purposes. All payments of Purchase Price other than the Closing Payment shall, unless elected by Seller in its sole and absolute discretion, be treated as installment obligations for the purposes of Section 453 of the Code, unless otherwise required pursuant to applicable Legal Requirements.

(b)    The parties agree to file all Tax Returns for the transactions contemplated hereby consistent with the manner described in this Section 1.08, and no party shall take any action or Tax filing position inconsistent with such income Tax characterization, unless in each case otherwise required pursuant to applicable Legal Requirements.

**Section 1.09    Allocation of Purchase Price**.    Buyer, Seller and the Owner agree to allocate the Purchase Price and other taxable consideration paid by Buyer among the Purchased Assets for all purposes (including Tax and financial accounting) in accordance with Code Section 1060 and the schedule attached hereto as Exhibit B (the "**Allocation Schedule**").    Buyer, Seller and the Owner each agree to file all Tax Returns (including IRS Form 8594) with its Federal income or information return for its taxable year that includes the Closing Date on a basis consistent with the Allocation Schedule.    In addition, Buyer, Seller, and the Owner each agree to prepare and file a mutually agreed upon supplemental Form 8594, on a basis consistent with the Allocation Schedule, with its Federal income or information return for any of its taxable years during which Contingent Consideration is paid to Seller, or a Purchase Price adjustment is made pursuant to the provisions of this Agreement.    Buyer, Seller and the Owner shall file all Tax Returns in a manner consistent with any such agreed-upon allocation of the Purchase Price, and neither Buyer, Seller nor the Owner shall take, and shall cause their respective Affiliates not to take, any position inconsistent with such allocation in the course of any audit by any Tax Authority or Tax Controversy, unless in each case otherwise required pursuant to applicable Legal Requirements. In the event that Buyer and Seller are unable to reach an agreement on the allocation to be included on any Form 8594, the disputed allocation shall be submitted to the Arbiter (or

Neutral Accounting Firm) for resolution in a manner consistent with to the principles set forth in Section 1.06(c), adapted to a purchase price allocation dispute.

Section 1.10   Withholding Tax.  Buyer, the Escrow Agent and any agent or Affiliate thereof shall be entitled to deduct and withhold from the amounts payable pursuant to this Agreement all Taxes that such persons are required to deduct and withhold under any applicable Legal Requirements.  To the extent that amounts are so deducted, withheld, and timely remitted to the appropriate Tax Authority, such withheld amounts shall be treated as delivered to Seller hereunder.

## ARTICLE II
## CLOSING

Section 2.01   Closing.  The consummation of the transactions contemplated hereby (the "**Closing**") is to take place remotely by means of facsimile, electronic mail or other electronic transmission effective as of the Effective Time.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

Section 2.02   Closing Deliverables.

(a)      Prior to or at the Closing, Seller and the Owner shall deliver to Buyer the following unless otherwise waived by Buyer in writing:

(i)      one or more bills of sale in form and substance reasonably satisfactory to Buyer (each, a "**Bill of Sale**") and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)      an assignment and assumption agreement in form and substance reasonably satisfactory to Buyer, duly executed by Seller effecting the assignment to and assumption by Buyer of the Purchased Assets (including the Purchased Contracts) (the "**General Assignment Agreement**");

(iii)      an assignment of Seller's right, title and interest in and to Seller Intellectual Property to Buyer, in a form reasonably acceptable to Buyer (the "**IP Assignment Agreement**"), and duly executed by Seller;

(iv)      a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller (the "**Seller Certificate**") certifying as to (A) the resolutions of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement, the Ancillary Transaction Documents and the transactions contemplated hereby and thereby and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder;

(v)      the Escrow Agreement, duly executed by Seller;

(vi)     the consents, waivers, approvals, authorizations, notices or filings set forth on Schedule 2.02(a)(vi) attached hereto;

(vii)    a commercial lease agreement between Buyer and K & K Leasing, LLC ("K & K Leasing") with regard to the premises at 22 N. Sheep Lane, Nephi, UT 84648 (the "Nephi Premises"), in form reasonably acceptable to Buyer and Seller (the "Commercial Lease Agreement"), and duly executed by K & K Leasing;

(viii)   a lease termination agreement with regard to the Nephi Premises terminating the existing lease between Seller and K &K Leasing, in form reasonably acceptable to Buyer, duly executed by Seller and K &K Leasing

(ix)     payoff letters and appropriate termination statements under the Uniform Commercial Code and other instruments as may be reasonably requested by Buyer evidencing extinguishment of all Indebtedness of Seller related to the Business and all Encumbrances in the Purchased Assets related thereto to the extent directed by Buyer or its lenders;

(x)      an IRS Form W-9 properly completed and executed by Seller and the Owner;

(xi)     the Disclosure Schedules;

(xii)    an employment agreement, including a restrictive covenant agreement, in form and substance reasonably satisfactory to the Owner and Buyer, duly executed by the Owner (the "**Garrett Employment Agreement**"); and

(xiii)   such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)      Prior to or at the Closing, Buyer shall deliver to Seller the following:

(i)      the Closing Payment;

(ii)     a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer (the "**Buyer Certificate**") certifying as to (A) the resolutions of the sole member of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder;

(iii)    the Escrow Agreement, duly executed by Buyer and Escrow Agent;

(iv)　　the Garrett Employment Agreement, duly executed by Buyer or its Affiliate;

(v)　　the Commercial Lease Agreement, duly executed by Buyer; and

(vi)　　such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

**Section 2.03   Escrow**.   At the Closing, Buyer shall transmit (i) One Hundred Fifty Thousand dollars ($150,000) (the **"Working Capital Escrow Amount"**), to satisfy any post-closing adjustment obligations of the Sellers pursuant to <u>Section 1.06</u> and (ii) Nine Hundred Seventy Five Thousand Dollars ($975,000) (the "**Indemnity Escrow Amount**"), to be deposited in an account designated by the Escrow Agent (the "**Indemnification Escrow Account**") to satisfy any post-closing indemnification obligations of Seller and the Owner pursuant to <u>Article VI</u>, by wire transfer of immediately available funds, to CIBC Bank USA f/k/a The PrivateBank and Trust Company (the "**Escrow Agent**"), to be held by the Escrow Agent pursuant to the terms and conditions of an escrow agreement substantially in the form attached hereto as <u>Exhibit C</u> (the "**Escrow Agreement**"). The Indemnification Escrow Account shall be a non-interest-bearing account.   The Parties agree that Buyer shall have the right to offset any amounts owed to it by Seller under this Agreement that have not been paid from any amounts released by the Escrow Agent to Seller.   All fees and costs associated with the Escrow Agreement and the Escrow Agent shall be paid fifty percent (50%) by Buyer and fifty percent (50%) by Seller.   To the extent there is any conflict between this Agreement and the Escrow Agreement in respect of the mechanics for distribution of the Working Capital Escrow Amount or the Indemnity Escrow Amount, the terms of the Escrow Agreement will control.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER AND THE OWNER**

Seller and the Owner, jointly and severally, represent and warrant to Buyer that the statements contained in this <u>Article III</u> are true and correct as of the date hereof.   For purposes of this <u>Article III</u>, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean (i) the actual knowledge of the Owner or the constructive knowledge that the Owner would be expected to have after reasonable inquiry, (ii) the knowledge of Lee Roberts and (iii) solely with respect to <u>Sections 3.07</u>, <u>3.10</u>, <u>3.12</u> and <u>3.27</u>, the knowledge of Scott Jackson.

**Section 3.01   Organization and Authority of Seller; Enforceability**.   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Utah, and the Owner is an individual resident of the State of Utah.   Seller has all requisite power and authority to own, operate, lease and otherwise hold its assets and to carry on the Business as it is now being conducted.   Seller is duly licensed or qualified to do business and is in good standing in each other jurisdiction in which it owns, operates, leases or otherwise holds assets or conducts business, so as to require such qualification in which the failure to so qualify would have a Material Adverse Effect.   <u>Schedule 3.01</u> of the Disclosure Schedule sets forth a correct and complete list of (a) each jurisdiction in which Seller is qualified or authorized to do business and (b) the directors, shareholders and officers, as applicable, of Seller.   Seller has full corporate power and authority to

15

enter into this Agreement and the Ancillary Transaction Documents, to carry out its obligations hereunder and to consummate the transactions contemplated thereby. The execution, delivery and performance by Seller of this Agreement and the Ancillary Transaction Documents and the consummation of the transactions contemplated thereby have been duly authorized by all requisite corporate action on the part of Seller (including, without limitation, approval of the Owner).  This Agreement and the Ancillary Transaction Documents have been duly executed and delivered by Seller and the Owner, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the Ancillary Transaction Documents constitute legal, valid and binding obligations of Seller and the Owner, enforceable against Seller and the Owner in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or applicable Legal Requirements affecting the enforcement of creditors' rights generally and by general equitable principles. Other than as set forth in Schedule 3.01 of the Disclosure Schedule, Seller (i) does not have, nor has Seller ever had, any Subsidiaries; (ii) does not own any equity securities or other ownership interest of any other Person; (iii) does not have any investments in, or hold any interest, directly or indirectly, in any Person; and (iv) has no obligation or requirement, directly or indirectly, to provide capital contributions to, or invest in, any Person.  The Owner is the sole record and beneficial owner, owning one hundred percent (100%) of all of the outstanding equity interests of Seller.  Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

  **Section 3.02   No Conflicts; Consents**.  The execution, delivery and performance by Seller and the Owner of this Agreement and the Ancillary Transaction Documents, and the consummation of the transactions contemplated thereby, do not and will not: (a) violate or conflict with the articles of incorporation, bylaws, operating agreement, or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller, the Owner or any Purchased Asset; (c) except to the extent set forth in Schedule 3.02 of the Disclosure Schedule, conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller or the Owner is a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. Except to the extent set forth in Schedule 3.02 of the Disclosure Schedule, no consent, approval, waiver, authorization, or notice is required to be obtained or given by Seller or the Owner from or to any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Seller or the Owner of this Agreement or the Ancillary Transaction Documents and the consummation of the transactions contemplated hereby or thereby.

  **Section 3.03   Purchased Assets**.  Seller owns and has good and valid title to, or a valid leasehold interest in, each of the Purchased Assets free and clear of any Encumbrances.  The tangible Purchased Assets are free from defects and are in good operating condition and repair (normal wear and tear excepted), have been regularly and properly serviced and maintained in a manner that would not void or limit the coverage of any warranty thereon and are adequate and fit to be used for the purposes for which they are currently used in the manner they are currently used. The Purchased Assets constitute all of the assets, properties and rights used in or held for use in the Business and are sufficient for Buyer to conduct the Business as of the Closing Date without interruption and in the ordinary course of business as it has been conducted by Seller.  Upon the Closing, no other Person, including without limitation, the Owner and their Affiliates, will have

any rights, title or interest in any assets, properties or rights used or held for use in the Business. None of the Purchased Assets are located or used outside of the United States of America.

**Section 3.04   Fixed Assets; Tangible Personal Property**.  Seller owns and has good and valid title to or a valid leasehold interest in the Fixed Assets and the Tangible Personal Property. The Bills of Sale conveying the Fixed Assets and Tangible Personal Property have been validly executed by Seller.  The Fixed Assets and Tangible Personal Property are in good operating condition and repair, ordinary wear and tear excepted, are adequate and suitable for their current and contemplated uses and for the continued operation of the Business consistent with past practice in the ordinary course of business and have been maintained and repaired in accordance with normal industry practice.  Except to the extent set forth on Schedule 3.04 of the Disclosure Schedule, none of the Fixed Assets are currently in need of any maintenance or repairs, except for ordinary, routine maintenance and repairs that are not material in nature or cost.  The Fixed Assets and the Tangible Personal Property constitute all of the material tangible assets used by or necessary for Seller to conduct the Business as of the Closing.

**Section 3.05   Intellectual Property**.

(a)     Schedule 3.05(a)(i) of the Disclosure Schedule sets forth a complete list and brief description of all Intellectual Property (including registrations and applications) owned by Seller, including without limitation any logos, domain names and website assets (the "**Seller Intellectual Property**").  Schedule 3.05(a)(ii) of the Disclosure Schedule sets forth a complete list of all Intellectual Property licensed or sublicensed by Seller from a third party or otherwise used in the Business pursuant to an agreement between Seller and a third party, other than off-the-shelf software licenses licensed on standard commercial terms with an annual replacement value of less than $10,000 (the "**Licensed Intellectual Property**").  Seller has delivered or made available to Buyer true and complete copies of licenses and agreements relating to the Licensed Intellectual Property.

(b)     Neither the execution of this Agreement nor the consummation of the transactions contemplated herein would reasonably be expected to result in (i) the loss or impairment of the right of Seller to own, license or use any of the Seller Intellectual Property or Licensed Intellectual Property, or (ii) the requirement to pay any additional consideration for the right to own, license or use any of the Seller Intellectual Property or Licensed Intellectual Property.  Seller is not in breach of or in default (whether with or without the giving of notice, passage of time or both) with respect to any Licensed Intellectual Property, and no counterparty to any license or agreement with respect to the Licensed Intellectual Property is in breach or default (whether with or without the giving of notice, passage of time or both).

(c)     Seller exclusively owns all right, title and interest in and to, or has a valid and enforceable leasehold interest in, the Seller Intellectual Property and the Licensed Intellectual Property, free and clear of all Encumbrances, and all registered Seller Intellectual Property is valid, subsisting and in full force and effect, and has not been cancelled, expired or abandoned.

(d)     The Seller Intellectual Property and the Licensed Intellectual Property constitute all of the Intellectual Property necessary and sufficient to conduct the Business as it had been conducted by Seller in the ordinary course of business consistent with past practice.

(e)     No Person is infringing, misappropriating, diluting or otherwise violating any of Seller's rights in the Seller Intellectual Property, and, during the past four (4) years, Seller has not made or asserted any claim, demand or notice against any Person alleging any such infringement, misappropriation, dilution or other violation of Seller's rights in the Seller Intellectual Property.

(f)     Seller's prior and current use of the Purchased Assets and the operation of the Business, including the use, reproduction, modification, distribution, licensing, sublicensing, sale, offering for sale or other exploitation of any of Seller's products or services, have not, and do not infringe, violate, dilute or misappropriate the Intellectual Property of any Person.

(g)     There are no claims pending or, to Seller's knowledge, threatened by any Person (i) challenging the validity, effectiveness or ownership by Seller of the Seller Intellectual Property, or (ii) alleging that Seller's prior and current use of the Purchased Assets or the operation of the Business infringe, or will infringe on, any third-party Intellectual Property, nor to Seller's knowledge, are there any valid grounds for any bona fide claim of any such kind.

(h)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby would reasonably be expected to result in (i) the loss or impairment of right of Seller to own, license or use any of Seller Intellectual Property or Licensed Intellectual Property, or (ii) the requirement to pay any additional consideration for the right to own, license or use any of Seller Intellectual Property or Licensed Intellectual Property.

(i)     Except as set forth on Schedule 3.05(i) of the Disclosure Schedule, Seller has secured from all current and former employees, consultants, contractors and other persons and entities who have created any portion of, or otherwise have any rights in or to, any Seller Intellectual Property, valid and enforceable written assignments to Seller of all such persons' and entities' contribution and rights therein. No Seller Intellectual Property is jointly owned by a third party.  Seller has taken commercially reasonable steps to protect its rights in the trade secrets and Confidential Information of the Business.  Seller has obtained legally binding, written agreements from all employees and third parties with whom Seller has shared trade secrets, Confidential Information or other proprietary information, that require such employees and third parties to keep such information confidential.

**Section 3.06   Inventory**.  As it relates to the Business, the value at which the Inventory is carried on the Financial Statements reflects an inventory valuation policy that is consistent with industry practice and the Accounting Principles consistently applied in accordance with past practices.

**Section 3.07   Financial Statements**.

(a)      Seller has delivered to Buyer true, correct and complete copies of (i) the internally prepared balance sheet of Seller as of December 31 for each of the years 2022, 2021 and 2020, together with the related internally prepared statements of income for such periods (collectively, the "**Annual Statements**"); and (ii) monthly balance sheets and interim statements of income of Seller for the one-month period ended January 31, 2023 (the "**Interim Statements**").   The Interim Statements and the Annual Statements are referred to as the "**Financial Statements**."  The Financial Statements have been prepared using modified cash accounting, with such departures from GAAP set forth on Schedule 3.07(a), and fairly present the financial condition and the results of operations of the Business relating to the Purchased Assets and Seller, as at the respective dates of, and for the periods referred to in, such Financial Statements, and have been reviewed by the Owner.

(b)      The Financial Statements were derived from the books and records of Seller, which are accurate and complete in all material respects and have been prepared in accordance with good business practice and applicable Legal Requirements.   Seller maintains a system of internal accounting controls sufficient to provide reasonable assurances that all transactions (i) are executed in accordance with management's general or specific authorization; and (ii) are recorded as necessary to permit the preparation of financial statements on a consistent basis and to maintain accountability for the Purchased Assets.

(c)      There are no significant deficiencies or weaknesses in the design or operation of Seller's internal controls that adversely affect the ability of Seller to record, process, summarize and report financial information. There has been no, and there does not currently exist, any fraud, nor the existence of or allegation of financial improprieties that involves the management of Seller.

(d)      Since December 31, 2022 (the "**Financial Position Date**"), Seller has conducted the Business in the ordinary course consistent with past practices and there has not been any adverse change in the liabilities or financial condition of the Business or Seller, nor has there been any event, change, effect or circumstance, individually or in the aggregate that is reasonably expected to result in a Material Adverse Effect.  Since the Financial Position Date, Seller has not incurred any material liabilities other than in the ordinary course of business.

(e)      Seller does not have any liabilities as of the date hereof that would be required to be reflected on a balance sheet of Seller that is prepared in accordance with GAAP other than those (i) specifically reflected on and fully reserved against in the Financial Statements, (ii) incurred in the ordinary course of business since the date of the Interim Statements (none of which is a liability for breach of any Purchased Contract, violation of applicable Legal Requirements or Action), (iii) relating to the performance under contracts that have not yet been fully performed and under which Seller is not in breach or default and (iv) Transaction Expenses of Seller to be paid off at the Closing.

(f)    Schedule 1.01(m) sets forth a true, correct and complete list of Assumed Capital Leases (including amounts outstanding under such respective Assumed Capital Leases).

**Section 3.08   Taxes**. Seller has timely filed or has caused to be timely filed all Tax Returns that were required to be filed by it (taking into account permissible extensions) and has timely paid all Taxes due and payable (whether or not shown on such Tax Returns).  At the time of filing, all such Tax Returns were complete and correct in all material respects.  Seller has not received any written notice from any Tax Authority indicating any pending or proposed audit, Action, claim or examination with respect to Taxes of Seller relating to the Purchased Assets or the Business, and no audit, Action, claim, deficiency or assessment is pending or threatened in writing.  Seller (a) has not agreed to, or been requested to agree to, any extension or waiver of the statute of limitations applicable to any of its Tax Returns or any Tax assessment or deficiency, and (b) is not a party to and has no liability or obligation under any Tax allocation, Tax sharing or Tax indemnification agreement, other than an agreement entered into in the ordinary course of business the primary subject matter of which is not Tax.  There are no Encumbrances for Taxes (other than for Taxes not yet due and payable) on any of the Purchased Assets.  Taxes imposed on (and payable by) Seller and all Taxes required to be withheld by Seller have been or will be duly, timely and fully reported and paid to the extent failure to do so would result in an Encumbrance on any of the Purchased Assets as of the Closing Date.  Buyer will not have any successor or transferee liability for Taxes, or liability for Taxes of Seller or the Owner or any other Person, as a result of the purchase of the Purchased Assets or the Business pursuant to this Agreement.  Buyer will not have any liability for Taxes after the Closing Date as a result of Seller or the Owner taking advantage of any loans, deferrals or programs under the COVID Relief Acts or any similar acts.

**Section 3.09   Material Contracts**.

(a)    Schedule 3.09(a) of the Disclosure Schedule sets forth each contract, including any amendment, supplement or modification (whether oral or written) in respect thereto, that relates to (each such contract a "**Material Contract**"):

    (i)    Indebtedness (or any similar obligation such as a letter of credit or finance lease) relating to the Business or the Purchased Assets, or any guaranty of any obligation for borrowings or performance relating to the Business or the Purchased Assets;

    (ii)    mortgages, pledges or security agreements or similar arrangements constituting an Encumbrance upon the assets or properties of Seller, in each case granted in connection with the incurrence of Indebtedness;

    (iii)    the sale or lease of any of the Purchased Assets, or other material assets used in or held for use in the Business, outside of the ordinary course of business (other than this Agreement);

    (iv)    any contract under which Seller has advanced or loaned any other Person an amount in excess of $10,000;

(v)     any contract involving aggregate consideration in excess of $100,000 (or $50,000 per annum) and which, in each case, cannot be terminated without penalty by Seller on no more than ninety (90) days' notice;

(vi)     any contract under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of Seller or (B) Seller has directly or indirectly guaranteed liabilities or obligations of any other Person;

(vii)     any contract granting any rights of first refusal or rights of first negotiation to any Person with respect to the sale of any assets used or held for use in the Business;

(viii)     any contract in respect of any interest rate, currency and commodity hedge, swap, collar, cap or similar instrument, in each case, relating to notional amounts in excess of $100,000;

(ix)     the acquisition or disposition by Seller, directly or indirectly, of the Business, or other assets or properties, or the equity interests of any other party which relate to the Business, in each case outside of the ordinary course of business;

(x)     the Intellectual Property, including, without limitation, any contract pertaining to the Seller Intellectual Property or Licensed Intellectual Property;

(xi)     the lease or sublease by Seller of the Leased Real Property;

(xii)     a Material Supplier;

(xiii)     a Material Customer;

(xiv)     any contract with an independent contractor or subcontractor pursuant to which such subcontractor provides products or services to Seller or Seller's customers and for which consideration paid pursuant to such contract is greater than $50,000 per year;

(xv)     any customer contract with any Governmental Authority;

(xvi)     any distribution contract, including where Seller serves as a distributor or where Seller has contracted with a distributor;

(xvii)     the employment, hire, retention, termination, severance (or similar arrangement) of any employee of Seller (including former employees), other than standard non-binding offer letters;

(xviii)     any contract for the future purchase of materials, supplies, services, merchandise and other goods, other than in the ordinary course of business and consistent with past practice;

(xix)   non-competition, non-solicitation or exclusive dealing obligations on Seller or otherwise limits Seller or its current or former equity holders from conducting the Business anywhere in the world;

(xx)   (A) containing "most favored nations" or similar provisions; (B) obligating Seller to purchase or otherwise obtain any product or service exclusively from, or sell any product or service exclusively to, a single party or group of related parties; or (C) granting any type of exclusive rights to any Person;

(xxi)   a joint venture or partnership or involving the sharing of profits, losses, costs or liability by Seller with any other Person;

(xxii)   indemnification of any Person (other than in the ordinary course of business) or the assumption of any Tax, environmental or other liability of any Person;

(xxiii)  any contract that contains earn-out, deferred or contingent purchase price or similar contingent payment obligations;

(xxiv)  any contract that contains outstanding obligations relating to the settlement of any action, litigation, claim, investigation, arbitration or other legal proceeding;

(xxv)   any contract with respect to an Affiliate Transaction; and

(xxvi)  any contract under which Seller has agreed to enter into any of the foregoing.

(b)   Seller has delivered to Buyer (i) a true, correct and complete copy of each Material Contract, together with all amendments, exhibits, attachments, waivers or other changes thereto, and (ii) written descriptions of each oral contract which constitutes a Material Contract. Each Purchased Contract is a valid and binding obligation of Seller and is in full force and effect. Seller is not in material default under the terms of any Purchased Contract, and to Seller's knowledge, (x) no other party thereto is in material default under the terms of any Purchased Contract, and (y) no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default thereunder. No party to a Purchased Contract has given written or oral notice to Seller of any material dispute with respect to, or any intention to terminate or materially change the terms of, any Purchased Contract. Upon the consummation of the transactions contemplated by this Agreement, each Material Contract shall continue in full force and effect without penalty (monetary or otherwise). Seller has not released any of its rights under any Material Contract. No party to a Purchased Contract has repudiated any of the terms thereof or, to Seller's knowledge, threatened to terminate, cancel or not renew any Purchased Contract. Seller has, and will transfer to Buyer at the Closing, good and valid title to the Purchased Contracts, free and clear of all Encumbrances.

**Section 3.10   Customers**.

(a)  Material Customers.  Schedule 3.10(a) of the Disclosure Schedule sets forth a true, correct and complete list, by gross revenue for the twelve (12) month period ending on December 31, 2022 of the fifteen (15) largest customers of Seller for such period (each a "**Material Customer**" and collectively, the "**Material Customers**").  Since December 31, 2022: (a) there has been no material change in the business relationship between Seller and any Material Customer and, there are no facts or circumstances that would cause Seller to believe that a material change will occur, and (b) no Material Customer has advised, informed or indicated to Seller, either orally or in writing, that it intends to terminate, cancel or otherwise seek to modify materially the terms of any customer agreement or its business relationship with Seller.  All products and services provided by Seller to the Material Customers have in all material respects been performed in conformity with all applicable contractual commitments and applicable Legal Requirements.  There are no outstanding Actions with any Material Customer.

(b)  Key Customers.  Schedule 3.10(b) of the Disclosure Schedule sets forth a true, correct and complete list of the customers of Seller that have created gross revenue for Seller greater than $500,000 for the twelve (12) month period ending on December 31, 2022 (each a "**Key Customer**" and collectively, the "**Key Customers**").  Since December 31, 2022: (a) there has been no material change in the business relationship between Seller and any Key Customer and, to Seller's knowledge there currently exists no facts or circumstances that would cause Seller to believe that a material change will occur, and (b) no Key Customer has advised, informed or indicated to Seller, either orally or in writing, that it intends to terminate, cancel or otherwise seek to modify materially the terms of any customer agreement or its business relationship with Seller. All products and services provided by Seller to the Key Customers have in all material respects been performed in conformity with all applicable contractual commitments and applicable Legal Requirements.  There are no outstanding Actions with any Key Customer.

**Section 3.11   Suppliers and Subcontractors**.  Schedule 3.11 of the Disclosure Schedule sets forth a true, correct and complete list, by amount spent by Seller, for the twelve (12) month period ending December 31, 2022, of the fifteen (15) largest suppliers of products or services (including subcontractors) to Seller for such period (each a "**Material Supplier**" and collectively the "**Material Suppliers**").  Since December 31, 2022: (a) there has been no material change in the business relationship between Seller and any Material Supplier and, there are no facts or circumstances that would cause Seller to believe that a material change will occur, and (b) no Material Supplier has advised, informed or indicated to Seller, either orally or in writing, that it intends to terminate, cancel or otherwise seek to modify materially the terms of its business relationship with Seller.  There are no outstanding Actions with any Material Supplier.

**Section 3.12   Seller Employees**.

(a)  Schedule 3.12(a) of the Disclosure Schedule sets forth a true, correct and complete list of Seller's current employees (the "**Seller Employees**"), setting forth accurate and complete information as of the date hereof regarding Seller Employee's name, location, title or position, compensation, date of hire, overtime classification, accrued vacation and other paid time off and all bonus and similar payments made during Seller's current and preceding fiscal year.  All of the Seller Employees are employed "at will" and

their employment is terminable by Seller without notice and without penalty or damages. Seller is not, and has not been in the past, party to or bound by any collective bargaining agreement or contract with any labor union or collective bargaining unit representing its employees and there is no request for representation pending. There are no strikes, lockouts, slowdowns or work stoppages pending or, to Seller's knowledge, threatened with respect to the Seller Employees. There have been no union organization efforts with respect to the Seller Employees or attempts by any union to represent the Seller Employees as a collective bargaining agent.

(b)     During the past six (6) years, Seller has complied with applicable Legal Requirements relating to employment matters, including those related to wages and hours, classification of employees and independent contractors, payroll taxes, unemployment taxes, medical leave, all other paid and unpaid leave, discrimination, harassment, retaliation, whistleblowing, plant closures and layoffs, wrongful termination, immigration and naturalization, collective bargaining and the payment and withholding of taxes. Seller is in compliance with and, in the past six (6) years, has complied with all Legal Requirements relating to immigration and naturalization, including Form I-9 requirements, any applicable mandatory E-Verify obligations, and the terms of any H2B visa labor certifications. As of the date hereof, all compensation, including wages, commissions, overtime, bonuses, accrued paid leave, fringe benefits, pension benefits, profit-sharing benefits and severance payments, payable to all employees, officers, and directors of Seller for services performed on or prior to the Closing Date have been paid in full in accordance with the applicable Legal Requirements. Seller is not liable for any payment to any trust or other fund to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the ordinary course of business and consistently with past practice). There is no pending claim or Action against Seller under any workers' compensation plan or policy or for long-term disability. Except as disclosed in <u>Schedule 3.12(a)</u> of the Disclosure Schedule, all deferred compensation arrangements, severance agreements, retirement agreements or other employee agreements or commitments applicable to any Seller Employee have been terminated by Seller prior to the Closing Date. Seller, including any of its officers, has not received within the past four (4) years any notice of intent by any Governmental Authority responsible for the enforcement of labor or employment laws to conduct an investigation relating to Seller and no such investigation is in process. During the past six (6) years, Seller has not effectuated: (i) a "plant closing" (as defined in the WARN Act or any similar Legal Requirement); or (ii) a "mass layoff" (as defined in the WARN Act or any similar Legal Requirement).

(c)     <u>Schedule 3.12(c)</u> sets forth a complete and accurate list of all "employee benefit plans" within the meaning of Section 3(3) of ERISA, and all other profit-sharing, bonus, incentive, stock option, stock purchase, restricted stock, change in control, pension, retirement, post-retirement, deferred compensation, post-retirement medical or life insurance, welfare, vacation, sick leave, short- or long-term disability, retention, severance and salary continuation, and fringe benefit plans, programs and arrangements, in each case, established, maintained, sponsored or contributed to by Seller for the benefit of any Seller Employees (the "**Benefit Plans**"). Seller has made available to Buyer the following documents with respect to each Benefit Plan, as applicable: (i) the governing plan

document, including all amendments thereto, and all related trust documents and funding instruments, including any group contracts and insurance policies; (ii) a written summary of the terms of any Benefit Plan that is not set forth in a written document; (iii) the most recent summary plan description; (iv) the most recent determination or opinion letter; and (v) the most recent annual report (Form 5500 series and all schedules and financial statements attached thereto).  Each Benefit Plan has been maintained and operated in accordance with its terms and is in compliance in all respects with applicable Legal Requirements.  All contributions, reserves or premium payments (including all employer contributions and employee salary reduction contributions) that are due as of the date hereof have been made or paid with respect to each Benefit Plan, or, if not yet due, have been properly accrued.  Seller does not maintain any Benefit Plan that is required to be treated as a nonqualified deferred compensation plan under Section 409A of the Code. Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is the subject of a favorable determination letter from the IRS, or with respect to a prototype plan, Seller can rely on an opinion letter from the IRS to the prototype plan sponsor, to the effect that such Benefit Plan is so qualified and that the Benefit Plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and there are no facts or circumstances that would reasonably be expected to result in the loss of the qualification of such Benefit Plan. Neither Seller, nor any ERISA Affiliate, sponsors, maintains or contributes to any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV of ERISA or any "multiemployer plan" within the meaning of Section 3(37) of ERISA.  As of the date hereof, there are no Actions pending or, to Seller's knowledge, threatened, with respect to any Benefit Plan (other than routine claims for benefits in the ordinary course of business). No Benefit Plan is under an audit or investigation by the IRS, the U.S. Department of Labor or any other Governmental Authority.

(d)     Except as set forth in Schedule 3.12(d) of the Disclosure Schedule, none of the execution and delivery of this Agreement or the consummation of any transaction contemplated hereby or any termination of employment or service in connection therewith or subsequent thereto will (i) result in any payment (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any Person, (ii) increase any benefits otherwise payable by Seller, (iii) result in the acceleration of the time of payment or vesting of any such benefits, (iv) increase the amount of compensation due to any Person, or (v) result in the forgiveness in whole or in part of any outstanding loans made by Seller to any Person. Neither Seller nor any of its Affiliates is party to any plan, program, arrangement or understanding that would result, separately or in the aggregate, in the payment (whether in connection with any termination of employment or otherwise) of any "excess parachute payment" within the meaning of Section 280G of the Code with respect to any "disqualified individual" within the meaning of Section 280G of the Code and the regulations promulgated thereunder as a result of the transactions contemplated by this Agreement.

**Section 3.13  Compliance With Legal Requirements**.  Seller and the Owner are currently in, and during the past six (6) years have been in, material compliance with applicable international, federal, state and local laws and regulations (both domestic and foreign), judgments, orders, decrees, ordinances or rules ("**Legal Requirements**") applicable to the ownership and use

of the Purchased Assets and the operation of the Business.  Seller has not received any (a) notice of a violation of any Legal Requirement, or (b) notice or other communication (whether oral or written) from any domestic or foreign national, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS) (each, a "**Governmental Authority**") or other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement.  Seller obtained a PPP loan on April 10, 2020, which was partially forgiven by the SBA on December 10, 2020 and paid in full by Seller prior to the Closing Date and a PPP loan on January 22, 2021, which was paid in full by the SBA on October 22, 2021, and as a result all obligations and liabilities of Seller with respect to such loans were fully forgiven by the SBA and the lender and/or repaid in full.  Seller has not made any false or misleading statements in any documents relating to any PPP loan or other loan under any COVID Relief Acts and have complied with the terms and requirements established by any applicable Governmental Authority with respect to any such loan and all of the proceeds of such loan have been used solely for authorized uses prior to the Closing and repayment of any such loan has been forgiven by such Governmental Authorities.  To Seller's knowledge, there are no proposed Legal Requirements that would be applicable to Seller or the Business and that would have a material adverse change on the Business.  No investigation or review is pending or, to Seller's knowledge, threatened by any Governmental Authority with respect to any alleged violation of any Legal Requirement.  Neither Seller nor, to the knowledge of Seller, any of its officers, directors or other employees or other Person acting on its behalf, have (i) violated any applicable provision of the Foreign Corrupt Practices Act of 1977, as amended (15 U.S.C.  §§ 78dd-1, et. seq.) or the Stark Act (42 U.S.C. § 1395nn), (ii) been targeted by any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department, (iii) paid, or offered, promised or authorized payment of, money or any other thing of value to any Governmental Authority, political party (or official thereof), candidate for political office, employee of a state-owned enterprise or official of an international organization (each, a "**Government Person**") in violation of applicable Legal Requirements for the purpose of influencing, directly or indirectly through another Person, any act, omission or decision of such Government Person in an official capacity so that Seller might secure an advantage, obtain or retain business or direct business to any Person or (iv) accepted or received any contributions, payments, gifts or expenditures that was unlawful.

**Section 3.14   Permits**.  Seller holds all necessary Permits required by any Governmental Authority in connection with the ownership and use of the Purchased Assets and the operation of the Business, consistent with applicable Legal Requirements.  Schedule 3.14 of the Disclosure Schedule sets forth an accurate and complete list of each Permit held by Seller.  All such Permits are valid and in full force and effect and Seller is in compliance with all of the terms and requirements of such Permits and there is no pending or, to Seller's knowledge, threatened termination, expiration, suspension, withdrawal or revocation of any of such Permits.  Except as set forth on Schedule 3.14 of the Disclosure Schedule, the Permits are transferable to Buyer.  Seller has not received any notice from any Governmental Authority alleging any violation of any Permit or that any Permit is subject to any investigation, revocation, withdrawal, suspension, cancellation, termination or modification.   None of the Permits will be terminated or impaired or become terminable as a result of the transactions contemplated hereby.

**Section 3.15   Actions; Settlements**.   Except as set forth on <u>Schedule 3.15</u> of the Disclosure Schedule, there is no claim, dispute, action, suit, demand, controversy, proceeding or investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller or the Owner: (a) relating to or affecting the Purchased Assets; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred and no circumstances exist that may give rise to, or serve as a basis for, any such Action. Except as set forth on <u>Schedule 3.15</u> of the Disclosure Schedule, Seller has not been a party to any Action during the past six (6) years and neither Seller nor any of the Purchased Assets are, or have been during the past six (6) years, subject to any order, judgment, injunction, assessment, award, decree, ruling, charge or writ of any Governmental Authority.

**Section 3.16   Insurance**.   <u>Schedule 3.16</u> of the Disclosure Schedule sets forth a correct and complete list of all of the insurance policies or binders for which Seller is a policyholder ("**Insurance Policies**").   Seller has made available to Buyer correct and complete copies of all Insurance Policies.   All Insurance Policies are in full force and effect in accordance with their terms and all premiums with respect thereto covering all periods up to and including the Closing Date have been paid or will be paid when due.   No default exists with respect to the obligations of Seller under any such Insurance Policies.   During the last four (4) years, Seller has not received any written notice of cancellation, alteration of coverage or denial of renewal in respect of any of the Insurance Policies.   The Insurance Policies are of the type and are in amounts commercially reasonable in connection with the Business as currently conducted and are sufficient for compliance with applicable Legal Requirements and with any Material Contracts.   All premiums due on the Insurance Policies have been paid when due and payable.   There are no Actions related to the Business pending under any of the Insurance Policies in respect of which there is an outstanding reservation of rights.   The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based liability on the part of Seller.   During the last four (4) years, no claim by Seller under any Insurance Policy has been denied or disputed (other than routine requests for quotes), nor has its coverage been limited by any insurance carrier to which it has applied for any such insurance or with which it has carried insurance.   Seller is not in default under any material provision of any Insurance Policy.

**Section 3.17   Warranties**. Except as set forth on <u>Schedule 3.17</u> of the Disclosure Schedule: (a) there are no warranty claims currently pending or, to Seller's knowledge, threatened against Seller; (b) there have been no such warranty claims made against Seller during the past four (4) years; and (c) there are no outstanding obligations or liabilities with respect to the replacement or repair of any work performed, distributed or sold by or on behalf of Seller, in each case other than in accordance with Seller's standard terms and conditions, which standard terms and conditions have been made available to Buyer, or the Purchased Contracts.  There have been no recalls by Seller during the past four (4) years.  All work performed, distributed or sold by or on behalf of Seller prior to date hereof comply with all contractual requirements and applicable Legal Requirements, including ISO to the extent required by its Purchased Contracts or applicable Legal Requirements.  Except for conditions or warranties implied or imposed by applicable Legal Requirements, any Purchased Contracts or otherwise contained in the applicable standard terms and conditions of sale for such products and services, Seller has not extended to any of its customers any written, non-uniform warranties, indemnifications or guarantees.

**Section 3.18   Liabilities**.   Except as set forth on <u>Schedule 3.18</u>, there are no existing claims, duties, responsibilities, liabilities or obligations arising from or alleged to arise from any injury to person or property as a result of the ownership, possession or use of any work performed, manufactured, processed, sold, distributed or delivered by or on behalf of Seller during the four (4) years prior to the date hereof.   Seller has no liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any work performed, processed, sold, distributed or delivered by or on behalf of Seller. There is no basis for any present or future Action against Seller giving rise to any liability, arising out of any injury to any person, entity or property as a result of the ownership, possession or use of a product designed, manufactured, assembled, repaired, sold, leased, delivered, installed or otherwise distributed, or services rendered, by Seller.

**Section 3.19   Environmental Matters**.

(a)     Seller is, and has been during the past four (4) years, in compliance in all respects with all Legal Requirements relating to pollution, protection of the environment, natural resources or wildlife, public health and safety, and worker and occupational health and safety related to exposure to Hazardous Materials, including, without limitation, Legal Requirements related to product stewardship (collectively, "**Environmental Laws**"). Seller has not received any written notice, order or other communication from any Governmental Authority or other person claiming that Seller is, or may be, in violation of any Environmental Law or liable for personal injury or property damage or for any other costs or expenses related to a violation of any Environmental Law or any release, treatment, storage or disposal of, or exposure to any Hazardous Materials.

(b)     There are no past or present conditions, events, circumstances or facts that could reasonably be expected to form the basis of any Action against or involving Seller based on or related to any Environmental Law or that pose an unreasonable risk to the environment or the health or safety of persons on or at any property currently or formerly owned or leased by Seller.

**Section 3.20   Information Privacy and Data Security**.

(a)     Seller's practices concerning collection, use, analysis, retention, storage, protection, security, transfer, disclosure and disposal of all data or information constituting the personal information of any natural person, including employees, that has been collected or otherwise obtained, including all such information subject to any applicable Legal Requirements respecting the privacy of financial, credit, or other information ("**Privacy Laws**"), comply with, and do not violate, any (i) of the terms of any Material Contract, (ii) applicable Privacy Laws or other Legal Requirements, or (iii) written policy or privacy statement of Seller (with respect to sub-clause (iii), to the extent existing). All information systems used by Seller in the conduct of the Business are sufficient for the conduct of the Business as currently conducted and as presently proposed to be conducted. Seller uses reasonable means, taking into account the nature of personal information collected and processed by Seller, to protect the security and integrity of all information systems used by the Business.

(b)     Seller (i) is not now and has not been during the past six (6) years, under investigation by any Governmental Authority for an actual or alleged violation of any applicable Privacy Laws, (ii) has not received any written notices from any Governmental Authority relating to any such actual or alleged violations of any applicable Privacy Laws, (iii) has not received any complaints, notices or other written communications from any Person alleging a violation of any applicable Privacy Laws and (iv) is not aware of any circumstance that would require Seller to notify any Person under any applicable Privacy Law.

(c)     Seller has established and maintained commercially reasonable privacy policies relating to privacy, data protection and the collection, retention, protection and use of personal information collected, used or held for use by Seller (the "**Privacy Policies**"). In connection with its collection, storage, transfer (including any transfer across national borders) and/or use of any personally identifiable information from any employees (collectively, "**Employee Personal Information**"), Seller is and has been, during the six (6) year period immediately preceding the date hereof, in compliance with, and the consummation of the transactions contemplated hereby will not breach or cause a violation of, all applicable Legal Requirements in all relevant jurisdictions, the applicable Privacy Policies, and the requirements of any contract to which Seller is a party or is otherwise bound.  The Privacy Policies are in compliance with all applicable Legal Requirements, including with respect to administrative, technical, and physical safeguards, to protect the confidentiality, integrity, and security of Employee Personal Information against unauthorized access, use, modification, disclosure, or other misuse.  Seller has not, in the past six (6) years, experienced any loss, damage, or unauthorized access, disclosure, use, or breach of security of any Employee Personal Information in Seller's possession, custody, or control or otherwise held or processed on their behalf that had or reasonably could have had an adverse effect on Seller or its computer systems.  During the six (6) year period immediately preceding the date hereof, no Actions have been filed or, to Seller's knowledge, threatened against Seller alleging a violation of any Person's privacy or Employee Personal Information or data rights or any of the Privacy Policies.  Immediately following the Closing, Seller will have the right to use the Employee Personal Information in its possession, custody or control on identical terms and conditions as Seller enjoyed immediately prior to the Closing.

(d)     Seller is and has been in compliance with applicable Payment Card Industry Data Security Standards and the related applicable card brand rules and requirements in any contracts between Seller and its payment processor and/or acquiring bank.  To the extent required by applicable Privacy Laws or other Legal Requirement, Seller has undertaken all commercially reasonable scans and assessments of its cardholder data environment and remediated any identified vulnerabilities.

**Section 3.21   Affiliate Transactions**. Except as set forth on <u>Schedule 3.21</u> of the Disclosure Schedule, neither Seller, the Owner, nor any of their respective Affiliates, nor any current or former director, officer or employee of Seller: (a) has or during the last two (2) years has had any direct or indirect interest (i) in, or is or during the last two (2) years was, a director, officer or employee of, any Person that is a client, customer, supplier, lessor, lessee, debtor, creditor, creditor or competitor of Seller or (ii) in any material property, asset or right that is owned

or used by Seller in the conduct of the Business or (b) is, or during the last two (2) years has been, a party to any agreement of transaction with Seller (in each case, an "**Affiliate Transaction**"), and neither Seller nor the Owner have made any commitments to enter into any Affiliate Transaction. Except as set forth in Schedule 3.21, there is no outstanding Indebtedness owed to Seller by, or owed by Seller to, any current or former director, officer, shareholder, member, manager, employee or consultant of Seller or any of its Affiliates. Each Affiliate Transaction is on commercially reasonable terms negotiated on an arms-length basis. Except as set forth on Schedule 3.21 of the Disclosure Schedule, no Affiliate of the Owner is an employee of Seller.

Section 3.22   **Solvency**.   Seller and the Owner are not entering into the transactions contemplated by this Agreement with the actual intent to hinder, delay or defraud either present or future creditors thereof. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, Seller will be Solvent.

Section 3.23   **Real Property**.

(a)      Seller does not currently own, and has never owned, any real property.

(b)      Schedule 3.23(b) of the Disclosure Schedule sets forth a true and complete description of all real property leased, licensed to or otherwise used or occupied by Seller or otherwise used or held for use in the Business (collectively, the "**Leased Real Property**"). Seller has a valid and subsisting leasehold estate in the Leased Real Property. A true, accurate and complete copy of each such lease, license, or occupancy agreement (the "**Leases**" and each a "**Lease**"), and any amendments thereto, with respect to the Leased Real Property has been delivered to Buyer, and no changes have been made to any such agreement since the date of delivery. Each Lease is in full force and effect with respect to each other party thereto, in accordance with the express terms thereof. All of the Leased Real Property is used or occupied by Seller pursuant to a Lease. With respect to each Lease: (i) all rents, deposits and additional rents due pursuant to such Lease have been paid in full and no security deposit or portion thereof has been applied in respect of a breach or default under such Lease that has not been redeposited in full, and (ii) Seller is not in default or breach under any Lease and has not received any notice that it is in default under any Lease or that the owner of any Leased Real Property has made any assignment, mortgage, pledge or hypothecation of such Lease or the rents or use fees due thereunder. Except as set forth on Schedule 3.23(b) of the Disclosure Schedule (the "**Affiliate Leases**" and each an "**Affiliate Lease**"), no Affiliate of Seller is the owner or lessor of any Leased Real Property. The Leased Real Property is (1) in good condition and repair (normal wear and tear excepted) and (2) sufficient for the operation of the Business as it has been conducted by Seller in the ordinary course of business consistent with past practice. Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy any of the Leased Real Property.

(c)      Except as set forth on Schedule 3.23(c) of the Disclosure Schedule, the condition, use and operation of any of the Leased Real Property in the conduct of the Business does not violate any Legal Requirement, covenant, condition, restriction, easement, license, permit or agreement.

(d)     There is not now pending nor, to the knowledge of Seller, contemplated any reassessment of any parcel included in the Leased Real Property that could result in a change in the rent, additional rent or other sums and charges payable by Seller under any agreements relating to the Leased Real Property. There are no public improvements in progress or, to the knowledge of Seller, proposed that will result in special assessments against or otherwise adversely affect any of the Leased Real Property.

(e)     There is no pending condemnation, expropriation, eminent domain or similar Action affecting all or any portion of any of the Leased Real Property. Seller has not received any notice of any such Action, and to the knowledge of Seller, no such Action is threatened or contemplated.

(f)     There has not been any interruption in the delivery of adequate service of any utilities required in the operation of the Business at each Leased Real Property. Seller has experienced any disruptions to its operations arising out of any recurring loss of electrical power, flooding, limitations to access to public sewer, and water or restrictions on septic service.

**Section 3.24   Government Contracts**.

(a)     Each contract listed on Schedule 3.09(xv) (each, a "**Government Contract**," and collectively, the "**Government Contracts**") was legally awarded and no Government Contract is the subject of bid or award protest proceedings. No Action threatened in writing or ongoing audit exists which would reasonably be expected to give rise to a material claim for price adjustment of any Government Contract under applicable Legal Requirements.

(b)     During the past six (6) years, (i) Seller has not been in violation of any statutory, regulatory or contractual requirement pertaining to any Government Contract, (ii) no Person has notified Seller of any actual or alleged violation or breach of any statute, regulation or contract term, and (iii) to Seller's knowledge, there exist no facts or allegations that would reasonably be expected to give rise to such violation or notice, as applicable, in the future.

(c)     All facts set forth in or acknowledged by any representations, certifications or disclosure statements made or submitted by or on behalf of Seller in connection with any (i) Government Contract or (ii) quotations, bids and proposals for Government Contracts were current, accurate and complete in all respects as of the date of their submission and the Closing Date. Seller has complied in all respects with all applicable representations, certifications and disclosure requirements under all Government Contracts and each of its quotations, bids and proposals for Government Contracts.

**Section 3.25   Brokers**.  Except as set forth in Schedule 3.25 of the Disclosure Schedule, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller or the Owner.

**Section 3.26    COVID-19 Precautions**.    Seller and the Owner have taken all commercially reasonable efforts to comply with applicable Legal Requirements, guidelines, recommendations and precautions of any applicable Governmental Authority with respect to COVID-19. No customer, distributor or supplier of Seller has advised, informed, or indicated to Seller, in writing or orally, that it intends, to terminate, cancel or otherwise seek to modify materially the terms of its business relationship with Seller as a result of COVID-19.

**Section 3.27    Accounts Receivable**.    Schedule 3.27(a) of the Disclosure Schedule sets forth a true, correct and complete accounts and notes receivable aging schedule as of the close of business of March 1, 2023. Except as set forth on Schedule 3.27(a) of the Disclosure Schedule, all accounts and notes receivable reflected on the Financial Statements, and accounts and notes receivable arising after the date of the Interim Statements: (i) have arisen from bona fide transactions entered into by Seller involving the rendering of services or sale of products in the ordinary course of business consistent with past practice as to which full performance has been rendered by Seller; and (ii) constitute only valid, undisputed claims of Seller not subject to claims of setoff or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice disclosed on Schedule 3.27(a) of the Disclosure Schedule. Seller has good and valid title to all accounts and notes receivable of the Business free and clear of any Encumbrances. To Seller's knowledge, there are no disputes with respect to any of the accounts and notes receivable reflected on the Financial Statements that have not been reserved for on the Financial Statements. Schedule 3.27(b) of the Disclosure Schedules sets forth the aggregate amount of accounts and notes payable as of the close of business of March 1, 2023.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01    Organization and Authority of Buyer; Enforceability**.    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has full power and authority to enter into this Agreement and the Ancillary Transaction Documents to which it is or will be a party, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Transaction Documents to which it is or will be a party and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Buyer. This Agreement and the Ancillary Transaction Documents to which Buyer is or will be a party have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller and the Owner) this Agreement and the Ancillary Transaction Documents constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02    No Conflicts; Consents**.    The execution, delivery and performance by Buyer of this Agreement and the Ancillary Transaction Documents to which Buyer is or will be a party, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the organizational documents of Buyer; or (b) violate or conflict with any

judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer.  Except for the consent of the sole member of Buyer, no consent, approval, waiver or authorization is required to be obtained by Buyer from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 4.03   Legal Proceedings**.  There is no Action of any nature pending or threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.04   Brokers**.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.05   Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 4.06   Solvency**.   Assuming that immediately prior to the Closing, Seller is Solvent and that all of the representations and warranties contained in <u>Article III</u> are true and correct in all material respects, then immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller.   In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.07   Legal Proceedings**.  There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.08   Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose.

**ARTICLE V**
**COVENANTS**

**Section 5.01   Public Announcements**.  Unless otherwise required by applicable Legal Requirements, no party shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other parties (which consent shall not be unreasonably withheld or delayed); <u>provided</u>, <u>however,</u> that the party required

to make the release or announcement shall allow the other parties hereto reasonable time to comment on such release or announcement in advance of such issuance.

**Section 5.02   Bulk Sales Laws**.  The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Legal Requirements of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; provided, however, that Seller agrees (i) to pay and discharge when due or to contest or litigate all claims of creditors (including state departments of revenue or similar governing bodies) which are asserted against Buyer or the Purchased Assets which arose by reason of Seller's noncompliance with such Legal Requirements, and (ii) to take promptly all action reasonably necessary to remove any Encumbrance which are placed on the Purchased Assets by reason of Seller's noncompliance with such Legal Requirements.

**Section 5.03   Tax Matters**.

(a)     In the case of Taxes imposed with respect to the Purchased Assets or the Business that are payable with respect to any Tax period beginning on or before and ending after the Closing Date (a "**Straddle Period**"), the portion of any such Tax that is attributable to the portion of the Straddle Period ending on the Closing Date and treated as attributable to the Pre-Closing Tax Period, and included within Pre-Closing Taxes, shall be:

(i)     in the case of Taxes based on income, gain or loss, if applicable, there will be an interim closing of the books as of close of business on the Closing Date, and all items of income or loss attributable to periods prior to such closing of the books shall be allocated to Seller, and included within Pre-Closing Taxes, and all such items attributable to periods after the closing of the books shall be allocated to Buyer; and

(ii)     in the case of any other Taxes, such amount shall be deemed to equal such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire period.

(iii)     In connection with the calculation of the prorations of the Taxes under this Section 5.03(a), the parties agree to cooperate in good faith to determine such allocation.

(b)     Except as otherwise provided in Section 5.04:

(i)     Seller shall, with respect to the Business and the Purchased Assets, be responsible for preparing and timely filing all (A) Tax Returns for any Pre-Closing Tax Period required by applicable Legal Requirements to be filed on or prior to the Closing Date, and (B) income Tax Returns of Seller;

(ii)     Buyer shall prepare or cause to be prepared and file, or cause to be filed, all Tax Returns with respect to the Purchased Assets other than those Tax Returns described in <u>Section 5.03(b)(i)</u>, including Tax Returns for any Straddle Period;

(iii)     Each of Buyer and Seller shall, as applicable, report the transfer of the Tangible Personal Property and Fixed Assets as an occasional or isolated sale under any appliable exemption, including but not limited to sales and use taxes.

(iv)     Seller shall have the right to control the conduct of any Tax audits, Tax disputes or other Action with respect to the Business or Purchased Assets ("**Tax Controversies**") relating solely to Tax Returns described in <u>Section 5.03(b)(i)</u>; provided, however, that in the case of any Tax Controversy described in this <u>Section 5.03(b)(iii)</u> that relates to any Taxes that could give rise to a liability of, or otherwise affect the Taxes or calculation of Taxes of, Buyer or its Affiliates or members under this Agreement or otherwise, Buyer may participate in such Tax Controversy at Buyer's expense, and Seller shall not settle, compromise or enter into any agreement that represents a final determination of the matter without Buyer's consent, which consent shall not unreasonably be withheld, conditioned, or delayed;

(v)     Buyer shall have the right to control the conduct of any Tax Controversy other than those that may be controlled by Seller pursuant to <u>Section 5.03(b)(iii)</u>; provided, however, that in the case of any Tax Controversy described in this <u>Section 5.03(b)(v)</u> that relates to any Taxes that could give rise to a liability of Seller or the Owner, or their respective Affiliates under this Agreement or otherwise, Seller may participate in such Tax Controversy at its expense, and neither Buyer nor any of its Affiliates shall settle, compromise or enter into any agreement that represents a final determination of the matter without Seller's consent, which consent shall not unreasonably be withheld, conditioned, or delayed;

(vi)     any Tax refunds (or credits in lieu of Tax refunds) with respect to Taxes paid by Seller that are received after the Closing Date by Buyer that are attributable to (i) Tax Returns described in <u>Section 5.03(a)(i)</u>, and (ii) Tax Returns for a Straddle Period that pertain to the portion of such Straddle Period ending on the day before the Closing Date, shall be for the account of Seller, and Buyer shall pay over to Seller such Tax refunds or credits in lieu thereof within seven calendar days after receipt or realization thereof, net of any expenses and Taxes incurred. To the extent any amounts paid to Seller under this <u>Section 5.03(b)(vi)</u> is subsequently challenged, disallowed or clawed back by the applicable Tax Authority, Seller shall repay to Buyer all such disallowed amounts.

(c)     In the event (i) Buyer or any of its Affiliates receives any document with respect to the Tax matters of the Business or the Purchased Assets that could affect the Taxes of Seller or the Owner, or (ii) Seller, the Owner, or any of their respective Affiliates receives any document with respect to the Tax matters of the Business or the Purchased

Assets, the party receiving such document shall supply a copy of such document to the potentially affected party within seven (7) calendar days of receipt.  A failure by a party to give such materials in a timely manner as set forth in this Section 5.03(c) will not affect the rights or obligations of any party hereunder except to the extent that, as a result of such failure, any party entitled to receive such materials was actually and materially prejudiced as a result of such failure.  For this purpose, such Tax documents shall include requests for information, notices of proposed adjustments, revenue agent's reports or similar reports, notices of deficiency, and other notices pertaining to Taxes issued by any Tax Authority with respect to the Business or the Purchased Assets.  Any information provided or obtained under this Section 5.03 shall be kept confidential, except as may otherwise be necessary in connection with the filing of a Tax Return, refund claims, Tax audits, Tax claims or Tax Controversies or as required by applicable Legal Requirements.

(d)    After the Closing, Seller and the Owner on the one hand, and Buyer on the other, shall, each at its own expense, cooperate with each other and with each other's agents, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return, refund claim, Tax Controversy or other Tax matter with respect to the Business or the Purchased Assets, and such cooperation shall include the retention and (upon the other party's reasonable request) the provision of records and information, excluding records and information that are protected by recognized professional privilege, which are reasonably relevant to any Tax Returns, claims for refund, Tax Controversy or other action with respect to the Business or the Purchased Assets, and shall include making employees and agents available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

**Section 5.04   Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest thereon) ("**Transfer Taxes**") incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne by Seller when due. Seller shall, at its own expense, timely prepare and file (or cause to be filed) any applicable Transfer Tax Returns or documents, subject to Buyer's review and approval, and Buyer shall use commercially reasonable efforts to cooperate with respect to such filing as reasonably requested by Seller (including by providing the other with any exemption certificate or its equivalent reasonably requested to support any exemption from Transfer Taxes claimed in such filing).

**Section 5.05   Employees**. On or prior to the Closing Date, Buyer shall offer employment to those Seller Employees who satisfy Buyer's pre-employment and background check procedures, as listed on Schedule 5.05, and those who accept employment with Buyer (the "**Acquired Employees**") will become at-will employees of Buyer effective as of the Closing Date.

**Section 5.06   Post-Closing Operation of the Business**.  Seller and the Owner agree that as of the Closing Date and at any time thereafter, except as otherwise expressly provided herein or as permitted by express prior written consent of Buyer:

(a)    they shall not use, directly or indirectly, including operating any business, (i) the name Rocky Mountain West Telecom, RMWT or any derivative, abbreviated or similar names, or (ii) any of the Seller Intellectual Property; and

(b)      Seller and the Owner shall cease conducting the Business.

This provision is not intended to limit in any way the use of the name listed above by Seller or the Owner in connection with managing the internal, non-operational, non-market-facing affairs of Seller in the process of winding down such entity or maintaining its legal existence as required by the terms hereof.  For a period of two (2) years from the Closing Date, Seller shall remain in compliance with applicable Legal Requirements in the State of Utah in order to remain in good standing in such jurisdiction, after which time Seller may be dissolved.

**Section 5.07   Restrictive Covenants**.

(a)      In order for Buyer to protect and preserve the value of the Purchased Assets, and as a material inducement to Buyer to enter into this Agreement, Seller and the Owner agree that for a period of six (6) years following the Closing Date (the "**Restricted Period**"), they will not, and will not permit any of their respective Affiliates to:

(i)      directly or indirectly, solicit or encourage any employee or independent contractor of Seller or Buyer, or any of their respective Affiliates, to resign or otherwise leave the employment or engagement of Buyer or any of its Affiliates;

(ii)      directly or indirectly, hire or engage any employee or independent contractor of Seller or Buyer, or any of their respective Affiliates, to perform services other than for the benefit of Buyer or any of its Affiliates;

(iii)      directly or indirectly, solicit or entice, or attempt to solicit or entice, any client or customer or potential client or customer of Buyer, or any of its Affiliates, to (A) cease doing business with Buyer or any of its Affiliates, or (B) materially reduce the amount of business they conduct with Buyer, or any of its Affiliates, in each case to the detriment of Buyer or any of its Affiliates; and

(iv)      directly or indirectly, own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, member, agent, or Representative), consult with, render services for, or in any other manner engage in the Business, in North America; provided, however, that nothing herein shall prohibit Seller or the Owner from: (i) being a passive owner of not more than three percent (3.0%) of the outstanding stock of any class of a corporation which is publicly traded, so long as such Person has no active participation in the business of such corporation, (ii) owning as a passive investment any private equity funds, mutual funds, exchange traded funds and similar collective investment vehicles that may, in turn, invest in competitors of the Business so long as neither Seller nor the Owner are otherwise in violation of the terms of this Agreement, (iii) serve in the capacity as an employee, independent contractor or consult to Buyer or any of its Affiliates, or (iv) engaging in any activity consented to in writing by the board of managers of Buyer.

(b)      During the Restricted Period, Seller and the Owner shall keep secret and retain in strictest confidence, and shall not, without the prior written consent of Buyer,

furnish, make available or disclose to any third party or use for their benefit or the benefit of a third party, any Confidential Information.  Notwithstanding the foregoing, Seller and the Owner may keep archival copies of the Confidential Information (i) to protect, enforce or defend its or any of its Affiliates' rights under this Agreement and the Ancillary Transaction Documents, (ii) pursuant to the terms and conditions of a bona fide document retention policy, (iii) to the extent required by applicable Legal Requirements or (iv) as may be electronically stored pursuant to automatic back-up storage or archival procedures or systems; provided, however, that any such retained copies shall be subject to the non-use and confidentiality provisions of this Section 5.07(b) both during the Restricted Period and for so long as Seller or the Owner retain such copies thereafter.  In the event that, during the Restricted Period, Seller or the Owner are required by any Governmental Authority or by interrogatory, subpoena, civil investigative demand or similar legal process to disclose any Confidential Information, Seller or the Owner, as applicable, may disclose the portion of the Confidential Information so requested or required; provided, however, that the applicable party will, to the extent permitted by applicable Legal Requirements, notify Buyer promptly of the request or requirement so that Buyer (with cooperation of Seller or the Owner) may seek an appropriate protective order or waive compliance with the provisions of this Section 5.07(b).  For purposes hereof, "**Confidential Information**" means all information belonging to, used by, relating to the Business which is in the possession of Seller, the Owner or Buyer, including but not limited to any information relating to financial statements, client or customer identities, potential clients or customers, employees, suppliers, servicing methods, product designs, equipment, programs, strategies and information, analyses, profit margins, Intellectual Property or other proprietary information; provided, however, that the obligations of this Section 5.07(b) shall not apply to Confidential Information that was or becomes generally available to the public, other than as a result of a disclosure by Seller or the Owner in breach of this Agreement; furthermore, Seller and the Owner shall be permitted to disclose the Confidential Information to their auditors, attorneys and other agents to the extent they need to know such information; provided, however, that, in each such case, such party shall be liable for each such Person's further disclosure of Confidential Information in violation of this Section 5.07(b) as if such Person was a direct party hereto.  Effective as of the Closing, the Confidentiality Agreement shall terminate automatically without further action by any of the parties hereto.

(c)     During the Restricted Period, Seller and the Owner shall not, directly or indirectly, make or solicit, or encourage others to make or solicit, disparaging or malicious comments to any Person concerning Buyer or any of its officers, directors, employees, Affiliates or the products or services provided or proposed to be provided by Buyer, or any of its Affiliates, or the business affairs, operation, management or financial condition of Buyer or any of its Affiliates; provided, however, that such prohibition will not be deemed a prohibition against (i) truthful testimony in any legal or administrative proceeding, or (ii) reporting possible violations of law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of law or regulation or other applicable statutes or regulations.

(d)     Seller and the Owner acknowledge and agree that in the event of a breach by any of them of any of the provisions of this <u>Section 5.07</u>, monetary damages will not constitute a sufficient remedy. Consequently, in the event of any such breach, Buyer may, in addition to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or prevent any violations of the provisions of this <u>Section 5.07</u>, in each case without the requirement of posting a bond or proving actual damages.

(e)     If the final judgment of a court of competent jurisdiction declares that any term or provision of this <u>Section 5.07</u> is invalid or unenforceable, the parties agree that it is their intention that such invalid, illegal or unenforceable term or provision shall be reformed and construed so that it be valid, legal and enforceable to the maximum extent possible in such jurisdiction, and that such court will reduce the scope, duration or area of the term or provision, add or delete specific words or phrases, or replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

**Section 5.08   Seller Release**.  Seller and the Owner agree that, effective as of the Closing Date, Seller and the Owner shall be deemed to have released and discharged Buyer and each of its Affiliates, officers, managers, equity holders, partners, employees, agents, accountants, attorneys and representatives, and the heirs, predecessors, successors and assigns of all of the foregoing (the "**Releasees**" and each, a "**Releasee**") from any and all claims, demands and causes of action, whether known or unknown, liquidated or contingent, which Seller, the Owner or any of their respective Affiliates now has, has ever had or may hereafter have against the Releasees arising contemporaneously with or prior to the Closing or on account of or arising out of any matter, cause or event, occurring prior to the Closing, <u>provided</u>, <u>however</u>, that such release shall not (i) operate to release such Person from any obligations under this Agreement or the Ancillary Transaction Documents or (ii) apply to any rights to indemnification under the organizational documents of Seller.  Seller and the Owner expressly waive any provisions under any Legal Requirements designed to protect a party from waiving claims which it does not know exist or may exist (unless such provisions are not able to be waived under Legal Requirements).  Seller and the Owner further agree that they shall not, nor permit any of their respective Affiliates to: (A) institute a lawsuit or other legal proceeding based upon, arising out of, or relating to any of the released claims, (B) participate, assist, or cooperate in any such proceeding or (C) encourage, assist and/or solicit any third party to institute any such proceeding.

**Section 5.09   Further Assurances**.

(a)     From and after the date hereof, each of the parties shall use commercially reasonable efforts to (i) cause the fulfillment at the earliest practicable date of all of the conditions to consummate the transactions contemplated by this Agreement, and (ii) take, or cause to be taken, all actions necessary or appropriate to consummate the transactions contemplated by this Agreement.

(b)     Following the Closing, each of the parties shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further

39

actions as may be reasonably required to comply with applicable Legal Requirements or to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Transaction Documents.  In the event that Seller or the Owner discover following the Closing that any assets or properties used in or held for use in the Business that should have been included in the Purchased Assets was owned by any Person other than Seller, Seller and the Owner shall promptly notify Buyer and upon Buyer's request, shall take, and shall cause their Affiliates to take, necessary steps, and coordinate with Buyer, to cause such assets to be transferred to Buyer pursuant to this Agreement for no additional consideration.  During the Restricted Period, Seller and the Owner acknowledge and agree that all opportunities in connection with the Business presented to either or both of them shall be opportunities of Buyer and its Affiliates, and neither Seller nor the Owner shall divert any such opportunities to any other Person, including without limitation, itself or himself (as applicable).

(c)     From and after the Closing Date, subject to the limitations set forth in Article VI, the Owner shall take all actions necessary to cause the full, complete and timely compliance with and performance of all agreements, covenants and obligations of Seller under this Agreement, including Seller's obligation to satisfy payment obligations arising in connection with Section 1.06 and Article VI when and to the extent that any of the same shall become due and payable or performance of or compliance with any of the same shall be required.

(d)     Seller shall provide reasonable assistance to Buyer in the collection of accounts receivable as may be requested by Buyer.  From and after the Closing, (i) Seller shall remove from invoices any instruction for payment to be made to any third-party and (ii) if Seller receives or collects any funds relating to any accounts receivable or any other Purchased Asset, Seller shall remit such funds to Buyer within five (5) business days after its receipt thereof.

**Section 5.10   Purchased Contracts Requiring Consent**.  To the extent that any of the Purchased Contracts that this Agreement contemplates are to be assigned to Buyer are not assignable without the consent of a third party (for purposes of this Section 5.10, "**Special Agreements**"), neither this Agreement nor any agreement, document or instrument delivered pursuant to this Agreement shall constitute an assignment or an attempted assignment of such Special Agreements if such consent is not obtained.  From and after the date hereof, Seller will cooperate with Buyer and exercise best efforts to obtain such consents and assign such Special Agreements to Buyer.  While any such consent is pending, and if such consent is ultimately not obtained, Seller agrees to cooperate with Buyer in any lawful and commercially reasonable arrangement reasonably proposed by Buyer under which (i) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Legal Requirement) the economic rights and benefits under the Special Agreement with respect to which the consent has not been obtained, (ii) Buyer shall assume any related economic burden with respect to such Special Agreement, (iii) Buyer shall comply with the terms of any Special Agreement, (iv) Seller will cooperate with Buyer's commercially reasonable requests to enforce Seller's rights arising under such Special Agreement, at the cost and for the benefit of Buyer, against any third party to such Special Agreement arising out of the breach or cancellation of such Special Agreement by such third-party or any other Person, and (v) any amount received by Seller in respect of any such Special

Agreement for the period commencing on the Closing Date shall be held by Seller in a constructive trust for the benefit of, and paid over to, Buyer within five (5) Business Days after its receipt.

**ARTICLE VI**
**INDEMNIFICATION**

**Section 6.01  Survival**.  The representations, warranties, covenants and agreements contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing, and thereafter as follows:

(a)      the representations and warranties contained in Article III and Article IV shall survive the Closing until 5:00 p.m. (Eastern Time) on the date that is eighteen (18) months after Closing; provided, however, (i) the representations and warranties set forth in Section 3.01 (Organization and Authority of Seller; Enforceability), Section 3.02 (No Conflicts; Consents), Section 3.03 (Purchased Assets) and Section 3.26 (Brokers) (collectively, the "**Fundamental Representations**") shall survive the Closing until 5:00 p.m. (Eastern Time) on the date that is sixty (60) months following the Closing Date, (ii) the representations and warranties contained in Section 3.08 (Taxes) shall survive the Closing until 5:00 p.m. (Eastern Time) on the date that is sixty (60) days after the expiration of the applicable statute of limitations with respect to claims that may arise as a result of the breach of such representations and warranties and (iii) the representations and warranties set forth in Section 4.01 (Organization and Authority of Buyer; Enforceability) and Section 4.04 (Brokers) (collectively, the "**Buyer Fundamental Representations**") shall survive the Closing until 5:00 p.m. (Eastern Time) on the date that is sixty (60) months following the Closing Date;

(b)      all other covenants and agreements contained in this Agreement related to Taxes (including those set forth in Article V (Covenants) and Section 6.02(f)) shall survive the Closing until 5:00 p.m. (Eastern Time) on the date that is sixty (60) days after the expiration of the applicable statute of limitations; and

(c)      all covenants and agreements contained herein which by their terms contemplate actions or impose obligations following the Closing shall survive the Closing indefinitely or for the respective period explicitly specified in this Agreement relating to such covenants and agreements, if any, and remain in full force and effect in accordance with their terms.

The parties further acknowledge that the time periods set forth in this Section 6.01 for the assertion of claims and notices under this Agreement are the result of arms'-length negotiation among the parties and that they intend for the time periods to be enforced as agreed by the parties.  Any claim that has been asserted in accordance with Section 6.04 and that is pending on the date of the expiration of the applicable survival period set forth in this Section 6.01 may continue to be asserted and shall be indemnified against until fully and finally resolved.

**Section 6.02  Indemnification of Buyer**.  Following the Closing, but subject to the survival periods set forth in Section 6.01, Seller and the Owner, jointly and severally, shall indemnify, defend and hold Buyer and its managers, members, officers, employees, agents,

41

Affiliates, successors and permitted assigns (collectively, the "**Buyer Indemnitees**") harmless from and against any and all Losses arising out of, resulting from or relating to:

(a)  any breach or non-fulfillment of any covenant or agreement made by Seller or the Owner under this Agreement or in any Ancillary Transaction Document to which Seller or the Owner is a party;

(b)  any inaccuracy in, misrepresentation of, or breach of the representations and warranties of Seller or the Owner contained in Article III (Representations and Warranties of Seller and the Owner) or in any Ancillary Transaction Document to which Seller or the Owner is a party;

(c)  any Excluded Asset or any Excluded Liability, or any other liability of Seller or the Owner (other than the Assumed Liabilities) associated with, related to or arising out of the conduct or operations of the Business prior to the Closing;

(d)  any Tax obligation in connection with Seller's or the Owner's failure to comply with its obligations under a "Bulk Sales Transfer" under the Legal Requirements of any jurisdiction, including Taxes, through the Closing Date, and including any such bulk sales Tax obligations arising here from;

(e)  any Action set forth in Schedule 3.16 of the Disclosure Schedule and any environmental matters set forth on Schedule 3.20 of the Disclosure Schedule;

(f)  the ownership of Seller or any Affiliate Transaction; and

(g)  all Pre-Closing Taxes.

**Section 6.03   Indemnification of Seller**.  Following the Closing, Buyer shall indemnify, defend and hold Seller, the Owner and their directors, officers, employees, agents, Affiliates, successors and permitted assigns ("**Seller Indemnitees**") harmless from and against any and all Losses arising out of, resulting from or relating to:

(a)  any breach or non-fulfillment of any covenant or agreement made by Buyer under this Agreement or in any Ancillary Transaction Document to which Buyer is a party; and

(b)  any inaccuracy in, misrepresentation of, or breach of the representations and warranties of Buyer contained in Article IV (Representations and Warranties of Buyer) or in any Ancillary Transaction Document.

**Section 6.04   Procedure**.

(a)  Any Buyer Indemnitee or Seller Indemnitee seeking indemnification hereunder (an "**Indemnified Party**") shall give a written notice (a "**Notice of Claim**") specifying (i) a reasonably detailed description of the facts constituting the reasonable basis for its claim, (ii) the applicable provision(s) of this Agreement upon which the Indemnified Party relies for its demand and (iii) a good faith estimate of the amount of the claim, in

each case to the Person(s) from whom indemnification is sought hereunder (an "**Indemnifying Party**"). If the claim is not a Third Party Claim, the Indemnifying Party shall have ten (10) Business Days after delivery of the Notice of Claim to notify the Indemnified Party in writing of the nature and basis of its objection, if any, to the asserted claim for indemnification. If no such objection is received by the Indemnified Party within ten (10) Business Days after delivery of the Notice of Claim, the claim shall be deemed to be allowed. If an objection is received by the Indemnified Party within ten (10) Business Days after delivery of the Notice of Claim, the parties shall resolve the dispute in accordance with <u>Section 6.05</u>.

(b)     If an Indemnified Party is seeking indemnification because of a claim asserted by any claimant other than an Indemnified Party, the Indemnified Party shall deliver a Notice of Claim to the Indemnifying Party promptly after such assertion is actually known to the Indemnified Party; <u>provided</u>, <u>however</u>, that the right of a Buyer Indemnitee or Seller Indemnitee, as the case may be, to be indemnified hereunder in respect of claims made or alleged by any such claimant (a "**Third Party Claim**") shall not be adversely affected by a failure to give such notice unless, and then only to the extent that, an Indemnifying Party is prejudiced in any material respect thereby. The Third Party Claim Notice of Claim shall be accompanied by copies of all relevant documentation with respect to such Third Party Claim to the extent readily available and to the extent such would not violate any non-disclosure obligation or adversely affect attorney-client privilege.

(i)     The Indemnifying Party shall have the right, upon written notice to the Indemnified Party, to assume and conduct the defense of the Third Party Claim with counsel reasonably acceptable to the Indemnified Party; <u>provided</u>, <u>however</u>, that: (t) such Third Party Claim is not asserted by any of the Material Customers or Material Suppliers; (u) such Third Party Claim is not asserted by any Governmental Authority; (v) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice materially adverse to the continuing business interest or the reputation of the Indemnified Party; (w) the Third Party Claim solely seeks (and continues to solely seek) monetary damages which are not reasonably expected to be in excess of the Indemnifying Party's remaining indemnity obligations hereunder and does not seek an injunction or other equitable relief; (x) no conflict of interest arises that, under applicable principles of legal ethics, in the reasonable judgment of counsel to the Indemnified Party, would prohibit a single counsel from representing both the Indemnifying Party and the Indemnified Party in connection with the defense of such Third Party Claim; and (y) the Indemnifying Party notifies the Indemnified Party in writing within twenty (20) days after the Indemnified Party has given Notice of Claim, that the Indemnifying Party will, subject to the limitations set forth <u>Section 6.06</u>, indemnify the Indemnified Party from and against the entirety of any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim. The Indemnified Party may thereafter participate in (but not control) the defense of any such Third Party Claim with its own counsel (reasonably acceptable to the Indemnifying Party) at its own expense; <u>provided</u>, <u>however</u>, that such Indemnified Party shall be entitled to participate in any such defense with one

separate counsel (reasonably acceptable to the Indemnifying Party) at the expense of the Indemnifying Party (provided that the expenses of such counsel shall be limited to the reasonable fees of such counsel and reasonable out-of-pocket expenses incurred by such counsel and subject to the limitations set forth in <u>Section 6.06</u>), if (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party, (B) such claim includes charges of criminal liability against an Indemnified Party or (C) there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the judgment of the Indemnified Party for the same counsel to represent both the Indemnified Party and the Indemnifying Party; <u>provided</u>, <u>however</u>, that if (1) any of the conditions described in subclauses (t), (u), (v), (w), (x) and (y) above fails to occur or ceases to be satisfied, or (2) the Indemnifying Party fails to take reasonable steps necessary to actively and diligently defend such Third Party Claim in the reasonable good faith judgment of the Indemnified Party, then the Indemnified Party may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense (subject to the limitations set forth herein).

(ii)     If the Indemnifying Party elects not to defend the Indemnified Party with respect to such Third Party Claim, or fails to notify the Indemnified Party of such election within twenty (20) days after receipt of the Notice of Claim, the Indemnified Party shall have the right, at its option, to assume and control the defense of the matter in such manner as it may deem reasonably appropriate, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such investigation or defense (subject to the limitations set forth herein), whether or not such Third Party Claim itself is indemnifiable under this <u>Article VI</u>.

(iii)     The Indemnifying Party, if it has assumed the defense of any Third Party Claim as provided in this Agreement, may not, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), consent to a settlement or compromise of, or the entry of any judgment arising from, any such Third Party Claim.  The Indemnified Party shall not be required to consent to any such settlement or compromise of, or the entry of any judgment, to the extent that such: (A) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party of a complete release from all liability in respect of such Third Party Claim, (B) does not provide for relief other than monetary damages which are paid solely by the Indemnifying Party, or (C) involves a finding or admission of any violation of Legal Requirements or admission of any wrongdoing by the Indemnified Party.

(iv)     Buyer and Seller agree to reasonably cooperate and provide reasonable access to such documents and information as may be reasonably requested by the Indemnifying Party in connection with the defense, negotiation or settlement of any such Third Party Claim.

(c)     The provisions set forth in <u>Section 5.03(b)</u> related to Tax Controversies shall control to the extent inconsistent with this <u>Section 6.04</u>.

**Section 6.05    Determination of Claims; Payment; Right to Offset**.

(a)     A claim for indemnification under this <u>Article VI</u> shall be deemed finally determined upon the occurrence of any of the following: (a) it is deemed allowed under Section 6.04(a); (b) entry of any final judgment or award rendered by a court of competent jurisdiction and the expiration of time in which to appeal therefrom; or (c) the execution by the Indemnifying Party and Indemnified Party of a mutually binding settlement agreement with respect to a claim.  The Indemnifying Party shall be required to pay all of the sums so owing in respect of such finally determined claim to the Indemnified Party by wire transfer of immediately available funds to an account designated by the Indemnified Party within ten (10) Business Days after such final determination.

(b)     Buyer's right to recoup any Losses for which it is entitled to indemnification pursuant to this <u>Article VI</u> shall be satisfied (i) first, from the Indemnity Escrow Amount, in accordance with the terms of the Escrow Agreement, (ii) second, jointly and severally from Seller and the Owner, including, without limitation, the right to offset pursuant to this <u>Section 6.05(b)</u>.  Once a Loss has been determined pursuant to <u>Section 6.05(a)</u> but subject to the limitations set forth in <u>Section 6.06</u>, Buyer shall have the right to satisfy any obligation of Seller or the Owner to Buyer by offsetting the amount of Losses from the Contingent Consideration to the extent earned; <u>provided</u>, <u>however</u>, that if the Contingent Consideration is not earned by Seller or the Contingent Consideration is exhausted by Buyer's offset of Losses or otherwise not sufficient to pay for the entirety of Buyer's Losses, Seller and the Owner shall satisfy their obligations to the Buyer Indemnitees within ten (10) Business Days after such mutual agreement or final, non-appealable adjudication by wire transfer of immediately available funds.  The foregoing shall not limit Buyer's rights to seek remedies of specific performance, injunction or other equitable relief.

**Section 6.06    Exceptions**.

(a)     Notwithstanding anything in this Agreement to the contrary but subject to <u>Section 6.06(b)</u>, the Buyer Indemnitees shall not have the right to be indemnified pursuant to <u>Section 6.02(b)</u> until the aggregate amount of all Losses which are indemnifiable pursuant to <u>Section 6.02(b)</u> exceeds Fifty Thousand Dollars ($50,000) (the "**Basket**"), in which event Seller and the Owner shall be liable for all such Losses exceeding the Basket.

(b)     Notwithstanding anything in <u>Section 6.06(a)</u> to the contrary, in no event shall the Basket apply to: (i) the rights of the Buyer Indemnitees to be indemnified pursuant to <u>Section 6.02(b)</u> with respect to the Fundamental Representations, (ii) any claim of Seller Fraud, (iii) matters with respect to Taxes, or (iv) the rights of the Buyer Indemnitees to be indemnified pursuant to <u>Section 6.02(a)</u> through <u>Section 6.02(f)</u> (other than <u>Section 6.02(b)</u>).

(c)     Seller's and the Owner's collective aggregate liability under this Agreement with respect to claims for indemnification pursuant to <u>Section 6.02(b)</u> (except with respect

to Seller Fraud, Taxes, Fundamental Representations or the representations made in Section 3.10(b) (Key Customers)) shall not exceed an amount equal to One Million Eight Hundred Thousand Dollars ($1,800,000).  Seller's and the Owner's collective aggregate liability under this Agreement with respect to claims for indemnification pursuant to Section 6.02(b) with respect to Section 3.10(b) (Key Customers) shall not exceed an amount equal to the Closing Payment.

(d)     Except for (i) Seller Fraud or (ii) a willful and intentional breach of Section 5.07(a)(iv), Seller's aggregate liability under this Agreement (including with respect to breaches or inaccuracies with respect to Fundamental Representations) shall not exceed an amount equal to the Cap.

(e)     Notwithstanding anything in this Agreement to the contrary, but subject to the limitations set forth in this Section 6.06 and the other limitations set forth in this Article VI, if:

(i)     there is a claim for indemnification pursuant to Section 6.02(b) (except with respect to the (A) Fundamental Representations, (B) Taxes, or (C) Seller Fraud) and the Deductible has been satisfied (when aggregated with all other Losses for matters referred to in Section 6.02(b)), the Buyer Indemnitees shall seek recourse in the following order of priority: (x) first, from the Indemnity Escrow Amount; and (y) *thereafter*, from Seller and the Owner including, without limitation, the right to offset pursuant to Section 6.05, provided, however such aggregate amounts shall not exceed an amount equal to $1,800,000;

(ii)     there is a claim for indemnification for a breach of a Fundamental Representation pursuant to Section 6.02(b) or Taxes (in each case except with respect to Seller Fraud), then the Buyer Indemnitees shall be entitled to seek recourse (at their sole election) from: (x) the Indemnity Escrow Amount and/or (y) directly from Seller and the Owner including, without limitation, the right to offset pursuant to Section 6.05, provided, however such aggregate amounts shall not exceed the Cap;

(iii)     there is a claim for indemnification pursuant to Section 6.02(a) through Section 6.02(g) (other than Section 6.02(b) or a willful and intentional breach of Section 5.07(a)(iv)), then the Buyer Indemnitees shall be entitled to seek recourse (at their sole election) from: (x) the Indemnity Escrow Amount and/or (y) directly from Seller and the Owner including, without limitation, the right to offset pursuant to Section 6.05; provided, however, such aggregate amounts shall not exceed the Cap; and

(iv)     there is a claim for indemnification relating to Seller Fraud or a willful and intentional breach of Section 5.07(a)(iv), then the Buyer Indemnitees shall be entitled to seek recourse (at their sole election) from: (x) the Indemnity Escrow Amount and/or (y) directly from Seller and the Owner including, without limitation, the right to offset pursuant to Section 6.05, without any limit on the amount.

(f)     Except for (i) indemnification for a breach of a Buyer Fundamental Representation pursuant to Section 6.03(b), or (ii) Buyer Fraud, Buyer shall not be liable to any Seller Indemnitee for indemnification under Section 6.03(b) until the aggregate amount of all Losses in respect of indemnification under Section 6.03(b) exceeds the Deductible, in which event Buyer shall be liable for all Losses back to the first dollar.

(g)     Except for Buyer Fraud, Buyer's aggregate liability under this Agreement (including in respect to a breach or inaccuracy with respect to a Fundamental Representation) shall not exceed an amount equal to the Cap; provided, however, that Buyer's aggregate liability under this Agreement with respect to any inaccuracy or breach of a representation or warranty (other than a Buyer Fundamental Representation) shall not exceed $1,800,000.

(h)     Once a Loss has been determined pursuant to Section 6.05(a) but subject to the limitations set forth in Section 6.05 and Section 6.06, Seller and the Owner, on the one hand, and Buyer, on the other hand, shall satisfy its obligations for payment within ten (10) Business Days after such mutual agreement or final, non-appealable adjudication by wire transfer of immediately available funds.

**Section 6.07   Limitations on Indemnification**.   Notwithstanding anything to the contrary contained in this Agreement:

(a)     No party shall be entitled to any double recovery for any specific Losses relating to any matter arising under one provision of this Agreement to the extent that such party has already recovered such Losses with respect to such matter pursuant to other provisions of this Agreement.

(b)     For purposes of determining the amount of any Losses payable pursuant to this Article VI, such amount shall be reduced by the amount of:

(i)     any insurance proceeds actually received by, or paid on behalf of, any Indemnified Party in respect of the Losses, net of any deductible amounts and net any reasonable costs and expenses actually incurred by such Indemnified Party in collecting such insurance proceeds, including any increase in insurance premiums resulting from the matter causing the Losses or the circumstances giving rise thereto; and

(ii)     any third-party indemnification proceeds, contribution payments or reimbursements actually recovered by the Indemnified Party or any Affiliate thereof from any third party as a direct result of the circumstances giving rise to such Losses (including any warranty proceeds recovered from subcontractors related to any warranty claim), net of any reasonable costs and expenses actually incurred by such Indemnified Party in collecting such indemnification proceeds.

**Section 6.08   Sole and Exclusive Remedy**.   As between Buyer, on the one hand, and Seller and the Owner, on the other hand, the remedies provided in this Article VI shall be the sole and exclusive remedies of the parties and their respective officers, directors, employees, Affiliates, agents, representatives, successors and assigns for any and all Losses arising out of, relating to, or

resulting from, any breach of any of the representations, warranties, covenants and agreements contained in this Agreement; provided, however, that nothing herein is intended to waive or otherwise limit any claims for Losses arising out of, relating to, or resulting from, (i) Seller Fraud, (ii) Buyer Fraud, (iii) disputes under Section 1.06 (Working Capital Adjustment) (which disputes will be resolved in accordance with the dispute mechanism in Section 1.06 (Working Capital Adjustment)), or (iv) waive any equitable remedies to which a party may be entitled to pursuant to Section 5.07 (Restrictive Covenants) and Section 7.13 (Specific Performance; Injunctive Relief).

Section 6.09   Tax Treatment of Indemnification Payments.   All indemnification payments made by Seller or the Owner under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by applicable Legal Requirements.

Section 6.10   Effect of Investigation.   Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller and the Owner contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

Section 6.11   Materiality Scrape.   For purposes under this Article VI, (i) in determining whether there has been any misrepresentation or breach of a representation or warranty and (ii) in determining the amount of Losses resulting from any misrepresentation or breach of a representation or warranty, all qualifications or exceptions in any representation or warranty relating to or referring to the terms "material," "materiality," "in all material respects," "material adverse effect," "material adverse change" or any similar term or phrase shall be disregarded, it being the understanding of the parties that the representations and warranties of the parties contained in Articles III and IV shall be read as if such terms and phrases were not included in them; provided, however, that this Section 6.11 shall not (a) be deemed to turn references to "Material Contract" to "Contract" or "Material Contracts" to "Contracts" nor (b) be deemed to turn "Material Customer" to "Customer" or "Material Supplier" to "Supplier."

Section 6.12   Release of Remaining Indemnity Escrow Amount.   Buyer and Seller shall jointly instruct the Escrow Agent to release any portion of the Indemnity Escrow Amount remaining (to the extent not previously disbursed to any Buyer Indemnitees pursuant to this Article VI) to Seller on the date that is eighteen (18) months after Closing (the "**Indemnification Escrow Expiration Date**"), except that the Escrow Agent shall retain an amount (up to the total amount of the balance of the Indemnity Escrow Amount then held by the Escrow Agent) equal to the amount of any claims asserted by Buyer prior to eighteen (18) months after Closing but not yet resolved ("**Unresolved Claims**").   The portion of the Indemnity Escrow Amount retained for Unresolved Claims shall be released by the Escrow Agent to Seller (to the extent not utilized to pay any Buyer Indemnitees for any such Unresolved Claims resolved in favor of such Buyer Indemnitees) upon their resolution in accordance with this Article VI and the Escrow Agreement.

Section 6.13   Acknowledgment.   The Owner acknowledge and agree that they have carefully read the terms and provisions of this Article VI and acknowledge and agree that, in consideration of the substantial consideration they will receive from Seller pursuant to the transactions under this Agreement, the terms and provisions in this Article VI are reasonable and

necessary to protect the legitimate interests of Buyer and its Affiliates and that Buyer would not have entered into this Agreement or otherwise agreed to the Purchase Price in the absence of such terms and provisions.  Seller and the Owner acknowledge and agree that the terms and provisions of this Article VI are an essential part of the transactions under this Agreement and that Buyer, in executing the Purchase Agreement and the Ancillary Transaction Documents, placed significant reliance on their compliance with the terms and provisions set forth in this Article VI.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01  Expenses**.  All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses except as set forth elsewhere in this Agreement.

**Section 7.02  Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) on the next Business Day if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

**If to Seller or the Owner**:                 Kyle Garrett
                                              22 North Sheep Lane Drive
                                              P.O. Box 331
                                              Nephi, Utah 84648
                                              Email: kgarrett@rmwt.com

with a copy, which shall not constitute        Bennett Tueller Johnson & Deere, LLC
notice to:                                     3165 East Millrock Drive, Suite 500
                                              Salt Lake City, Utah 84121
                                              Attn: Jeffrey E. Matson, Esq.
                                              Email: jmatson@btjd.com

**If to Buyer:**                               RMWT Consulting LLC
                                              c/o Mill Point Capital LLC
                                              1177 Avenue of the Americas
                                              45th Floor
                                              New York, NY 10036
                                              Attn: Tom Barnes
                                              Email: tom.barnes@fullcirclefiberpartners.com

with a copy, which shall not constitute        Becker Legal Group
notice to:                                     99 Madison Avenue, Fifth Floor

New York, NY 10016
Attn: David M. Becker
Email: dbecker@beckerlg.com

**Section 7.03   Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04   Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction and such invalid, illegal or unenforceable term or provision shall be reformed and construed so that it be valid, legal and enforceable to the maximum extent possible in such jurisdiction.

**Section 7.05   Entire Agreement**.  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits, the Schedules and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 7.06   Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed; provided that Buyer may assign its rights, but not its obligations, under this Agreement to any of its Affiliates.   No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07   Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, including any employee or independent contractor, or former employee or independent contractor, (including any beneficiary or dependent thereof) of Seller.

**Section 7.08   Amendment and Modification**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 7.09   Waiver**.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder

50

preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 7.10   Governing Law**. This Agreement shall be governed by and construed and interpreted in accordance with the internal laws of the State of Delaware without regard to any choice or conflict of law or choice of forum provision, rule or principle (whether of the State of Delaware or any other jurisdiction) that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction.

**Section 7.11   Submission to Jurisdiction**.  Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware in each case located in New Castle County, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**Section 7.12   Waiver of Jury Trial**.  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 7.13   Specific Performance; Injunctive Relief**.   The parties agree that irreparable damage could occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. Notwithstanding anything contained herein to the contrary, Seller and the Owner acknowledge and agree that a breach of the provisions set forth in <u>Section 5.08</u> hereof would cause irreparable injury to Buyer and its successors and assigns, and that Buyer and its successors and assigns shall therefore be permitted to seek injunctive relief in the event of any actual or potential breach thereof, without the need to prove actual damages or post a bond.

**Section 7.14   Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, portable document format ("**PDF**") or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  Each party agrees that it intends to be bound by its electronic signature on this Agreement or any Ancillary Transaction Documents, if applicable, and waives any defense to the enforcement of this Agreement and such Ancillary Transaction Document based on the fact that they used an electronic signature or that a signature was sent by electronic means only.

**Section 7.15   Construction**.  The term "Agreement" means this Agreement together with all Schedules (including the Disclosure Schedule), annexes and Exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party by virtue of the authorship of this Agreement shall

not apply to the construction and interpretation hereof.  The parties agree that no party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any suit among any of the foregoing.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires, (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning, (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified, (e) the words "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified, (f) references to a particular statute or regulation include all rules and regulations thereunder and any predecessor or successor statute, rules or regulation, in each case as amended or otherwise modified from time to time, (g) the word "will" shall have the same meaning as the word "shall," (h) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if," (i) the references to "dollar," "dollars" or "$" shall mean the lawful currency of the United States, (j) the term "ordinary course of business" means "ordinary course of business consistent with past practices"  and (k) the references to "day" or "days" in the lower case means calendar days. Capitalized terms set forth but not defined in the Schedules (including the Disclosure Schedule) or Exhibits to this Agreement shall have the meanings set forth in this Agreement (including Appendix A hereto).

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: D9950E489-86G2-4435-9271-9368B7474C8B

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

**ROCKY MOUNTAIN WEST TELECOM, INC.**

By: _____
Name: Kyle Garrett
Title: President


**OWNER:**

**KYLE GARRETT**

By: _____
Name: Kyle Garrett

**BUYER:**

**RMWT TELECOM LLC**


By: _____
Name: Tom Barnes
Title: Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

**ROCKY MOUNTAIN WEST TELECOM, INC.**


By: _____
Name: Kyle Garrett
Title: President


**OWNER:**

**KYLE GARRETT**

By: _____
Name: Kyle Garrett

**BUYER:**

**RMWT TELECOM LLC**

By: _____
Name: Tom Barnes
Title: Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

## APPENDIX A

### Definitions

"**Accounting Principles**" means those same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Interim Financial Statements.

"**Affiliate**" means, with respect to any Person, (a) any director, officer, manager, managing member, general partner, or trustee of such Person, (b) if such Person is a natural person, a spouse, parent, sibling, or descendant, or other family members and direct relatives of such Person, and (c) any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person, and includes such Person's Subsidiaries.

"**Ancillary Transaction Documents**" means the Bill of Sale, the General Assignment Agreement, the Commercial Lease Assignment, the IP Assignment Agreement, the Buyer Certificate, the Seller Certificate and the Escrow Agreement.

"**Business Day(s)**" means any day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Legal Requirements to remain closed.

"**Closing Date**" means the date of this Agreement.

"**Closing Indebtedness**" means, without duplication, the obligations of Seller outstanding and unpaid immediately prior to the Effective Time (excluding any undrawn amounts under credit lines or revolving (or similar) credit facilities, and excluding any indemnification or contingent obligations not then owing) under any Indebtedness.

"**Closing Transaction Expenses**" means Transaction Expenses that remain unpaid as of immediately prior to the Effective Time.

"**Buyer Fraud**" means (a) Buyer has made a material representation or warranty in Article IV or in any Ancillary Transaction Document to which Buyer is a party with the actual knowledge that such representation or warranty was false at the Closing, (b) such misrepresentation was made with the intent of inducing the Sellers to enter into this Agreement and the Ancillary Transaction Documents to which the Sellers are a party, (c) the Sellers justifiably relied on such misrepresentation to its detriment and (d) the Sellers suffered Losses as a result of such reliance. For the avoidance of doubt, Buyer Fraud does not include merely making a negligent misrepresentation, negligent omission or negligent disclosure, and does not include constructive knowledge (as opposed to actual knowledge).

"**Cap**" means the aggregate dollar amount of Purchase Price. For the avoidance of doubt, the Purchase Price shall only include the dollar amounts of Contingent Consideration, if any, once such amount is actually paid to Seller pursuant to Sections 1.05(a)(ii) and 1.05(a)(iii) (or deemed paid to the Sellers pursuant to Section 6.05(b)).

"**Cash on Hand**" means as of any time the aggregate cash balance of Seller on hand or in transit, in the Operating Bank Accounts, including all cash, commercial paper, certificates of deposit and other bank deposits, treasury bills, short term liquid investments and all other cash equivalents, and third party checks deposited or held in the accounts of Seller that have not yet cleared, in each case as of such time; provided, however, that Cash on Hand shall be reduced by the amount of all outstanding checks on draft of Seller that are issued or outstanding at such time.

"**Closing Cash on Hand**" means the Cash on Hand as of the Effective Time.

"**Closing Working Capital**" means, with respect to the Business as of the Effective Time, the difference (whether positive or negative) of (a) Current Assets and (b) Current Liabilities, in each case determined and calculated in accordance with the Accounting Principles, as illustrated in the calculation of Target Closing Working Capital set forth on Schedule 1.06 attached hereto.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated September 19, 2022, by and between Seller and Full Circle Fiber Partners, LLC.

"**Current Assets**" means those assets identified as being included in the calculation of the Target Closing Working Capital, set forth on Schedule 1.06. For the avoidance of doubt, "Current Assets" shall exclude Cash on Hand, income tax assets, all Excluded Assets and Seller's accounts receivable included in the calculation of Target Closing Working Capital but not collected within one-hundred twenty (120) days of the Closing Date, except as otherwise set forth on Schedule 1.06.

"**Current Liabilities**" means those liabilities identified as being included in the calculation of Target Closing Working Capital, set forth on Schedule 1.06. For the avoidance of doubt, "Current Liabilities" shall exclude (A) all Closing Indebtedness, (B) the Transaction Expenses of Seller paid at or prior to Closing, (C) all income tax liabilities, and (D) all Excluded Liabilities, except as otherwise set forth on Schedule 1.06.

"**COVID-19**" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemics or disease outbreaks.

"**COVID Relief Acts**" shall mean (i) the Coronavirus Aid, Relief, and Economic Security Act (Public Law 116-136), signed into law on March 27, 2020, (ii) Paycheck Protection Program and Health Care Enhancement Act (Public Law 116-139), (iii) Paycheck Protection Program Flexibility Act of 2020 (Public Law 116-142), (iv) Consolidated Appropriations Act, 2021 (Public Law 116-260), and (v) American Rescue Plan Act of 2021 (Public Law 117-2), and any other legislation relating to COVID-19, and related regulations, policies and rules by the Governmental Bodies implementing such legislative actions.

"**Disclosure Schedule**" means the disclosure schedule delivered by Seller and the Owner to Buyer in connection with this Agreement.

"**Effective Time**" means 11:59 p.m. (Eastern Time) on the Closing Date.

"**Employee Retention Credit**" means the employee retention tax credit set forth in Section 2301 of the CARES Act (as modified by the Consolidated Appropriations Act, 2021).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any Person that is treated as a single employer or under common control with the Company under Sections 414(b), (c), (m) or (o) of the Code.

"**Final Closing Working Capital**" means the Closing Working Capital, as finally determined in accordance with Section 1.06(b) and (c).

"**Fiscal 2023 Audit**" means the audit of the Business, conducted by Buyer or its representative, for Fiscal 2023.

"**GAAP**", as used throughout this Agreement, means generally accepted accounting principles, consistently applied.

"**Hazardous Materials**" means (i) "hazardous substances" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq. as amended by the Superfund Amendments and Reauthorization Act of 1986, and as further amended from time to time, and regulations promulgated thereunder, (ii) "PCBs" as defined in 40 C.F.R. §§ 761, et seq., or analogous regulations promulgated under the Toxic Substances Control Act, as amended, (iii) "asbestos" as defined in 29 C.F.R. §§ 1910.1001, et seq., or analogous regulations promulgated under the Occupational Safety and Health Act of 1970, as amended, (iv) oil and petroleum based products, (v) radioactive material or waste, (vi) biological and other medical products and waste material, (vii) "hazardous wastes" as defined in Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601, et seq., as amended and all regulations promulgated thereunder, (viii) hazardous air pollutants as defined in the Clean Air Act, 42 U.S.C., §§ 740-1, et seq., and all regulations promulgated thereunder, (ix) "hazardous substance" as defined in the Clean Water Act, 33 U.S.C. §§ 1251, et seq., as amended and all regulations promulgated thereunder, (x) any substance regulated under the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., as amended and all regulations promulgated thereunder, (xi) any substance regulated under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136, et seq., as amended and all regulations promulgated thereunder, and (xii) any chemicals, materials, waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant, under any Legal Requirements relating to protection of the environment.; as such Legal Requirements may be amended from time to time, and as such terms may be expanded by additional legislation of a general nature.

"**Indebtedness**" of any Person means (i) any liability of any Person (A) for borrowed money (including the current portion thereof), or (B) under any reimbursement obligation relating to a letter of credit, bankers' acceptance or note purchase facility, or (C) evidenced by a bond, note, debenture or similar instrument (including a money purchase obligation), or (D) for the payment of money relating to leases that are required to be classified as a capitalized lease obligation in accordance with GAAP (including any Assumed Capital Leases), (E) for all or any part of the deferred purchase price of property or services (other than trade payables), including any "earnout" or similar payments or any non-compete payments, (F) under interest swap, hedging

or similar agreements, (G) the aggregate amount of all accounts payable that is ninety (90) days or greater past due, or (H) any amounts of deferred revenue, including customer and client prepayments and offsetting deferred maintenance costs; (ii) any liability of others described in the preceding clause (i) that such Person has guaranteed, that is recourse to such Person or any of its assets or that otherwise is its legal liability or that is secured in whole or in part by the assets of such Person; (iii) any Pre-Closing Taxes; or (iv) such debt-like items set forth on Schedule Appendix-1. For purposes of this Agreement, Indebtedness includes any and all accrued interest, success fees, prepayment premiums, make-whole premiums or penalties and fees or expenses (including attorneys' fees) associated with the prepayment of any Indebtedness.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) trade names, trademarks, service marks, brand names, trade dress rights, logos, corporate names, trade styles, and other source or business identifiers, including all applications and registrations therefor and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) websites and internet domain name registrations; (vi) software programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code; (vii) other intangible or intellectual property and related proprietary rights, interests and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing); and (viii) any licenses, arrangements, and other agreements related to any of the foregoing.

"**Losses**" means any damages, losses, charges, liabilities, claims, demands, actions, suits, fines, judgments, settlements, awards, Taxes, interest, penalties, fees, costs, fees and expenses (including documented, reasonable and out-of-pocket attorneys' fees and disbursements); provided, however, that "Losses" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or other third party.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or would reasonably be expected to become, individually or in the aggregate when taken together with all other such similar or related events, occurrences, facts, conditions or changes that have occurred prior to the date of determination of the occurrence of such event, occurrence, fact, condition or change, materially adverse to (a) the business or financial condition of Seller, taken as a whole, or (b) the ability of Seller and the Owner to consummate the transactions contemplated hereby on a timely basis; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition, or change, arising out of or attributable to: (i) a change in general economic or political conditions; (ii) a change in conditions generally affecting the industries in which the Business operates; (iii) any changes in financial or securities markets in general; (iv) natural disaster, sabotage, acts of terrorism, war (whether or not declared); (v) any failure by Seller to meet any internal or published projections, forecasts, revenue, or earnings predictions; (vi) any action or inaction in compliance with, or as permitted or required by, this Agreement or any action taken (or omitted to be taken) with the written consent or at the request of Buyer; or (vii) any changes after the date of this Agreement to GAAP or Legal Requirements; provided, further, that any event, occurrence, fact, condition, or change referred to in clauses (i) through (vii) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such event, occurrence, fact, condition,

or change has a materially disproportionate effect on the Business compared to Seller's competitors in the Business.

"**Person**" means and includes an individual, a partnership, a joint venture, an association, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Authority, or any other entity.

"**PPP**" means "the Paycheck Protection Program administered by the U.S. Small Business Administration ("**SBA**") or such other Governmental Authority responsible for such program.

"**Representatives**" means, with respect to a Person, the Person's directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents.

"**Seller Fraud**" means (a) Seller or the Owner have made a material representation or warranty in Article III or in any Ancillary Transaction Document to which Seller or the Owner is a party with the actual knowledge that such representation or warranty was false at the Closing, and (b) (x) such misrepresentation or disclosure was made with the intent of inducing Buyer to enter into this Agreement and the Ancillary Transaction Documents to which Buyer is a party, (y) Buyer justifiably relied on such misrepresentation or disclosure to its detriment, and (z) Buyer suffered Losses as a result of such reliance.  For the avoidance of doubt, Seller Fraud does not include merely making a negligent misrepresentation, negligent omission or negligent disclosure, and does not include constructive knowledge (as opposed to actual knowledge).

"**Solvent**" means that: (a) the fair value of the assets of such party will exceed its consolidated debt and liabilities, contingent or otherwise; (b) the present fair saleable value of the property of such party will be greater than the amount that will be required to pay the probable liability on its debts and other liabilities contingent or otherwise, as such debts and other liabilities become absolute and mature; (c) such party is able to pay its debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business; and (d) such party is not engaged in, and is not about to engage in, any business or transaction contemplated as of the date hereof for which it has unreasonably small capital.

"**Subsidiary**" of any Person means, with respect to any corporation, limited liability company, partnership, limited partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or (b) if a limited liability company, partnership, limited partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons is allocated a majority of such business entity's gains or losses or is a managing director or general partner of such business entity (other than a corporation) or controls such a managing director or general partner.

"**Target Closing Working Capital**" means One Million Three Hundred Thousand dollars ($1,300,000).

"**Tax**" or "**Taxes**" means any and all taxes, including any income, alternative or add-on minimum, gross income, gross receipts, accumulated earnings, sales, use, ad valorem, value added, transfer, franchise, profits, license, registration, recording, documentary, conveyancing, gains, withholding, payroll, employment, social security, national insurance, disability, unemployment, worker's compensation, excise, severance, stamp, occupation, premium, property, environmental or windfall profit, custom duty, escheat, unclaimed property, estimated or other tax, governmental fee or other like assessment or charge, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority, whether or not disputed, and any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person by law, by contract or otherwise.

"**Tax Authority**" means any Governmental Authority responsible for the imposition, administration, assessment, or collection of any Tax.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, in each case filed with any Tax Authority.

"**Transaction Expenses**" means: (i) all unpaid costs, fees and expenses of outside professionals incurred by Seller of which any party other than Seller has agreed to pay relating to the preparation, negotiation and execution of this Agreement and the Ancillary Transaction Documents, and the performance and consummation of the transactions contemplated thereby, including, but not limited to, any legal or other advisor expenses, expenses or fees in connection with any third-party consents (including any additional amounts of security deposits required in connection therewith), and Seller's portion of fees with respect to the Escrow Agreement; and (ii) any sale bonuses, change in control bonuses, transaction bonuses, retention bonuses or other similar payments (including any employer portion of employment or payroll Taxes with respect thereto) that become payable to any current or former director, manager, officer, employee, contractor, consultant or agent upon, and as a result of, the consummation of the transactions contemplated hereby (whether alone or together with another event (which for the avoidance of doubt, excludes events resulting from an action by Buyer after Closing)) and that arise as a result of an agreement, plan, contract or other arrangement entered into by or on behalf of Seller prior to the Closing or are otherwise incurred by or on behalf of Seller and which any other party other than Seller has agreed to pay on Seller's behalf.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, as amended.

## __SCHEDULES TO THE APA__

[*See Attached*]

**SCHEDULE 1.01(a)**

**FIXED ASSETS**

1.      Office Equipment:

      (a)      FILING CABINETS

      (b)      ALARM SYSTEM

      (c)      POWERED CUBICLES

      (d)      STOVE

      (e)      AC UNIT

**SCHEDULE 1.01(f)**

**PERMITS**

1.      None.

**SCHEDULE 1.01(g)**

**TANGIBLE PERSONAL PROPERTY**

1.      Automobiles and Automotive Equipment:

      (a)      2019 FORD F-150 – VIN 1FTFW1E40KKE17541

      (b)      2019 FORD F-150 – VIN 1FTFW1E42KKE17542

      (c)      2020 FORD F150 – VIN 1FTEW1EP3LKE38262

      (d)      2020 FORD F150 – VIN 1FTEW1EP5LKF39092

      (e)      2021 JEEP CHEROKEE – VIN 1C4PJMLB0MD120718

      (f)      2014 FORD F-150 – VIN 1FTFW1ETXEKD26952

      (g)      2014 FORD F-150 – VIN 1FTFW1ET6EKD26947

      (h)      2014 FORD F-150 – VIN 1FTFW1ET0EKD26944

      (i)      2014 FORD F-150 – VIN 1FTFW1ET4EKD26946

      (j)      2014 FORD F-150 – VIN 1FTFW1ET2EKD26945

2.      Field Equipment:

      (a)      GRS UNITS

      (b)      DMI RAC GEO

      (c)      GPS EQUIPMENT (SYRINGA)

      (d)      EXFO TESTING MACHINE

      (e)      CALIBRATION EQUIPMENT

      (f)      MEASURING WHEELS

      (g)      HEIGH STICKS

      (h)      CMR MEASURING ROD

      (i)      PATHFINDER/RYCOM

      (j)      MEASURING RODS

      (k)      RALLY EQUIPMENT

      (l)      LAWN MOWER

      (m)     DRONE

      (n)     FURNACE

      (o)     HEATER & AC

      (p)     REWIRE OFFICE

      (q)     LIGHTING SYSTEM

      (r)     BLINDS

3.    Equipment:

      (a)     ROUTERS

      (b)     SERVERS

      (c)     MONITORS & PRINTERS

      (d)     DESKTOP COMPUTERS

      (e)     SURFACE PROS2

      (f)     DRAFTER COMPUTERS

      (g)     GRS UNITS

      (h)     DMI RAC GEO

      (i)     GPS EQUIPMENT (SYRINGA)

      (j)     EXFO TESTING MACINE

      (k)     CALIBRATION EQUIPMENT

      (l)     MEASURING WHEELS

      (m)     HEIGH STICKS

      (n)     CMR MEASURING RODS

      (o)     PATHFINDER/RYCOM

      (p)     MEASURING RODS

      (q)     RALLY EQUIPMENT

      (r)     LAWN MOWER

      (s)     DRONE

4.      Office Equipment.

     (a)      KIP 1030 COPIER

     (b)      OFFICE PHONES

     (c)      24X36 DIGITIZER

     (d)      DIGITIZER 11X17

     (e)      CONFERENCE ROOM TABLE

     (f)      CUBICLE FURNITURE

     (g)      DESKS

     (h)      CHAIRS

     (i)      WIDE FORMAT

     (j)      PAPER SHREDDER

     (k)      CREDIT CARD MACHINE

     (l)      BATTERIES FOR SERVERS

     (m)      TELEPHONE SYSTEM

     (n)      SWEEP GEER

     (o)      VACUUM

     (p)      DESKTOP GRAPHICS CARD

     (q)      6 5' TRAINING TABLES

     (r)      2 5' NESTING TABLES

     (s)      MONITORS (TX)

     (t)      REFRIDGERATORS

5.      The following automobiles leased pursuant to that certain Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC:

     (a)      2022 FORD F-150 – VIN 1FTFW1ED2NFC41234

     (b)      2022 FORD F-150 – VIN 1FTFW1ED4NFC41042

     (c)      2022 FORD F-150 – VIN 1FTFW1ED4NFC41039

     (d)      2022 FORD F-150 – VIN 1FTFW1ED9NFC40954

**SCHEDULE 1.01(l)**

**OPERATING BANK ACCOUNTS**

1.

| Account # | Bank | Address | Use | Authorized Party |
|---|---|---|---|---|
| 470002379 | Wells Fargo | 10 N Center Street Nephi, UT 84648 | Commercial Business Checking | Seller |
| 266-18099-1-9 | Edward Jones | 170 Yellow Creek Rd, Ste A Evanston, WY 82930 | Trust | Seller |

## SCHEDULE 1.01(m)

## ASSUMED CAPITAL LEASES

1.      The following equipment leased pursuant to that certain Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital:

| Quantity | Model | Description |
|---|---|---|
| 1 | X10-HA True NAS | 2U TrueNAS X10 with Dual Controllers, 12 x 3.5" Drive Bays, Services: NFS v3/4, CIFS/SMB, iSCSI, AFP, WebDav, FTP, S3 API, WebUI |
| 2 | X10C 10GSFP+x2 2S 32G | X10 Controller: 2x 10Gb (SFP+), 2x 1GbBaseT, Up to 2x 12 Bay Expansion Shelf 32GB RAM Cache, 12 vCPU |
| 1 | X10A Read/Write | X10 Accelerator. 1x 200GB and 1x 400GB SAS SSD Write and Read Cache - 2 Bays |
| 5 | 8TB SAS 7.2K HDD | TrueNAS 8TB Enterprise Nearline SAS 7200RPM 128MB Cache |
| 1 | Bronze 3-YR | 3-Year 8x5 Help Desk (phone/email) Software Support w/ Next Business Day Advance Parts/Storage |

2.      All equipment leased pursuant to the following agreements:

(a)      Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

(b)      ValueLease Agreement, between the Seller and Imaging Capital.

(c)      Cost Per Image Agreement, dated December 10, 2018, between the Seller and Xerox Financial Services LLC.

**SCHEDULE 1.02(b)**

**EXCLUDED ASSETS**

1.      2020 F-350 – VIN 1FT8W3BT9LEC30721

2.      2020 Axel Dump Goose Neck Trailer

3.      Certain personal items in Owner's office, including pictures

4.      All animal mounts

5.      Gun cabinet and guns contained therein

6.      All items in storage unit.

7.      Laptop computer, HP, Silver, 15" screen, 10 key.

8.      Cell phone and associated phone number.

9.      Certain personal documents and photos of Owner on Seller's server.

10.     Gun cabinets in Bart Wankier and KC Lunt's offices.

11.     Personal property and decorations in the workspaces of Seller employees.

12.     The following items located on the Leased Real Property and used by the Seller are the property of K & K Leasing, LLC:

        (a)      Ice machine

## SCHEDULE 1.02(d)

### EXCLUDED CONTRACTS

1.      Since October 8, 2012, Seller has been leasing a storage unit located at 107 West Center Street, Nephi, Utah 84648 from Carmco, LLC pursuant to an oral contract for $325.00 per month. All items kept in such storage unit will be excluded from the transaction and Owner will assume such lease and the payments to lease such storage unit following the Closing.

2.      Life Insurance Policy No. 000181423 with U.S. Financial Life Insurance Co.

3.      Life Insurance Policy (Policy Number 0000181428) on the Owner through U.S. Financial Life Insurance Company.

4.      Subcontractor Agreement, dated January 1, 2020, between the Seller and SOW Management, LLC, as amended by that certain Subcontractor Agreement Pricing Addendum, dated January 1, 2020.

**SCHEDULE 1.02(e)**

**EXCLUDED BANK ACCOUNTS**

1.

| Account # | Bank | Address | Use | Authorized Party |
|-----------|------|---------|-----|------------------|
| 266-25710-1-3 | Edward Jones | 170 Yellow Creek Rd, Ste A Evanston, WY 82930 | LLC Account Guided Solutions Fund Account | Seller |
| ******3187 | Central Bank | 182 S Main Street Payson UT 84651 | Checking | ******3187 |
| 63173810 | Cache Valley Bank | 185 S Main Street Nephi, UT 84648 | Savings | 63173810 |
| 470001686 | Wells Fargo | 10 N Center Street Nephi, UT 84648 | Commercial Business Checking | 470001686 |
| 5161639439 | Wells Fargo | 10 N Center Street Nephi, UT 84648 | Commercial Business Checking | 5161639439 |

**SCHEDULE 1.02(f)**

**EXCLUDED ACCOUNTS RECEIVABLE**

1.     Seller anticipates receiving an Employee Retention Credit in the amount of $1,642,267.41, of which twenty percent (20%), or $325,853.48, is owed to Jorns & Associates, who assisted Seller in obtaining such credit.

**<u>SCHEDULE 1.04</u>**

**EXCLUDED LIABILITIES**

1.      None.

### <u>SCHEDULE 1.05(a)</u>

**WIRE INFORMATION**

1.   Kyle Garrett / PO Box 141 / Nephi, UT 84648 Central Bank / Spanish Fork, UT 84648 Routing #124300327 Account #92412998

**SCHEDULE 1.06(a)**

**ESTIMATED CLOSING STATEMENT**

1.

|  | March 6, 2023 |
|---|---|
| **Cash** | 100,000.00 |
| | |
| **Working Capital** | |
| Accounts Receivable | 1,850,401.05 |
| Accounts Payable | -50,000.00 |
| Credit Cards | -25,000.00 |
| Payroll Accrual (Payroll paid 3/10/23) | -250,000.00 |
| Payroll Liabilities (prior payrolls) | -18,072.00 |
| Working Capital | 1,507,329.05 |
| | |
| **Transaction Costs** | |
| Bennett Tueller Johnson Deere | 59,667.50 |
| Denali Consulting LLC (Lee) | 100,000.00 |
| Tyson Garrett (Employee) | 25,000.00 |
| Bart Wankier (Employee) | 100,000.00 |
| | 284,667.50 |

**<u>SCHEDULE 2.02(a)(vi)</u>**

**REQUIRED CONSENTS**

1.      The following contracts listed on Schedule 3.02:

      (a)      Item #1(d)

      (b)      Item #1(j)

      (c)      Item #1(m)

      (d)      Item #1(ii)

      (e)      Item #1(qq)

      (f)      Item #1(rr)

## DISCLOSURE SCHEDULES

March 10, 2023

These Disclosure Schedules (these "***Disclosure Schedules***") are made and given pursuant to that certain Asset Purchase Agreement (the "***Agreement***"), dated as of March 10, 2023, is entered into among (i) Rocky Mountain West Telecom, Inc., a Utah corporation ("***Seller***"), (ii) Kyle Garrett, an individual (the "***Owners***"), and (iii) RMWT Consulting LLC, a Delaware limited liability company ("***Buyer***"). Each of Seller, Buyer, and the Owners are sometimes referred to herein as a "***Party***" and together, as the "***Parties***."

All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The sections of the Disclosure Schedules correspond to the section numbers of the representations and warranties in the Agreement that are modified by the disclosures set forth herein, and the non-numerical headings in these Disclosure Schedules are for convenience only and shall not control nor affect the meaning of any section of these Disclosure Schedules. The Parties agree that any reference in a particular section of these Disclosure Schedules shall only be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (a) the representations and warranties of the relevant party contained in the corresponding section of the Agreement and (b) any other representation or warranty of such Party that is contained in these Disclosure Schedules, but only if the relevance of that reference as an exception to (or a disclosure for purposes of) such representation or warranty would be reasonably apparent to a reasonable person who has read that reference and such representation(s) or warranty(ies), without any independent knowledge on the part of such person regarding the matter(s) so disclosed.

Nothing in these Disclosure Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant.  The inclusion of any item or matter in these Disclosure Schedules (a) does not represent a determination that (i) such item or matter is or is not material or establish a standard of materiality (and no party shall use the fact of the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any item or matter is or is not material for purposes of the Agreement), (ii) such item or matter did or did not arise in the ordinary course of business (and no party shall use the fact of the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any item or matter is or is not in the ordinary course of business for purposes of the Agreement), (iii) such item or matter is required to be referred to or disclosed on these Disclosure Schedules, or (iv) the transactions contemplated by the Agreement require the consent of third parties, and (b) shall not constitute, or be deemed to be, an admission (i) of liability in respect of any pending or threatened Action, (ii) of any breach of or event of default under any Purchased Contract or violation of any Legal Requirement, or (iii) to any third party concerning such item or matter.  These Disclosure Schedules include brief descriptions or summaries of certain Purchased Contracts and instruments, copies of which have been made available to Buyer. Such descriptions do not purport to be comprehensive and are qualified in their entirety by reference to the text of the documents described.

<u>**SCHEDULE 3.01**</u>

**ORGANIZATION AND AUTHORITY OF SELLER; ENFORCEABILITY**

1.      The Seller is currently qualified to do business in each of the following states:

      (a)      California

      (b)      Colorado

      (c)      Nevada

      (d)      New Mexico

      (e)      Oregon

      (f)      Utah

2.      The Seller currently has employees, but has not qualified to do business as a foreign corporation, in each of the following jurisdictions:

      (a)      Arizona

      (b)      Colorado

      (c)      Florida

      (d)      Oklahoma

      (e)      Nebraska

3.      The Seller currently files income tax returns, but has not qualified to do business as a foreign corporation, in each of the following jurisdictions:

      (a)      Arkansas

      (b)      Arizona

      (c)      Colorado

      (d)      Idaho

      (e)      Kansas

      (f)      Louisiana

      (g)      Missouri

      (h)      Mississippi

       (i)      Montana

       (j)      Nebraska

       (k)     Oklahoma

       (l)      Tennessee

       (m)    Wisconsin

       (n)     Washington

       (o)     Wyoming

       (p)     Florida

4.     The Seller believed that it was qualified to do business as a foreign corporation in the State of Colorado but recently became aware that the filing was erroneously made to form a domestic Colorado corporation. Such entity was dissolved on February 28, 2023.

5.     Kyle Garrett owns one hundred percent (100%) of the issued and outstanding stock, and is the sole shareholder, of the Seller.

6.     The following is a list of the current directors and officers of the Seller:

       1.     Kyle R. Garrett, President, Director

       2.     Kyler Lunt, Secretary/Treasurer, Vice President of Engineering

       3.     Kyle Jon Carter, Director

       4.     K.C. Lunt, Director

       5.     Nick Pexton, Chief Operating Officer

7.     Seller owns a Limited Liability Company Account Guided Solutions Fund Account (No. 266-25710-1-3 and a Trust (No 266-18099-1-9) at EdwardJones. This account was closed on February 27, 2023.

**SCHEDULE 3.02**

**CONFLICTS; CONSENTS**

1. The execution, delivery and performance of the Agreement and the Ancillary Transaction Documents, and the consummation of the transactions contemplated thereby, require the consent of or notice to the other party(ies) under each of the following Material Contracts:

(a) Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

(b) Master Subcontract Agreement, dated January 19, 2022, between the Seller and ADB Companies, LLC, as amended by that certain Statement of Work, dated January 24, 2022.

(c) Mutual Non-Disclosure Agreement, dated November 4, 2021, between the Seller and Arcadian Infracom, Inc.

(d) Engineering and Technical Services Agreement, dated July 1, 2020, between the Seller and AT&T Services, Inc.

(e) Non-Disclosure Agreement, dated September 13, 2021, between the Seller and CCI Systems, Inc.

(f) Network Construction Master Services Agreement, dated March 6, 2017, between the Seller and Centurytel Service Group, LLC.

(g) Subcontract Agreement, dated April 15, 2021, between the Seller and Ervin Cable Construction, LLC, as amended by that certain Amendment Agreement, dated April 15, 2021.

(h) Mutual Non-Disclosure Agreement, dated August 6, 2018, between the Seller and Facebook, Inc.

(i) Professional Services Agreement (Infrastructure), dated November 1, 2018, between the Seller and Facebook, Inc., as amended by that certain Statement of Work No. 1, dated February 23, 2021.

(j) Master Professional Services Agreement, dated January 23, 2013, between the Seller and FiberLight, LLC.

(k) Master Engineering Services Agreement, dated September 28, 2012, between the Seller and FiberLight, LLC, as amended by that certain First Amendment to Master Engineering Services Agreement.

(l) Contractor Agreement, dated October 20, 2021, between the Seller and FD Construction, LLC.

(m) Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

(n)     Master Services Agreement, dated January 6, 2022, between the Seller and Hylan West, Inc., as amended by that certain Statement of Work, dated February 7, 2022.

(o)     Non-Disclosure and Confidentiality Agreement, dated August 12, 2020, between the Seller and Northwest Fiber, LLC.

(p)     Non-Disclosure Agreement, dated July 2021, between the Seller and Columbine Telephone Company, Inc. dba Silver Star Communications.

(q)     Nondisclosure Agreement, dated December 8, 2020, between the Seller and Vero Fiber Networks, LLC.

(r)     Master Construction Services Agreement, dated June 4, 2021, between the Seller and Vero Fiber Networks, LLC, as amended by that certain Addendum #1, dated June 4, 2021.

(s)     Mutual Non-Disclosure and Non-Circumvention Agreement, dated February 2, 2021, between the Seller and Volks Resources LLC.

(t)     Non-Disclosure Agreement, dated September 27, 2018, between the Seller and TEKsystems Global Services, LLC.

(u)     Non-Disclosure Agreement, dated January 23, 2018, between the Seller and General Dynamics Information Technology, Inc.

(v)     Confidential Nondisclosure Agreement, dated December 19, 2018, between the Seller and RAMTeCH Software Solutions, Inc.

(w)     Mutual Non-Disclosure Agreement, dated May 9, 2018, between the Seller and Sonic.net, Inc.

(x)     Master Engineering Services Subcontract, dated September 6, 2018, between the Seller and Quanta Telecommunication Services, LLC, as amended by that certain First Amendment to Subcontract Work Assignment, dated December 27, 2018.

(y)     Aerial Architect's/Engineer's Contract, dated July 30, 2018, between the Seller and Sonic Telecom.

(z)     Workers Compensation and Employers Liability Insurance Policy, dated October 1, 2022, between the Seller and RLI Insurance Company.

(aa)    Professional, Environmental And Network Security Liability Policy, dated October 1, 2022, between the Seller and XL Specialty Insurance Company.

(bb)    Commercial Auto Insurance Policy, dated October 1, 2022, between the Seller and RLI Insurance Company.

(cc)    Businessowners Insurance Policy, dated October 1, 2022, between the Seller and RLI Insurance Company.

(dd)    Crime Insurance Policy, dated October 1, 2022, between the Seller and Travelers Casualty and Surety Company of America.

(ee) Cyber & Privacy, Cyber Crime Insurance Policy, dated October 1, 2022, between the Seller and CFC Underwriting Limited.

(ff) Employment Practices Liability Insurance Policy, dated October 1, 2022, between the Seller and Great American Insurance Company.

(gg) Excess Insurance Policy, dated October 1, 2022, between the Seller and RLI Insurance Company.

(hh) Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital.

(ii) Postloan Engineering Services Contract, dated November 11, 2021, between the Seller and Beehive Telephone Company, Inc.

(jj) Engineering Services Agreement, dated April 18, 2016, between the Seller and Syringa Networks, LLC, as amended by that certain First Amendment to Route Engineering Services Agreement, dated August 24, 2020, as further amended by that certain Second Amendment to Route Engineering Services Agreement, dated October 30, 2020.

(kk) Project Service Agreement, dated January 14, 2019, between the Seller and Zayo Group, LLC.

(ll) Engineering Services Agreement, dated June 8, 2011, between the Seller and Zayo Group, LLC.

(mm) Construction Master Services Agreement, dated April 14, 2020, between the Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021.

(nn) Professional Services Agreement, dated October 17, 2018, between the Seller and Utah Telecommunication Open Infrastructure Agency.

(oo) Postloan Engineering Services Contract, dated August 1, 2022, between the Seller and Tularosa Basin Telephone Company, Inc.

(pp) Supplier Agreement, dated September 15, 2018, between the Seller and Citibank, N.A.

(qq) Postloan Engineering Services Contract, dated March 1, 2022, between the Seller and Beehive Telephone Company, Inc., Nevada.

(rr) Strategic Vendor Agreement No. 459646.C, dated August 16, 2022, between Seller and AT&T Services, Inc.

(ss) Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

(tt) ValueLease Agreement, between the Seller and Imaging Capital.

(uu) Purchase Agreement, between the Seller and Imaging Concepts, LLC.

(vv) Cost Per Image Agreement, dated December 10, 2018, between the Seller and Xerox Financial Services LLC.

(ww)   Master Service Agreement, between the Seller and Central Telcom Services, LLC, as amended by that certain Service Level Agreement.

2.   Consummation of the transactions contemplated by the Agreement grants a twelve-month termination right to the other party to that certain Construction Master Services Agreement, dated April 14, 2020, between the Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021.

## SCHEDULE 3.03

### PURCHASED ASSETS

1.     The Encumbrances described in the following UCC-1 Financing Statement (including any amendments and/or addendums thereto) filed in the jurisdiction and by the secured party listed below with respect to certain assets (or potential assets) of the Company listed below under "Debtor," as described in such financing statement:

| FILE NO. | DEBTOR | SECURED PARTY | JURISDICTION | FILING DATE |
|----------|--------|---------------|--------------|-------------|
| 552706201837 | Seller | Citibank, N.A., its branches, subsidiaries and affiliates | Utah | 10/16/2018 |

2.     The Encumbrances described in the following Material Contracts:

(a)     Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

(b)     Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital.

(c)     Lease Agreement, dated March 8, 2022, between the Seller and Alamo Broadway Mini-Storage, Ltd.

3.     See Schedule 3.04 of these Disclosure Schedules.

4.     The following vehicles that are used in the Business will be retained by Owner following the Closing:

(a)     2020 F-350 – VIN 1FT8W3BT9LEC30721

(b)     2020 Axel Dump Goose Neck Trailer

5.     The following Purchased Assets require or are subject to routine maintenance:

(a)     The equipment leased pursuant to the following contracts:

(i)     Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

(ii)     ValueLease Agreement, between the Seller and Imaging Capital.

(iii)     Cost Per Image Agreement, dated December 10, 2018, between the Seller and Xerox Financial Services LLC.

(b)     The automobiles leased pursuant to that certain Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

## SCHEDULE 3.04

## FIXED ASSETS; TANGIBLE PERSONAL PROPERTY

1.      The following items of Tangible Personal Property located on the Leased Real Property, but are property of the Owner:

      (a)      Certain personal items in Owner's office, including pictures

      (b)      All animal mounts

      (c)      Gun cabinet and guns contained therein

      (d)      All items in storage unit.

      (e)      Laptop computer, HP, Silver, 15" screen, 10 key.

      (f)      Cell phone and associated phone number.

      (g)      Certain personal documents and photos of Owner on Seller's server.

      (h)      Gun cabinets in Bart Wankier and KC Lunt's offices.

      (i)      Personal property and decorations in the workspaces of Seller employees.

2.      The following items located on the Leased Real Property and used by the Seller are the property of K & K Leasing, LLC:

      (a)      Ice machine

3.      On March 8, 2023, Seller's 2022 FORD F-150 – VIN 1FTFW1ED4NFC41042 was involved in a minor collision where another driver made a minor collision with the rear of such vehicle, resulting in minor damage to such vehicle. To Seller's knowledge, the employee of Seller was not at fault for such incident. Such incident has been reported to Seller's insurance company. The vehicle is currently in operable condition and Seller is currently awaiting instructions from the applicable insurance company for how to proceed with vehicle repairs, if necessary.

**SCHEDULE 3.05(a)(i)**

**SELLER INTELLECTUAL PROPERTY**

1.      Unregistered trademarks:

      (a)      Rocky Mountain West Telecom

      (b)      RMWT

2.      Domain names

      (a)      rmwt.com

      (b)      rmwt2.com

3.      Seller maintains the following social media accounts:

      (a)      Linkedin – https://www.linkedin.com/company/rmwt

      (b)      Facebook - https://www.facebook.com/RockyMountainWestTelecom

4.      RMWT is a registered dba of Seller.

**SCHEDULE 3.05(a)(ii)**

**LICENSED INTELLECTUAL PROPERTY**

1.    Licensed Intellectual Property:

(a)    Avetta (supply chain and risk management (SAAS))

(b)    Backblaze (cloud back and storage service)

(c)    AutoCAD- U.S. CAD 19 Seats – Company ID L194250 / AutoCAD LT 4 Seats (draw and edit digital 2D and 3D designs)

(d)    SAP Concur (expense management, travel and invoice software)

(e)    Plexscape Earth – (17 licenses listed)(provides 3D geographical view of a project area for an engineer or architect)

(f)    Sitetracker (project management software)

(g)    O-Calc (3 licenses - structural analysis software)

(h)    Visio (software for drawing a variety of diagrams)

(i)    Bluebeam (15 seats)(empowers public sector teams with customizable markup, measurement and document management tools that improve review speed an accuracy)

2.    The Seller licenses Intellectual Property from a third party pursuant to the following Material Contracts:

(a)    Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

(b)    Client Services Agreement, dated August 17, 2021, between the Seller and Volks Resources LLC.

(c)    Invoice Number 148538, dated January 5, 2023, between the Seller and Transit Instruments, Inc.

(d)    Supplier Agreement, dated September 15, 2018, between the Seller and Citibank, N.A.

(e)    Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

## SCHEDULE 3.05(c)

## INTELLECTUAL PROPERTY

1.    In September 2019, Seller received a cease and desist letter from Osmose Utilities Services, Inc. as a result of a former employee of Seller's misuse of the O-Calc software following the termination of the employment of such employee. Seller engaged an attorney to assist with the matter which was resolved thereafter with such former employee discontinuing use of the software and Osmose Utilities Services, Inc. allowing Seller to continue to use the software with no restrictions.

2.    Certain computers used by the employees of Seller may have previously used or currently may be using some or all of the software listed below without a valid license. Seller has not received written notice from a third party claiming that Seller is infringing, misappropriating, diluting or otherwise violating intellectual property rights by Seller's use of such software.

    (a)    Adobe Pro

    (b)    AutoCAD

    (c)    Microsoft Windows

    (d)    Malware Bytes

    (e)    Microsoft Visio

## SCHEDULE 3.05(f)

## INTELLECTUAL PROPERTY

1.      See Schedule 3.05(c) of these Disclosure Schedules.

**<u>SCHEDULE 3.05(g)</u>**

**INTELLECTUAL PROPERTY**

1.      See Schedule 3.05(c), Item 2 of these Disclosure Schedules.

## SCHEDULE 3.05(i)

## INTELLECTUAL PROPERTY

1.      The Seller has not entered into an Intellectual Property assignment with the former employee involved in designing the Seller's website, Bill Westfall, Jr. Jr. who resigned his employment with the Seller in December 2022.

2.      During the onboarding process for new employees, each employee is required to sign a form of Employee Non-Disclosure & Confidentiality Agreement included in Employee Handbook prior to commencing and work for Seller. All current employees of Seller, with the exception of those listed below, have signed such form, although Seller cannot not confirm whether every former employee has entered into such agreement with the Seller.

        (a)     Kyle Garrett

3.      The form of Employee Non-Disclosure and Confidentiality Agreement that is signed by employees of Seller when hired does not include a written assignment to Seller of each such employee's contribution and rights to any intellectual property created while such party is employed by Seller.

<u>**SCHEDULE 3.07(a)**</u>

**FINANCIAL STATEMENTS**

1.      The Seller uses modified cash accounting with the following departures from GAAP:

    (a)      Revenue is recorded on an invoiced basis.  There are no accounting reserves recorded for potentially uncollectible amounts.

    (b)      Expenses are recognized when the invoice is received or paid and not when the service is provided.

    (c)      Annual subscriptions are recorded as expanse when the invoice is received or paid and not recorded as prepaid expense and amortized.

    (d)      Accruals are not recorded for costs incurred for items such as payroll, commissions, bonuses, profit sharing and vacation, rather these items are recorded as an expense when paid.

**SCHEDULE 3.07(d)**

**FINANCIAL STATEMENTS**

1.      See Schedule 3.08, Item 1 of these Disclosure Schedules.

2.      On January 5, 2023, Seller purchased a drone to be used in the Business pursuant to that certain Invoice Number 148538, dated January 5, 2023, between the Seller and Transit Instruments, Inc.

3.      See Schedule 3.03, Item 4 of these Disclosure Schedules.

4.      Seller paid off the balance of the item listed on the Financial Statements as the "HM Loan" on January 26, 2023.

5.      Seller paid off the balance of each of the below-listed truck loans on February 21, 2023:

    (a)      2019 FORD F-150 – VIN 1FTFW1E40KKE17541

    (b)      2019 FORD F-150 – VIN 1FTFW1E42KKE17542

    (c)      2020 FORD F150 – VIN 1FTEW1EP3LKE38262

    (d)      2020 FORD F150 – VIN 1FTEW1EP5LKF39092

    (e)      2021 JEEP CHEROKEE – VIN 1C4PJMLB0MD120718

    (f)      2020 F-350 – VIN 1FT8W3BT9LEC30721

## <u>SCHEDULE 3.07(e)</u>

## FINANCIAL STATEMENTS

1.      See Schedule 3.08, Item 1 of these Disclosure Schedules.

**SCHEDULE 3.08**

**TAXES**

1.      Seller anticipates receiving an Employee Retention Credit in the amount of $1,642,267.41, of which twenty percent (20%), or $325,853.48, is owed to Jorns & Associates, who assisted Seller in obtaining such credit.

2.      Between its date of formation through December 31, 2006, Seller was taxed as a C-corporation. The Seller made the election with the IRS to be taxed as an S-corporation in the period lasting from January 1, 2007 through December 31, 2019. Seller's election to be taxed as an S corporation ended beginning January 1, 2020 and Seller has been taxed as a C-corporation since that date to the present.

**SCHEDULE 3.09(a)**

**MATERIAL CONTRACTS**

(i)

1. From time to time, the Seller uses credit cards for certain materials and equipment.

2. Supplier Agreement, dated September 15, 2018, between the Seller and Citibank, N.A.

3. Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital.

4. Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

5. Cost Per Image Agreement, dated December 10, 2018, between the Seller and Xerox Financial Services LLC.

(ii)

1. Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

2. Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital.

3. Engineering Services Agreement, dated April 18, 2016, between the Seller and Syringa Networks, LLC, as amended by that certain First Amendment to Route Engineering Services Agreement, dated August 24, 2020, as further amended by that certain Second Amendment to Route Engineering Services Agreement, dated October 30, 2020.

4. Supplier Agreement, dated September 15, 2018, between the Seller and Citibank, N.A.

5. Lease Agreement, dated March 8, 2022, between the Seller and Alamo Broadway Mini-Storage, Ltd.

(iii)

1. All vehicles leased pursuant to that certain Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

2. Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital.

3. Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

4. ValueLease Agreement, between the Seller and Imaging Capital.

5. Cost Per Image Agreement, dated December 10, 2018, between the Seller and Xerox Financial Services LLC.

6. Invoice Number 148538, dated January 5, 2023, between the Seller and Transit Instruments, Inc.

(iv)

1. As of March 1, 2023, the following employee advances remain outstanding:

    (a)      Mel Green - $114.52

(v)

1. Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

2. Master Subcontract Agreement, dated January 19, 2022, between the Seller and ADB Companies, LLC, as amended by that certain Statement of Work, dated January 24, 2022.

3. Engineering and Technical Services Agreement, dated July 1, 2020, between the Seller and AT&T Services, Inc.

4. Purchase Order, dated March 10, 2021, between the Seller and Atlantic Tele-Network and Subsidiaries.

5. Master Service Agreement, dated May 27, 2021, between the Seller and City of Mountain Home, as amended by that certain Addendum A, dated August 31, 2021.

6. Master Subcontractor Agreement, dated September 21, 2021, between the Seller and Connext LLC.

7. Professional Services Agreement (Infrastructure), dated November 1, 2018, between the Seller and Facebook, Inc., as amended by that certain Statement of Work No. 1, dated February 23, 2021.

8. Master Professional Services Agreement, dated January 23, 2013, between the Seller and FiberLight, LLC.

9. Master Engineering Services Agreement, dated September 28, 2012, between the Seller and FiberLight, LLC, as amended by that certain First Amendment to Master Engineering Services Agreement.

10. Contractor Agreement, dated October 20, 2021, between the Seller and FD Construction, LLC.

11. Master Subcontractor Agreement, dated May 20, 2021, between the Seller and Fusion Networks LLC, as amended by that certain Addendum A, dated February 7, 2022.

12. Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

13. Scope of Work, dated February 3, 2022, between the Seller and Palnies.

14. Master Subcontractor Agreement, dated February 2, 2022, between the Company and Skybeam LLC d/b/a Rise Broadband.

15. Master Construction Services Agreement, dated June 4, 2021, between the Seller and Vero Fiber Networks, LLC, as amended by that certain Addendum #1, dated June 4, 2021.

16. Subcontractor Agreement, dated March 7, 2018, between the Seller and ASG Telecom Inc (registered as Aventura Group).

17. Contractor Service Agreement, dated January 8, 2018, between the Seller and B+T Group Holdings Inc.

18. Subcontractor Agreement, dated February 21, 2018, between the Seller and East Wind Enterprises, LLC.

19. Subcontractor Agreement, dated February 23, 2018, between the Seller and MIR Association.

20. Subcontractor Agreement, dated February 13, 2019, between the Seller and MIR Association.

21. Subcontractor Agreement, dated May 23, 2018, between the Seller and NKE Engineering, LLC.

22. Subcontractor Agreement, dated February 21, 2018, between the Seller and Palmetto/CT&T.

23. Master Engineering Services Subcontract, dated September 6, 2018, between the Seller and Quanta Telecommunication Services, LLC, as amended by that certain First Amendment to Subcontract Work Assignment, dated December 27, 2018.

24. Aerial Architect's/Engineer's Contract, dated July 30, 2018, between the Seller and Sonic Telecom.

25. Subcontractor Agreement, dated June 12, 2018, between the Seller and SouthPointe Assoc Inc. (dba SouthPointe Engineering).

26. Subcontractor Agreement, dated January 27, 2020, between the Seller and Dynasty Fiber Optics, LLC.

27. Subcontractor Agreement, dated November 11, 2020], between the Seller and Elton Bull.

28. Subcontractor Agreement, dated March 22, 2019, between the Seller and LTL Communications, LLC.

29. Subcontractor Agreement, dated February 3, 2021, between the Seller and Onpoint Utility Designs & Permitting, LLC.

30. Subcontractor Agreement, between the Seller and Dynasty Fiber Optics, LLC.

31. Subcontractor Agreement, dated January 1, 2020, between the Seller and SOW Management, LLC, as amended by that certain Subcontractor Agreement Pricing Addendum, dated January 1, 2020.

32. Subcontractor Agreement, dated February 22, 2019, between the Seller and OPTX.

33. Subcontractor Agreement, dated March 5, 2019, between the Seller and Telecom Technicians, Inc.

34. Subcontractor Agreement, dated May 2, 2022, between the Seller and DoverSpike Fiber Optics, LLC.

35. Subcontractor Agreement, dated November 24, 2021, between the Seller and Online Directional Boring, LP.

36. Postloan Engineering Services Contract, dated November 11, 2021, between the Seller and Beehive Telephone Company, Inc.

37. Subcontractor Agreement, dated September 12, 2019, between the Seller and LightLink Communications.

38. Engineering Services Agreement, dated April 18, 2016, between the Seller and Syringa Networks, LLC, as amended by that certain First Amendment to Route Engineering Services Agreement, dated August 24, 2020, as further amended by that certain Second Amendment to Route Engineering Services Agreement, dated October 30, 2020.

39. Project Service Agreement, dated January 14, 2019, between the Seller and Zayo Group, LLC.

40. Engineering Services Agreement, dated June 8, 2011, between the Seller and Zayo Group, LLC.

41. Construction Master Services Agreement, dated April 14, 2020, between the Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021.

42. Professional Services Agreement, dated October 17, 2018, between the Seller and Utah Telecommunication Open Infrastructure Agency.

43. Postloan Engineering Services Contract, dated August 1, 2022, between the Seller and Tularosa Basin Telephone Company, Inc.

44. Postloan Engineering Services Contract, dated March 1, 2022, between the Seller and Beehive Telephone Company, Inc., Nevada.

45. Strategic Vendor Agreement No. 459646.C, dated August 16, 2022, between Seller and AT&T Services, Inc.

46. Master Service Agreement, between the Seller and Central Telcom Services, LLC, as amended by that certain Service Level Agreement.

47. The Seller does not have a master service agreement, but provides services to each of the following customers pursuant to a pricing sheet or equivalent document:

   (a) Emery Telecom

   (b) Atlantic Tele-Network

(vi)

1. Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

(vii)

(viii)

(ix)

(x)

1. See Schedule 3.05(a)(ii) of these Disclosure Schedules.

2. Engineering and Technical Services Agreement, dated July 1, 2020, between the Seller and AT&T Services, Inc.

3. Network Construction Master Services Agreement, dated March 6, 2017, between the Seller and Centurytel Service Group, LLC.

4. Professional Services Agreement (Infrastructure), dated November 1, 2018, between the Seller and Facebook, Inc., as amended by that certain Statement of Work No. 1, dated February 23, 2021.

5. Master Professional Services Agreement, dated January 23, 2013, between the Seller and FiberLight, LLC.

6. Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

7. Client Services Agreement, dated August 17, 2021, between the Seller and Volks Resources LLC.

8. Master Engineering Services Subcontract, dated September 6, 2018, between the Seller and Quanta Telecommunication Services, LLC, as amended by that certain First Amendment to Subcontract Work Assignment, dated December 27, 2018.

9. Supplier Agreement, dated September 15, 2018, between the Seller and Citibank, N.A.

(xi)

1. Since October 8, 2012, Seller has been leasing a storage unit located at 107 West Center Street, Nephi, Utah 84648 from Carmco, LLC pursuant to an oral contract for $325.00 per month. All items kept in such storage unit will be excluded from the transaction and Owner will assume such lease and the payments to lease such storage unit following the Closing.

2. Lease Agreement, dated March 8, 2022, between the Seller and Alamo Broadway Mini-Storage, Ltd.

3. Commercial Lease Agreement, dated June 30, 2020, between the Seller and K & K Leasing LLC.

(xii)

1. Commercial Lease Agreement, dated June 30, 2020, between the Seller and K & K Leasing LLC.

2. Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

3. Subcontractor Agreement, dated March 7, 2018, between the Seller and ASG Telecom Inc (registered as Aventura Group).

4. Nondisclosure Agreement, dated August 15, 2018, between the Seller and Bighorn Archaeological Consultants, LLC.

5. Subcontractor Agreement, dated February 23, 2018, between the Seller and MIR Association.

6.  Subcontractor Agreement, dated February 13, 2019, between the Seller and MIR Association.

7.  Subcontractor Agreement, dated February 21, 2018, between the Seller and Palmetto/CT&T.

8.  Subcontractor Agreement, dated March 22, 2019, between the Seller and LTL Communications, LLC.

9.  Subcontractor Agreement, dated January 1, 2020, between the Seller and SOW Management, LLC, as amended by that certain Subcontractor Agreement Pricing Addendum, dated January 1, 2020.

10. Subcontractor Agreement, dated February 22, 2019, between the Seller and OPTX.

11. Subcontractor Agreement, dated March 5, 2019, between the Seller and Telecom Technicians, Inc.

12. Letter agreement, dated July 5, 2018, between the Seller and Equitable Accounting Services, LLC.

13. Subcontractor Agreement, dated November 24, 2021, between the Seller and Online Directional Boring, LP.

(xiii)

1.  Postloan Engineering Services Contract, dated November 11, 2021, between the Seller and Beehive Telephone Company, Inc.

2.  Subcontractor Agreement, dated September 12, 2019, between the Seller and LightLink Communications.

3.  Engineering Services Agreement, dated April 18, 2016, between the Seller and Syringa Networks, LLC, as amended by that certain First Amendment to Route Engineering Services Agreement, dated August 24, 2020, as further amended by that certain Second Amendment to Route Engineering Services Agreement, dated October 30, 2020.

4.  Project Service Agreement, dated January 14, 2019, between the Seller and Zayo Group, LLC.

5.  Engineering Services Agreement, dated June 8, 2011, between the Seller and Zayo Group, LLC.

6.  Construction Master Services Agreement, dated April 14, 2020, between the Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021.

7.  Professional Services Agreement, dated October 17, 2018, between the Seller and Utah Telecommunication Open Infrastructure Agency.

8.  Postloan Engineering Services Contract, dated August 1, 2022, between the Seller and Tularosa Basin Telephone Company, Inc.

9.  Engineering and Technical Services Agreement, dated July 1, 2020, between the Seller and AT&T Services, Inc.

10. Purchase Order, dated March 10, 2021, between the Seller and Atlantic Tele-Network and Subsidiaries.

11. Network Construction Master Services Agreement, dated March 6, 2017, between the Seller and Centurytel Service Group, LLC.

12. Scope of Work, dated November 19, 2012, between the Seller and Emery Telcom.

13. Confidentiality Agreement, dated August 5, 2010, between the Seller and Emery Telcom.

14. Master Professional Services Agreement, dated January 23, 2013, between the Seller and FiberLight, LLC.

15. Master Engineering Services Agreement, dated September 28, 2012, between the Seller and FiberLight, LLC, as amended by that certain First Amendment to Master Engineering Services Agreement.

16. Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

17. Mutual Non-Disclosure Agreement, dated February 10, 2021, between the Seller and Skybeam, LLC.

18. Master Subcontractor Agreement, dated February 2, 2022, between the Company and Skybeam LLC d/b/a Rise Broadband.

19. Nondisclosure Agreement, dated December 8, 2020, between the Seller and Vero Fiber Networks, LLC.

20. Master Construction Services Agreement, dated June 4, 2021, between the Seller and Vero Fiber Networks, LLC, as amended by that certain Addendum #1, dated June 4, 2021.

21. Postloan Engineering Services Contract, dated March 1, 2022, between the Seller and Beehive Telephone Company, Inc., Nevada.

22. Strategic Vendor Agreement No. 459646.C, dated August 16, 2022, between Seller and AT&T Services, Inc.

(xiv)

1. Client Services Agreement, dated August 17, 2021, between the Seller and Volks Resources LLC.

2. Subcontractor Agreement, dated March 7, 2018, between the Seller and ASG Telecom Inc (registered as Aventura Group).

3. Contractor Service Agreement, dated January 8, 2018, between the Seller and B+T Group Holdings Inc.

4. Nondisclosure Agreement, dated August 15, 2018, between the Seller and Bighorn Archaeological Consultants, LLC.

5. Subcontractor Agreement, dated February 21, 2018, between the Seller and East Wind Enterprises, LLC.

6. Subcontractor Agreement, dated February 23, 2018, between the Seller and MIR Association.

7. Subcontractor Agreement, dated February 13, 2019, between the Seller and MIR Association.

8. Subcontractor Agreement, dated May 23, 2018, between the Seller and NKE Engineering, LLC.

9. Professional Services Agreement, dated August 17, 2018, between the Seller and Osmose Utilities Services, Inc.

10. Subcontractor Agreement, dated February 21, 2018, between the Seller and Palmetto/CT&T.

11. Subcontractor Agreement, dated June 12, 2018, between the Seller and SouthPointe Assoc Inc. (dba SouthPointe Engineering).

12. Subcontractor Agreement, dated January 27, 2020, between the Seller and Dynasty Fiber Optics, LLC.

13. Subcontractor Agreement, dated November 11, 2020], between the Seller and Elton Bull.

14. Subcontractor Agreement, dated March 22, 2019, between the Seller and LTL Communications, LLC.

15. Subcontractor Agreement, dated February 3, 2021, between the Seller and Onpoint Utility Designs & Permitting, LLC.

16. Subcontractor Agreement, between the Seller and Dynasty Fiber Optics, LLC.

17. Subcontractor Agreement, dated January 1, 2020, between the Seller and SOW Management, LLC, as amended by that certain Subcontractor Agreement Pricing Addendum, dated January 1, 2020.

18. Subcontractor Agreement, dated February 22, 2019, between the Seller and OPTX.

19. Subcontractor Agreement, dated March 5, 2019, between the Seller and Telecom Technicians, Inc.

20. Subcontractor Agreement, dated May 2, 2022, between the Seller and DoverSpike Fiber Optics, LLC.

21. Letter agreement, dated July 5, 2018, between the Seller and Equitable Accounting Services, LLC.

22. Subcontractor Agreement, dated November 24, 2021, between the Seller and Online Directional Boring, LP.

(xv)

1. Professional Services Agreement, dated October 17, 2018, between the Seller and Utah Telecommunication Open Infrastructure Agency.

2. Master Service Agreement, dated May 27, 2021, between the Seller and City of Mountain Home, as amended by that certain Addendum A, dated August 31, 2021.

3. Master Service Agreement, dated November 18, 2022, between the Seller and Gooding County, Idaho.

4.  Master Service Agreement, dated October 18, 2022, between the Seller and Jerome County, Idaho.

5.  Master Service Agreement, dated March 14, 2022, between the Seller and Minidoka County of Rupert, Idaho.

(xvi)

1.  Purchase Order, dated March 10, 2021, between the Seller and Atlantic Tele-Network and Subsidiaries.

2.  Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

3.  Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

4.  ValueLease Agreement, between the Seller and Imaging Capital.

5.  Purchase Agreement, between the Seller and Imaging Concepts, LLC.

(xvii)

1.  Worksite Learning OJT and EIO Employer Agreement, dated October 4, 2022, between the Seller and the Utah Department of Workforce Services.

2.  Worksite Learning OJT and EIO Trainee Agreement, dated October 4, 2022, by and among the Seller, the Utah Department of Workforce Services, and Stratton Brown.

(xviii)

1.  Worksite Learning OJT and EIO Employer Agreement, dated October 4, 2022, between the Seller and the Utah Department of Workforce Services.

2.  Worksite Learning OJT and EIO Trainee Agreement, dated October 4, 2022, by and among the Seller, the Utah Department of Workforce Services, and Stratton Brown.

(xix)

1.  Master Subcontract Agreement, dated January 19, 2022, between the Seller and ADB Companies, LLC, as amended by that certain Statement of Work, dated January 24, 2022.

2.  Master Service Agreement, dated May 27, 2021, between the Seller and City of Mountain Home, as amended by that certain Addendum A, dated August 31, 2021.

3.  Master Subcontractor Agreement, dated September 21, 2021, between the Seller and Connext LLC.

4.  Network Construction Master Services Agreement, dated March 6, 2017, between the Seller and Centurytel Service Group, LLC.

5.  Subcontract Agreement, dated April 15, 2021, between the Seller and Ervin Cable Construction, LLC, as amended by that certain Amendment Agreement, dated April 15, 2021.

6. Master Engineering Services Agreement, dated September 28, 2012, between the Seller and FiberLight, LLC, as amended by that certain First Amendment to Master Engineering Services Agreement.

7. Contractor Agreement, dated October 20, 2021, between the Seller and FD Construction, LLC.

8. Non-Disclosure Agreement, dated May 13, 2021, between the Seller and Hylan Holdings, LLC.

9. Master Subcontractor Agreement, dated February 2, 2022, between the Company and Skybeam LLC d/b/a Rise Broadband.

10. Master Construction Services Agreement, dated June 4, 2021, between the Seller and Vero Fiber Networks, LLC, as amended by that certain Addendum #1, dated June 4, 2021.

11. Mutual Non-Disclosure and Non-Circumvention Agreement, dated February 2, 2021, between the Seller and Volks Resources LLC.

12. Subcontractor Agreement, dated March 7, 2018, between the Seller and ASG Telecom Inc (registered as Aventura Group).

13. Subcontract Agreement, dated January 10, 2018, between the Seller and Engineering Associates, LLC.

14. Subcontractor Agreement, dated September 12, 2019, between the Seller and LightLink Communications.

15. Engineering Services Agreement, dated April 18, 2016, between the Seller and Syringa Networks, LLC, as amended by that certain First Amendment to Route Engineering Services Agreement, dated August 24, 2020, as further amended by that certain Second Amendment to Route Engineering Services Agreement, dated October 30, 2020.

16. Master Service Agreement, dated November 18, 2022, between the Seller and Gooding County, Idaho.

17. Master Service Agreement, dated October 18, 2022, between the Seller and Jerome County, Idaho.

18. Master Service Agreement, dated March 14, 2022, between the Seller and Minidoka County of Rupert, Idaho.

(xx)

1. Engineering and Technical Services Agreement, dated July 1, 2020, between the Seller and AT&T Services, Inc.

2. Postloan Engineering Services Contract, dated November 11, 2021, between the Seller and Beehive Telephone Company, Inc.

3. Construction Master Services Agreement, dated April 14, 2020, between the Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021.

4. Postloan Engineering Services Contract, dated August 1, 2022, between the Seller and Tularosa Basin Telephone Company, Inc.

5. Postloan Engineering Services Contract, dated March 1, 2022, between the Seller and Beehive Telephone Company, Inc., Nevada.

6. Strategic Vendor Agreement No. 459646.C, dated August 16, 2022, between Seller and AT&T Services, Inc.

7. Strategic Vendor Agreement No. 459646.C, dated August 16, 2022, between Seller and AT&T Services, Inc.

(xxi)

1. Subcontractor Agreement, dated January 1, 2020, between the Seller and SOW Management, LLC, as amended by that certain Subcontractor Agreement Pricing Addendum, dated January 1, 2020.

(xxii)

1. Master Lease Agreement, dated March 15, 2022, between the Seller and Pro Leasing Services, LLC.

2. Master Subcontract Agreement, dated January 19, 2022, between the Seller and ADB Companies, LLC, as amended by that certain Statement of Work, dated January 24, 2022.

3. Engineering and Technical Services Agreement, dated July 1, 2020, between the Seller and AT&T Services, Inc.

4. Master Service Agreement, dated May 27, 2021, between the Seller and City of Mountain Home, as amended by that certain Addendum A, dated August 31, 2021.

5. Master Subcontractor Agreement, dated September 21, 2021, between the Seller and Connext LLC.

6. Network Construction Master Services Agreement, dated March 6, 2017, between the Seller and Centurytel Service Group, LLC.

7. Subcontract Agreement, dated April 15, 2021, between the Seller and Ervin Cable Construction, LLC, as amended by that certain Amendment Agreement, dated April 15, 2021.

8. Professional Services Agreement (Infrastructure), dated November 1, 2018, between the Seller and Facebook, Inc., as amended by that certain Statement of Work No. 1, dated February 23, 2021.

9. Master Professional Services Agreement, dated January 23, 2013, between the Seller and FiberLight, LLC.

10. Master Engineering Services Agreement, dated September 28, 2012, between the Seller and FiberLight, LLC, as amended by that certain First Amendment to Master Engineering Services Agreement.

11. Contractor Agreement, dated October 20, 2021, between the Seller and FD Construction, LLC.

12. Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

13. Master Services Agreement, dated January 6, 2022, between the Seller and Hylan West, Inc., as amended by that certain Statement of Work, dated February 7, 2022.

14. Hold Harmless Agreement, dated February 17, 2021, between the Seller and NB+C Engineering Services, LLC.

15. Mutual Non-Disclosure Agreement, dated February 10, 2021, between the Seller and Skybeam, LLC.

16. Master Subcontractor Agreement, dated February 2, 2022, between the Company and Skybeam LLC d/b/a Rise Broadband.

17. Master Construction Services Agreement, dated June 4, 2021, between the Seller and Vero Fiber Networks, LLC, as amended by that certain Addendum #1, dated June 4, 2021.

18. Subcontractor Agreement, dated March 7, 2018, between the Seller and ASG Telecom Inc (registered as Aventura Group).

19. Contractor Service Agreement, dated January 8, 2018, between the Seller and B+T Group Holdings Inc.

20. Confidential Nondisclosure Agreement, dated December 19, 2018, between the Seller and RAMTeCH Software Solutions, Inc.

21. Professional Services Agreement, dated August 17, 2018, between the Seller and Osmose Utilities Services, Inc.

22. Master Engineering Services Subcontract, dated September 6, 2018, between the Seller and Quanta Telecommunication Services, LLC, as amended by that certain First Amendment to Subcontract Work Assignment, dated December 27, 2018.

23. Aerial Architect's/Engineer's Contract, dated July 30, 2018, between the Seller and Sonic Telecom.

24. Master Equipment Lease, dated November 1, 2018, between the Seller and DDI Capital.

25. Subcontractor Agreement, dated September 12, 2019, between the Seller and LightLink Communications.

26. Engineering Services Agreement, dated April 18, 2016, between the Seller and Syringa Networks, LLC, as amended by that certain First Amendment to Route Engineering Services Agreement, dated August 24, 2020, as further amended by that certain Second Amendment to Route Engineering Services Agreement, dated October 30, 2020.

27. Project Service Agreement, dated January 14, 2019, between the Seller and Zayo Group, LLC.

28. Engineering Services Agreement, dated June 8, 2011, between the Seller and Zayo Group, LLC.

29. Construction Master Services Agreement, dated April 14, 2020, between the Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021.

30. Professional Services Agreement, dated October 17, 2018, between the Seller and Utah Telecommunication Open Infrastructure Agency.

31. Supplier Agreement, dated September 15, 2018, between the Seller and Citibank, N.A.

32. Lease Agreement, dated March 8, 2022, between the Seller and Alamo Broadway Mini-Storage, Ltd.

33. Master Service Agreement, dated November 18, 2022, between the Seller and Gooding County, Idaho.

34. Master Service Agreement, dated October 18, 2022, between the Seller and Jerome County, Idaho.

35. Master Service Agreement, dated March 14, 2022, between the Seller and Minidoka County of Rupert, Idaho.

36. Strategic Vendor Agreement No. 459646.C, dated August 16, 2022, between Seller and AT&T Services, Inc.

37. Unified Lease Agreement, dated October 28, 2019, between the Seller and Canon Solutions America, Inc.

38. ValueLease Agreement, between the Seller and Imaging Capital.

39. Purchase Agreement, between the Seller and Imaging Concepts, LLC.

40. Cost Per Image Agreement, dated December 10, 2018, between the Seller and Xerox Financial Services LLC.

41. Master Service Agreement, between the Seller and Central Telcom Services, LLC, as amended by that certain Service Level Agreement.

(xxiii)

1. Non-Qualified Deferred Compensation Trust, dated December 2, 1998, by and among the Seller, T. Earl Andrews and Brenda M. Sperry.

2. Subcontractor Agreement, dated January 1, 2020, between the Seller and SOW Management, LLC, as amended by that certain Subcontractor Agreement Pricing Addendum, dated January 1, 2020.

(xxiv)

(xxv)

1. See Schedule 3.21 of these Disclosure Schedules.

(xxvi)

**SCHEDULE 3.09(b)**

**MATERIAL CONTRACTS**

1.   In July 2022, Seller notified Centurytel Service Group, LLC ("**CenturyLink**") that it would no longer be providing services pursuant to that certain Construction Master Services Agreement, dated April 14, 2020, between Seller and CenturyTel Service Group, LLC, as amended by that certain Engineering Annex, dated February 17, 2021 (the "**CenturyLink Agreement**"). On November 7, 2022, CenturyLink responded by notifying Seller that failure of Seller to accept and perform all requested work under the CenturyLink Agreement would result in a default by Seller under such agreement. Seller has since agreed to resume its performance under the CenturyLink Agreement, with CenturyLink agreeing to accept Seller's updated pricing upon renewal of the CenturyLink Agreement in April 2023, though CenturyLink has refused to remove the provision requiring Seller to accept all requested work from CenturyLink, regardless of size and quality.  On February 21, 2023, CenturyLink indicated to Seller by email that CenturyLink will not be renewing/extending the CenturyLink Agreement at the expiration of the current term, which is set to expire on the later of March 31, 2023 or the completion of all orders under the CenturyLink Agreement.

2.   See Schedule 3.05(c) of these Disclosure Schedules.

3.   See the accounts receivable listed on the Financial Statements for customers who are late in making payments to Seller, but who are not yet considered by Seller to be in default.

4.   Seller does not meet the required minimum threshold amounts of insurance coverage required under its agreements with certain customers.

   (a)   Google Fiber Master Services Agreement, dated June 8, 2020, between the Seller and Google Fiber, Inc., as amended by that certain Statement of Work No. 2, dated June 8, 2020, as further amended by that certain Amendment Number 1 to Statement of Work No. 2, dated August 11, 2022.

5.   See Schedule 3.12(c), Item 3 of these Disclosure Schedules.

6.   See Schedule 3.02, Item 2 of these Disclosure Schedules.

**SCHEDULE 3.10(a)**

**MATERIAL CUSTOMERS**

1.      The following table lists the Material Customers:

| Customer | Revenue |
|---|---|
| AT&T/TCA | $ 3,890,194.33 |
| Beehive | $1,998,752.12 |
| Centurytel Service Group, LLC (CenturyLink) | $1,162,410.59 |
| Fiberlight | $936,724.44 |
| Emery Telcom | $833,658.90 |
| Google | $523,501.94 |
| Zayo | $343,921.13 |
| UTOPIA | $300,806.40 |
| Tularosa Telephone | $298,778.18 |
| ATNI | $272,493.51 |
| Manweiler Telecom Consulting, Inc. | $167,030.95 |
| Rise Broadband | $98,501.83 |
| Wyco | $92,929.32 |
| Vero | $79,258.74 |
| Syringa | $58,682.53 |

2.      See Schedule 3.09(b), Item 1 of these Disclosure Schedules.

3.      Seller has completed all services for which it was contracted by Wyco and is unaware of any additional services for which Seller may be contracted by such customer.

**SCHEDULE 3.10(b)**

**KEY CUSTOMERS**

1.      The following table lists the Key Customers:

| Customer | Revenue |
|---|---|
| AT&T/TCA | $ 3,890,194.33 |
| Beehive | $1,998,752.12 |
| Centurytel Service Group, LLC (CenturyLink) | $1,162,410.59 |
| Fiberlight | $936,724.44 |
| Emery Telcom | $833,658.90 |
| Google | $523,501.94 |

2.      See Schedule 3.09(b), Item 1 of these Disclosure Schedules.

## SCHEDULE 3.11

**MATERIAL SUPPLIERS AND SUBCONTRACTORS**

1.      The following table lists the Material Suppliers:

| Supplier | Amount Paid |
|---|---|
| SOW Management LLC | $1,124,797.59 |
| Online Directional Boring, LP | $295,116.05 |
| Doverspike Fiber Optics LLC | $130,850.00 |
| Douglas Klunder | $126,000.00 |
| Cardinal EC | $123,704.26 |
| Bighorn Archaeological Consultants | $123,344.02 |
| CIS Professional Land Surveying | $93,650.00 |
| ASG Telecom, Inc. | $82,152.60 |
| LTL Communications LLC | $79,920.00 |
| Strategic Fiber Optics, LLC | $64,304.00 |
| Equitable Accounting Services | $62,718.50 |
| GL Fiber Services, LLC | $58,877.94 |
| Transcon Environmental | $56,124.66 |
| Elite Aerial | $49,335.97 |
| Elton Bull | $45,676.21 |

**SCHEDULE 3.12(a)**

**SELLER EMPLOYEES**

1.      Seller employees as of March 1, 2023:

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|---|---|---|---|---|---|---|---|---|
| Lunt, Macy K | UT | Drafter | N/E | 11/21/2022 | Hourly Regular Rate 17.00 | 0.00 | 108.28 | |
| Andersen, Camrie | UT | Drafter | N/E | 11/07/2022 | Hourly Regular Rate 17.00 | 0.00 | 108.29 | |
| Brown, Kimberly R | UT | Accounting | Exempt | 06/04/2018 | Salary Admin   58,500.00 | 202.75 | 2,707.10 | 8,327.75 |
| Brown, Stratton T | UT | Drafter | N/E | 10/05/2022 | Hourly Regular Rate 15.00 | 0.00 | 108.28 | |
| Butler, Jeremy | TX | Field Engineer | N/E | 09/06/2022 | Salary Billable 95,400.00 | 120.00 | 541.42 | |
| Carter, Ciara | UT | Drafter | N/E | 09/13/2021 | Hourly Regular Rate 16.00 | 0.00 | 541.42 | 4,727.75 |
| Carter, Kyle Jon | UT | Field Engineer | Exempt | 07/24/2012 | Salary Billable 78,000.00 | 6.00 | 5,414.18 | 3827.75 |
| Cassidy, Duke T | UT | Drafter | N/E | 02/16/2022 | Hourly Regular Rate 19.00 | 40.00 | 270.70 | 5,327.75 |
| Diddens, Marcus E | UT | Field Engineer | N/E | 10/10/2022 | Salary Billable 86,920.00 | 96.00 | 812.13 | |

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|---|---|---|---|---|---|---|---|---|
| Dillon, Justin | CO | Field Engineer | N/E | 04/26/2021 | Units #1 | 0.00 | 270.72 | |
| Dodson, Angela M | CO | In-House Engineer | Exempt | 01/01/2019 | Salary Admin 127,910.02 | 192.00 | 1,624.25 | |
| Ferdin, Aaron W | TX | Field Engineer | N/E | 05/02/2022 | Daily Pay Rate   250.00 | 0.00 | 541.41 | |
| Friedman, Zachary H | NE | Field Engineer | Exempt | 01/01/2019 | Salary Admin 102,500.00 | 196.00 | 1,624.26 | |
| Garrett, Keti | UT | Clerical | N/E | 12/27/2018 | Salary Admin   30,000.00 | 0.00 | | |
| Garrett, Kyle R | UT | In-House Engineer | N/E | 09/12/1996 | Officer's Salary 108,000.00 | 160.00 | 10,828.37 | 5,377.75 |
| Garrett, Nicole | UT | Clerical | N/E | 04/17/2019 | Hourly Regular Rate 21.00 | 0.00 | 1,082.83 | 5,877.75 |
| Garrett, Tyson | UT | Field Engineer | N/E | 01/04/2013 | Hourly Regular Rate 21.00 | 120.00 | 2,165.68 | 5,327.75 |
| Garrett, Wyatt | UT | Drafter | N/E | 01/09/2023 | Hourly Administrative 15.00 | 0.00 | | |
| Gerrish, Ronald M | TX | Field Engineer | N/E | 02/01/2021 | Salary Admin   80,000.00 | 90.00 | 1,082.84 | 2,875.77 |
| Green, Melodi S | UT | Field Engineer | N/E | 12/12/2013 | Hourly Regular Rate 27.50 | 45.50 | 2,165.67 | 1,951.98 |

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|----------|----------|----------------|----------------|-----------|--------------|------------------|------------|------------------------|
| Greenwald, Chauntel | UT | Field Engineer | N/E | 09/25/2019 | Salary Billable 68,000.00 | 82.50 | 1,624.25 | 6,327.75 |
| Greenwald, Christian M | UT | Field Engineer | N/E | 09/09/2020 | Salary Admin  90,000.00 | 178.25 | 6,033.63 | 5,068.48 |
| Harwood, Robin | UT | Clerical | N/E | 05/18/2021 | Hourly Regular Rate 17.50 | -3.00 | 541.42 | 2,875.77 |
| Higginson, Cody L | UT | In-House Engineer | N/E | 02/01/2022 | Hourly Regular Rate 14.70 | 0.00 | 20.70 | |
| Hyatt, Tatum | UT | Drafter | N/E | 01/30/2023 | Hourly Regular Rate 15.00 | 0.00 | | |
| Ingram, Guy S | UT | Field Engineer | N/E | 11/04/2020 | Hourly Administrative 22.00 | 120.00 | 812.13 | 6,127.75 |
| Ingram, Jed | UT | Field Engineer | N/E | 08/01/2019 | Hourly Regular Rate 21.00 | 108.50 | 1,624.26 | 6,427.75 |
| Jackson, Scott | UT | Accounting | Exempt | 10/02/2019 | Salary Admin 100,000.00 | 80.00 | 5,414.18 | 9,177.75 |
| Jeffery, Sierra N | UT | Field Engineer | N/E | 06/08/2022 | Hourly Regular Rate 16.00 | -8.00 | 270.71 | 2,327.75 |
| Johnson, Kiah B | UT | Drafter | N/E | 11/21/2022 | Hourly Regular Rate 17.00 | 0.00 | | |
| Kirkwood, Robin F | UT | Drafter | N/E | 07/25/2005 | Hourly Regular Rate 24.00 | 93.50 | 1,624.25 | 5,877.75 |

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|---|---|---|---|---|---|---|---|---|
| Kyle, CharLinda | UT | Drafter | N/E | 10/22/2017 | Hourly Administrative 19.50 | 120.00 | 1,624.25 | 6,977.75 |
| LeChevalier, Nicole | CO | In-House Engineer | Exempt | 05/21/2018 | Salary Admin 134,800.00 | 88.00 | 1,624.25 | |
| Linne, Nicholas P | NC | Field Engineer | N/E | 11/29/2021 | Salary Billable 63,500.00 | 16.50 | 792.01 | 5,027.75 |
| Long, Tessa | UT | Drafter | N/E | 04/07/2003 | Hourly Regular Rate 25.00 | 72.00 | 2,165.67 | 8,077.75 |
| Lunt, Hunter C | UT | Drafter | N/E | 02/20/2023 | Units #1 | 0.00 | | |
| Lunt, KC | UT | In-House Engineer | Exempt | 02/19/2018 | Salary Admin   93,000.00 | 234.00 | 5,414.17 | 7,977.75 |
| Lunt, Kyler E | UT | In-House Engineer | Exempt | 02/11/2008 | Salary Admin   95,000.00 | 73.00 | 5,414.19 | 8,177.75 |
| Lusk, McKade K | UT | Field Engineer | N/E | 06/29/2015 | Hourly Regular Rate 28.00 | 35.50 | 2,707.10 | 9,327.75 |
| Lusk, Shaelene | UT | Drafter | N/E | 11/21/2022 | Hourly Regular Rate 17.00 | 0.00 | 54.14 | |
| Martin, Chelsie | UT | Clerical | N/E | 05/18/2021 | Hourly Administrative 13.50 | 7.50 | 541.42 | 6,827.75 |
| Matthews, Christopher S | NE | In-House Engineer | N/E | 09/26/2022 | Salary Billable 33,920.00 | 40.00 | 812.12 | |

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|---|---|---|---|---|---|---|---|---|
| McAdams, Samantha | NE | Clerical | N/E | 02/11/2019 | Salary Admin   43,703.80 | 128.00 | 1,624.25 | |
| McClellan, Tina | UT | Permitting | N/E | 09/19/2019 | Hourly Regular Rate 16.00 | 17.00 | 1,624.26 | 5,527.75 |
| McCrary, Dale | UT | Field Engineer | N/E | 02/17/2020 | Hourly Regular Rate 38.00 | 0.00 | 541.42 | |
| Molyneux, Gregory | UT | Information Technology | N/E | 01/30/2023 | Salary Admin  60,000.00 | 0.00 | | |
| Mortimore, Hayley R | UT | Drafter | N/E | 02/11/2021 | Hourly Regular Rate 16.75 | 0.00 | 541.42 | 7,227.75 |
| Neilsen, Christian E | UT | Permitting | N/E | 11/21/2016 | Hourly Regular Rate 26.00 | 18.50 | 1,624.26 | 4,327.75 |
| Odegard, Stephanie | TX | Field Engineer | Exempt | 01/09/2018 | Salary Admin 130,000.00 | 120.00 | 1,624.27 | |
| Painter, Marlo J | UT | Drafter | N/E | 01/03/2023 | Hourly Regular Rate 16.00 | 0.00 | | |
| Pexton, Nicholas | UT | Field Engineer | N/E | 05/27/2020 | Salary Admin 100,000.00 | 98.00 | 10,828.38 | 8,627.75 |
| Putman, Loyd D | TX | Field Engineer | N/E | 11/16/2022 | Salary Billable 115,000.00 | 0.00 | | |
| Reavis, Brian | CO | Field Engineer | N/E | 04/26/2021 | Salary Billable 68,000.00 | 32.00 | 541.42 | 3,827.75 |

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|---|---|---|---|---|---|---|---|---|
| Reniger, Grace | TX | Clerical | N/E | 07/29/2019 | Hourly Regular Rate 17.00 | 0.00 | 1,624.25 | |
| Reniger, Heather | TX | Clerical | N/E | 05/21/2018 | Salary Admin   86,263.02 | 200.00 | 1,624.25 | |
| Rich, Christel | UT | Drafter | N/E | 11/07/2022 | Hourly Regular Rate 17.00 | 0.00 | 54.15 | |
| Robertson, Jessica | UT | Permitting | N/E | 07/09/2018 | Salary Billable 55,000.00 | 14.25 | 2,165.67 | 10,427.75 |
| Rosquist, Emily | UT | Drafter | N/E | 10/24/2016 | Hourly Administrative 20.00 | 40.25 | 2,165.67 | 6,477.75 |
| Rosquist, Kelly L | UT | Drafter | N/E | 09/29/2000 | Salary Billable 80,000.00 | -8.00 | 3,789.94 | 11,077.75 |
| Sperry, Brenda M | UT | Drafter | N/E | 11/07/2017 | Units #1 | 71.00 | 1,353.55 | 3,201.98 |
| Sperry, Dyllan J | UT | Field Engineer | N/E | 02/07/2022 | Hourly Regular Rate 19.00 | 40.00 | 541.42 | 5,077.75 |
| Sperry, Kaitlyn | UT | Clerical | N/E | 01/01/2022 | Salary Admin   12,994.08 | 0.00 | 270.71 | |
| Swallow, Robert G | OK | Field Engineer | N/E | 06/11/2007 | Salary Billable 67,320.00 | 1.50 | 1,624.25 | 4,827.75 |
| Valdez, Joni | UT | Field Engineer | N/E | 04/21/2021 | Salary Billable 77,000.00 | 20.00 | 541.42 | 1,625.77 |
| Vogt, McKiley B | UT | Drafter | N/E | 08/16/2022 | Hourly Regular Rate 15.50 | 0.00 | 270.71 | |

| Employee | Location | Title/Position | Classification | Hire Date | Compensation | PTO As of 3/1/23 | Bonus 2022 | Bonus 2022 (Paid 2023) |
|---|---|---|---|---|---|---|---|---|
| Wankier, Bart J | UT | Field Engineer | N/E | 01/19/1998 | Hourly Regular Rate 32.25 | 70.50 | 3,248.52 | 8,077.75 |
| Wardell, Lindsay | UT | Drafter | N/E | 11/07/2022 | Hourly Regular Rate 17.00 | 0.00 | 54.15 | |
| Westfall Jr, Wilbur G | UT | Field Engineer | N/E | 03/19/2018 | Salary Admin   75,000.00 | 75.50 | 1,894.96 | 4,351.98 |
| Westfall, Steven | UT | Field Engineer | N/E | 01/05/2009 | Hourly Regular Rate 26.50 | 0.00 | 1,624.25 | 4,577.75 |
| Wilkey, Brandon J | UT | Drafter | N/E | 12/02/2022 | Hourly Regular Rate 18.00 | 0.00 | | |
| Williams, Michael | UT | Field Engineer | N/E | 03/22/2017 | Hourly Administrative 22.00 | 18.00 | 1,624.25 | 2,577.75 |
| Williams, Brandon G | UT | Field Engineer | N/E | 03/05/2018 | Hourly Administrative 22.00 | 0.00 | 1,624.26 | 5,727.75 |
| Williams, Makenzie | UT | Drafter | N/E | 02/07/2022 | Hourly Regular Rate 15.75 | 40.00 | 270.70 | 4,727.75 |
| Womble, Aaron K | UT | Field Engineer | N/E | 03/28/2022 | Hourly Regular Rate 29.00 | 0.00 | 541.41 | 4,727.75 |
| Wright, Carl | UT | Field Engineer | N/E | 08/23/2021 | Hourly Regular Rate 29.00 | 77.00 | 1,082.84 | 3,951.98 |
| Wright, Kristopher R. | UT | Field Engineer | N/E | 04/16/2018 | Hourly Regular Rate 33.00 | 109.50 | 2,165.67 | 6,077.75 |

2.      See Schedule 3.12(c), Item 17 of these Disclosure Schedules.

**SCHEDULE 3.12(b)**

**SELLER EMPLOYEES**

1.      During the onboarding process for new employees, each employee is required to sign an I-9 and go through E-Verification prior to commencing and work for Seller. All current employees of Seller, with the exception of those listed below, have signed such form and been E-Verified, although Seller cannot not confirm whether every former employee has signed such form and been E-Verified:

   (a)      Keti Garrett

   (b)      Kyle Garrett

   (c)      Bart Wankier

## SCHEDULE 3.12(c)

## BENEFIT PLANS

1.      Approximately once a month, the Seller, at its discretion, provides lunch to employees in connection with meetings for the purpose of providing employees information or trainings relevant to the Business.

2.      Seller provides a holiday party each year in December, which includes an employee prize raffle purchased by Seller.

3.      Flexible Spending Account/Cafeteria Plan. Seller has not made the applicable Plan documents available to Buyer as Seller has been unable to locate such documents.

4.      Health insurance. The Seller contributes towards employee premiums based on the following tables:

| RMWT Monthly Contribution | $1k Deductible Plan Employee Monthly Cost | | |
|---|---|---|---|
| $ 600.00 | 90 days to 3 years | Employee | $177.15 |
| $ 600.00 | | Employee + Spouse | $1,105.87 |
| $ 600.00 | | Employee + Children | $1,029.69 |
| $ 600.00 | | Family | $1,809.24 |
| | | | |
| $ 650.00 | 4 to 5 years | Employee | $127.15 |
| $ 650.00 | | Employee + Spouse | $1,055.87 |
| $ 650.00 | | Employee + Children | $979.69 |
| $ 650.00 | | Family | $1,759.24 |
| | | | |
| $ 730.82 | 6 to 9 years | Employee | $46.33 |
| $ 800.00 | | Employee + Spouse | $905.87 |
| $ 800.00 | | Employee + Children | $829.69 |
| $ 800.00 | | Family | $1,609.24 |
| | | | |
| $ 730.82 | 10 to 14 years | Employee | $46.33 |
| $ 802.09 | | Employee + Spouse | $903.78 |
| $ 800.00 | | Employee + Children | $829.69 |
| $ 1,132.81 | | Family | $1,276.43 |
| | | | |
| $ 730.82 | 15 + years | Employee | $46.33 |
| $ 1,122.93 | | Employee + Spouse | $582.94 |
| $ 1,072.78 | | Employee + Children | $556.91 |
| $ 1,585.93 | | Family | $823.31 |

| RMWT Monthly Contribution | $3K Deductible Plan Employee Monthly Cost | | |
|---|---|---|---|
| $ 577.55 | 90 days to 3 years | Employee | $0.00 |
| $ 700.00 | | Employee + Spouse | $567.72 |
| $ 700.00 | | Employee + Children | $511.19 |
| $ 700.00 | | Family | $1,090.46 |
| | | | |
| $ 577.55 | 4 to 5 years | Employee | $0.00 |
| $ 775.00 | | Employee + Spouse | $492.72 |
| $ 775.00 | | Employee + Children | $436.19 |
| $ 775.00 | | Family | $1,015.46 |
| | | | |
| $ 577.55 | 6 to 9 years | Employee | $0.00 |
| $ 850.00 | | Employee + Spouse | $417.72 |
| $ 850.00 | | Employee + Children | $361.19 |
| $ 850.00 | | Family | $940.46 |
| | | | |
| $ 577.55 | 10 to 14 years | Employee | $0.00 |
| $ 900.00 | | Employee + Spouse | $367.72 |
| $ 900.00 | | Employee + Children | $311.19 |
| $ 900.00 | | Family | $890.46 |
| | | | |
| $ 577.55 | 15 + years | Employee | $0.00 |
| $ 900.00 | | Employee + Spouse | $367.72 |
| $ 900.00 | | Employee + Children | $311.19 |
| $ 1,253.32 | 70% | Family | $537.14 |

5.      Dental insurance. Seller contributes 50% of the premium.

6.      Vision insurance. Seller contributes 50% of the premium.

7.      Group Life insurance and Accidental Death and Dismemberment insurance, paid for by Seller.

8.      Short-term disability insurance, available to for employees to purchase.

9.      Accident insurance, available to for employees to purchase.

10.     Critical Illness insurance, available to for employees to purchase.

11.     The Seller recognizes six (6) paid holidays per year:

(a)   New Year's Day

(b)   Memorial Day

(c)   Independence Day

(d)   Labor Day

(e)   Thanksgiving Day

(f)   Christmas Day

12.   Employees eligible for paid vacation receive paid vacation hours based on the following table:

| Years of Employment | Maximum # Days of Paid Vacation |
| --- | --- |
| Less than 1 year | 0 |
| 1 year complete through end of second year | 5 days or 40 hours |
| 2 years completed through end of fifth year | 10 days or 80 hours |
| 5 years completed through end of ninth year | 15 days or 120 hours |
| 10 or more years completed | 20 days or 160 hours |

13.   Bereavement pay of up to two (2) days for full-time employees who have completed one year of employment in the event of the death of a niece, nephew, grandparent, or grandchild and up to three (3) days in the event of the death of a spouse, child, stepchild, brother, sister, parent, or parent-in-law.

14.   401(k) plan, to which Seller matches 100% of each employee's contribution up to 4%.

15.   Seller pays cell phone expenses for the following individuals:

(a)   Owner

(b)   Wyatt Garrett

(c)   Bart Wankier

16.   Seller provides a $50/month cell phone allowance to the following individuals:

(a)   Heather Reniger

(b)   Jeremy Butler

(c)   Samantha McAdams

(d)   Stephanie Odegard

(e)   Zachary Friedman

(f)   Marcus Diddens

(g)   Angela Dodson

(h)     Nicole LeChevalier

(i)     Christopher Matthews

17.     The Seller created that certain Non-Qualified Deferred Compensation Trust, dated December 2, 1998, by and among the Seller, T. Earl Andrews and Brenda M. Sperry. Such trust was never funded and disbursements under such trust were never made.

18.     Seller pays the premium for Kyle Garrett's Life Insurance Policy No. 000181423 with U.S. Financial Life Insurance Co.

19.     Benefits are available to full-time employees working at least thirty (30) hours per week, along with spouses and eligible dependents.

20.     The Seller has committed to contribute forty percent (40%) of its profits to a bonus pool to be paid out to its employees for the year ending December 31, 2022. Bonuses paid to employees are based on employee performance and attitude. Seller has discontinued employee profit sharing bonus accruals following those paid out for the period ending December 31, 2022.

**SCHEDULE 3.12(d)**

**EMPLOYEE AND CONTRACTOR TRANSACTION MATTERS**

1.      Denali Consulting, LLC, a consulting entity owned by Lee Roberts, will receive a bonus in the amount of $100,000 in connection with the transactions contemplated by the Agreement, which will be paid at Closing.

2.      Bart Wankier will receive a bonus in the amount of $100,000 in connection with the transactions contemplated by the Agreement, which will be paid at Closing.

3.      Tyson Garrett will receive a bonus in the amount of $25,000 in connection with the transactions contemplated by the Agreement, which will be paid at Closing.

## <u>SCHEDULE 3.13</u>

## COMPLIANCE WITH LEGAL REQUIREMENTS

1.      See Schedule 3.01, Items 2, 3, and 4 of these Disclosure Schedules.

2.      See Schedule 3.05(c) of these Disclosure Schedules.

## SCHEDULE 3.14

### PERMITS

1.     Business License No. 18070 to carry on the business of telecommunication contractor issued by the City of Nephi, Juab County, State of Utah. Such license indicates that it is non-transferrable.

2.     Certificate of Authority of Notary Public, issued to Kimberly Brown by the State of Utah Office of the Lieutenant Governor.

## SCHEDULE 3.15

### ACTIONS; SETTLEMENTS

1.  The Seller is current involved as a third-party respondent in the litigation matter In the Matter of the Marriage of Stephanie Bree Walker and Christopher Michael Walker; Cause No. 2017-06311; in the 257th Judicial District Court of Harris County, Texas (the "**Walker Lawsuit**"). Ms. Walker has pled claims of civil conspiracy, participation in breach of fiduciary duty, tortious interference with prospective business relations, aiding and abetting, constructive fraud and unjust enrichment against the Seller in connection with her divorce from Mr. Walker. Ms. Walker alleges that Mr. Walker conspired to direct business away from Walker Communications, LLC, ("**WC**") a company allegedly owned equally by Ms. Walker and Mr. Walker to the Seller in exchange for Mr. Walker to set up Stephanie Odegard as an employee of the Seller, to the financial detriment of WC. The Seller denies all of such allegations. The Walker Lawsuit currently has been stayed as a result of a bankruptcy filing by Ms. Walker and is in the discovery stage of litigation.

2.  In 2017, Seller hired C2K Construction LLC ("**C2K**") to perform subcontractor services, with C2K subsequently subcontracting certain of the services to Transcend Spatial Solutions, LLC ("**Transcend**"). Ultimately, there was a payment dispute that resulted from C2K's failure to pay Transcend for services performed due to C2K's failure to complete the work for which C2K was hired by Seller. Such matter was ultimately settled in mediation with C2K and Transcend in 2019 and the Seller does not have any outstanding obligations pursuant to such matter.

3.  The Seller is currently subject several garnishment orders for various employees for child support.

4.  See Schedule 3.09(b), Item 1 of these Disclosure Schedules.

**SCHEDULE 3.16**

**INSURANCE**

1.

| Description | Carrier | Policy Number | Effective Date | Expiration Date | Inception Premium |
|---|---|---|---|---|---|
| Workers Compensation and Employers Liability Insurance Policy | RLI Insurance Company | PSW0004740 | 10/1/22 | 10/1/23 | $6,754.37 |
| Professional, Environmental And Network Security Liability Policy | XL Specialty Insurance Company | DPR5003075 | 10/1/22 | 10/1/23 | $38,454.00 |
| Business Auto | RLI Insurance Company | PSA0002792 | 10/1/22 | 10/1/23 | $21,643.00 |
| Businessowners | RLI Insurance Company | PSB0008515 | 10/1/22 | 10/1/23 | $1,863.00 |
| Crime | Travelers Casualty and Surety Company of America | 1055758074 | 10/1/22 | 10/1/23 | $2,417.00 |
| Cyber & Privacy, Cyber Crime | CFC Underwriting Limited | ESL0339532132 | 10/1/22 | 10/1/23 | $5,965.00 |
| Employment Practices Liability | Great American Insurance Company | EPLE440958 | 10/1/22 | 10/1/23 | $5,800.00 |
| EXCESS LIABILITY | RLI Insurance Company | PSE0004226 | 10/1/22 | 10/1/23 | $3,812.00 |
| Life Insurance | U.S. Financial Life Insurance Co. | 0000181428 | 9/28/01 | | $1,007.88 |

2.      All insurance premium increases over the past four years have been ordinary course increases.

3.      That certain Workers Compensation and Employers Liability Insurance Policy, dated October 1, 2022, between the Seller and RLI Insurance Company includes a provision providing for retrospective premium adjustments.

4.      Seller holds a life insurance policy (Policy Number 0000181428) on the Owner through U.S. Financial Life Insurance Company.

5.      See Section 3.09(b), Item 4 of these Disclosure Schedules.

**SCHEDULE 3.17**

**WARRANTIES**

1.      None.

**<u>SCHEDULE 3.18</u>**

**LIABILITIES**

1.      None.

## SCHEDULE 3.19

### ENVIRONMENTAL MATTERS

1.    While performing work pursuant to that certain Postloan Engineering Services Contract, dated November 11, 2021, between the Seller and Beehive Telephone Company, Inc., Seller was informed that Beehive Telephone Company, Inc. had been issued the incorrect permit by the U.S. Bureau of Land Management, resulting in Seller's work being delayed for a period of approximately eight (8) months. Issuance of the incorrect permit was not due to any improper action by Seller or its employees and, with the exception of expenses caused by the delays from performing the services, did not result in any liabilities or fines to Seller and Seller was never determined to have acted improperly by Beehive Telephone Company, Inc. or the U.S. Bureau of Land Management.

## **<u>SCHEDULE 3.20</u>**

### **INFORMATION PRIVACY AND DATA SECURITY**

1.      Seller's website does not include a privacy policy.

2.      The Seller does not have a card processor and doesn't store any card payment information.

## SCHEDULE 3.21

### AFFILIATE TRANSACTIONS

1.  Seller made a loan in the amount of $600,000 to Challenger Real Estate, LLC, a company with which Lee Roberts is affiliated on September 9, 2022. On January 23, 2023, the remaining outstanding balance of such loan was repaid in full, including all interest owed thereunder.

2.  Commercial Lease Agreement, dated June 30, 2020, between the Seller and K & K Leasing LLC.

3.  From time to time, the Seller makes advances to employees. As of March 1, 2023, the following employee advances remain outstanding:

    (a)     Mel Green - $114.52

4.  The Seller has purchased vehicle magnets and door signs from Custom Signworks, LLC, a company previously owned by Keti Garrett which is now owned by Wyet Ingram, Keti Garrett's nephew. Such products were purchased at arm's length.

5.  In 2022, the Seller paid Duke Cassidy, an employee of Seller, to clean and detail certain vehicles at a rate of $80.00 per vehicle.

6.  On January 5, 2023, Seller purchased a drone to be used in the Business pursuant to that certain Invoice Number 148538, dated January 5, 2023, between the Seller and Transit Instruments, Inc. Transit Instruments, Inc. is owned by a family member of Owner and such purchase was made at a ten percent (10%) discount.

7.  Due to the fact that the utilities of the Leased Real Property also include the utilities for a nearby cabin and trailer park that K & K Leasing LLC is currently leasing to third-party tenants, the Seller's water and sewer utilities currently include amounts incurred by the utilities used by the cabin tenant and the trailer park tenants and also includes amounts incurred by the electricity utilities used by the cabin tenant, which Seller currently pays.

8.  The following employees of Seller are family of the Owner:

    (a)     Garrett, Keti

    (b)     Garrett, Nicole

    (c)     Garrett, Tyson

    (d)     Garrett, Wyatt

    (e)     Ingram, Guy S

    (f)     Ingram, Jed

    (g)     Painter, Marlo J

    (h)     Sperry, Dyllan J

    (i)     Sperry, Kaitlyn

9.    See Schedule 3.12(d) of these Disclosure Schedules.

**SCHEDULE 3.23(b)**

**LEASED REAL PROPERTY**

1.      Leased Real Property:

| Landlord | Address |
|---|---|
| K & K Leasing LLC | 22 N Sheep Lane, Nephi, Utah 84648 |
| Carmco, LLC | 107 West Center Street, Nephi, Utah 84648 |
| Alamo Broadway Mini-Storage, Ltd. | 1999 Gulfmart Street, Unit #532, San Antonio, Texas 78217 |

2.      See Schedule 3.21, Item 2 of these Disclosure Schedules.

**<u>SCHEDULE 3.23(c)</u>**

**REAL PROPERTY LEASE COMPLIANCE**

1.     None.

## **SCHEDULE 3.24(a)**

### **SELLER GOVERNMENT CONTRACTS**

1.      See Schedule 3.09(a)(xv) of these Disclosure Schedules.

## <u>SCHEDULE 3.25</u>

### BROKERS

1.      None.

## SCHEDULE 3.27(a)

### ACCOUNTS RECEIVABLE

1.      See Attachment 3.27(a), attached to these Disclosure Schedules.

2.      See Schedule 3.08, Item 1 of these Disclosure Schedules.

3.      See Schedule 3.03, Items 1 and 2 of these Disclosure Schedules.

**<u>SCHEDULE 3.27(b)</u>**

**ACCOUNTS PAYABLE**

1.      $50,000

## SCHEDULE 5.05

### ACQUIRED EMPLOYEES

1.      All individuals listed on Schedule 3.12(a) except the following individuals:

      (a)      Stephanie Odegard

      (b)      Keti Garrett

## SCHEDULE APPENDIX-1

### DEBT-LIKE ITEMS

1.      None.

# EXHIBIT A

## Adjusted EBITDA

"**Adjusted EBITDA**" (or "**EBITDA**") means earnings before interest, taxes, depreciation and amortization of the Business under the control of the Seller for the period commencing on January 1, 2023 through and including the Closing Date, and of the Buyer after the Closing Date, determined on a consolidated basis with any direct or indirect subsidiaries of Buyer (for the period after the Closing Date).  In determining EBITDA:

(a)     EBITDA shall be calculated in good faith in accordance with the accounting policies (including Accounting Principles), bases, methods, practices and procedures adopted by the Company in the preparation of its financial statements for the Fiscal Year ended December 31, 2022;

(b)     EBITDA shall be computed to exclude items that represent extraordinary (as defined under GAAP prior to the effectiveness of FASB ASU 2015-01), unusual, one-time, nonrecurring, or noncash items of gain, loss, income or expense, and such items to be disregarded shall, for the avoidance of doubt, include, but shall not be limited to: (i) after-tax gains or losses attributable to the sale of Buyer's subsidiaries, businesses, assets or properties of any kind, whether real, personal or mixed and whether tangible or intangible; (ii) any recoveries or non-cash gains during the period commencing on January 1, 2023 through and including December 31, 2023 resulting from the reversal of reserves or accrued expenses recorded on or prior to December 31, 2022; and (iii) forgiveness of the Paycheck Protection Program (PPP) loan;

(c)     The following reductions to earnings shall be added back in determining EBITDA (to the extent deducted from the calculation of EBITDA during the applicable Fiscal Year): (i) any fees, costs and expenses incurred, accrued or paid in connection with the consummation of the transactions contemplated by this Agreement on or about the Closing Date and (ii) Capital structure, shared services or allocated charges from Full Circle Fiber Partners, if any.

(d)     If Buyer or any of its Subsidiaries makes an Acquisition during Fiscal 2023, then EBITDA shall not include any income or expenses of such Acquired Company or attributable to such Acquired Company Business, as applicable. "Acquired Company" means the Person acquired by Buyer or any of its Subsidiaries in any Acquisition. "Acquired Company Business" means the property or assets acquired by Buyer or any of its Subsidiaries in any Acquisition (if the Acquisition is structured as an acquisition of substantially all of the property and assets of (or all or substantially all of the property and assets representing a business unit or business line of or customer base of) a Person). "Acquisition" means the purchase or other acquisition by Buyer or any of its Subsidiaries of all or at least a majority of the equity securities in, or all or substantially all of the property and assets of (or all or substantially all of the property and assets representing a business unit or business line of or customer base of) any Person that, upon the consummation thereof, will be controlled directly by Buyer or such Subsidiary (including as a result of a merger or consolidation or the purchase or other acquisition of all or a substantial portion of the property and assets of a Person).

**EXHIBIT B**

**ALLOCATION SCHEDULE**

The Purchase Price, together with any other items treated for Tax purposes as consideration for the Purchased Assets (including Assumed Liabilities, if any, and Transaction Expenses paid by Buyer), all as finally determined (the "**Allocable Consideration**") will be allocated among the Purchased Assets and the restrictive covenants set forth in Section 5.07 of the Agreement. Class references will conform to Section 1060 of the Internal Revenue Code and Treasury Regulations Sections 1.1060-1. Accordingly, the Allocable Consideration will be allocated first to the Class I assets, if any, up to the value of such assets as set forth below. Any excess Allocable Consideration will next be allocated to Class II assets, if any, up to the value of such assets as set forth below. For purposes of clarity, after the Allocable Consideration is allocated to each class up to the value thereof as determined below, any excess Allocable Consideration will be allocated to the next sequential class of assets. Any Allocable Consideration remaining after the allocations to assets in Classes I through VI shall be allocated to Class VII assets. The listing of a class of assets in the table below does not necessarily mean that such class of assets is applicable to the transaction.

| Asset Class | Allocation Methodology |
|---|---|
| Class I (cash, demand deposits, etc.) | Face value. |
| Class II (marketable stock, government securities, etc.) | An amount equal to the value of the Class II assets (if any) included in actual Closing Working Capital. |
| Class III (accounts receivables, mortgages, etc.) | An amount equal to the value of the Class III Assets (if any) included in actual Closing Working Capital. |
| Class IV (inventory, etc.) | An amount equal to the value of Class IV Assets (if any) included in actual Closing Working Capital. |
| Class V (assets other than Class I, II, III, IV, VI or VII assets) | An amount equal to the net book value of the Class V Assets (if any) as reflected in the most recently completed Financial Statements of Company. |
| Class VI (Section 197 intangibles, other than goodwill and going concern value) | Zero, other than $5,000 to the restrictive covenant(s) contained in Section 5.07. |
| Class VII (goodwill and going concern value) | The remainder of the Allocable Consideration. |

**EXHIBIT C**

**ESCROW AGREEMENT**

**[*See Attached*]**

## ESCROW AGREEMENT

This Escrow Agreement (this "**Escrow Agreement**") is dated as of this 10th day of March, 2023, by and among CIBC National Trust Company (the "**Escrow Agent**", which term shall also include any successor escrow agent appointed in accordance with <u>Section 4(a)</u> hereof), Rocky Mountain West Telecom, Inc., a Utah corporation ("**Seller**") and RMWT Consulting LLC, a Delaware limited liability company ("**Buyer**," and together with Seller, the "**Other Parties**").

      **WHEREAS**, pursuant to Section 2.03 of that certain Asset Purchase Agreement, dated as March 10, 2023 (the "**Purchase Agreement**"), by and among Buyer, Seller and Kyle Garrett, Buyer agreed to deliver to the Escrow Agent One Million One Hundred Twenty Five Thousand Dollars ($1,125,000) (the "**Escrow Amount**"), which shall be allocated as follows:

      a.      One Hundred Fifty Thousand Dollars ($150,000) (the "**Working Capital Escrow Amount**"), to secure any obligations owed by the Sellers to Buyer after determination of the final Purchase Price and Net Adjustment Amount pursuant to Section 1.06 of the Purchase Agreement.

      b.      Nine Hundred Seventy Five Thousand Dollars ($975,000) (the "**Indemnification Escrow Amount**"), to secure any indemnification claims of the Buyer Indemnified Other Parties pursuant to Article VI of the Purchase Agreement, as well as to secure any obligations owed by the Sellers to Buyer after determination of the final Purchase Price and Net Adjustment Amount pursuant to Section 1.06 of the Purchase Agreement.

      **WHEREAS**, the parties hereto desire to set forth the terms and conditions relating to the Escrow Amount.

      **NOW, THEREFORE**, the parties hereto, in consideration of the mutual covenants contained herein, and intending to be legally bound, hereby agree as follows:

1.    <u>Escrow.</u>

      a.    <u>Appointment of the Escrow Agent.</u>  The Other Parties hereby appoint the Escrow Agent to serve as, and the Escrow Agent hereby agrees to act as, escrow agent for the benefit of the Other Parties in accordance with the terms and conditions of this Escrow Agreement.

      b.    <u>Escrow Amount.</u>  Upon execution of this Escrow Agreement by Buyer, Seller and Escrow Agent, Buyer will deposit the Escrow Amount into a single account to be held by the Escrow Agent (the "**Escrow Account**").  The Escrow Agent shall promptly upon request of Buyer or Seller acknowledge receipt of any funds so deposited. The Escrow Agent agrees to hold the Indemnification Escrow Funds (as defined below) and the Working Capital Escrow Funds (as defined below) in separate sub-accounts of the Escrow Account (the sub-account with the Indemnification Escrow Funds, the "**Indemnification Escrow Account**" and the sub-account with the Working Capital Escrow Funds, the "**Working Capital Escrow Account**"), subject to the terms and conditions of this Escrow Agreement and, as between the Other Parties, the Purchase Agreement.

      c.    <u>Escrow Account</u>:

      Escrow Account Number: 104-4064

d.      <u>Investment</u>.  Funds on deposit in the Escrow Account shall be held/invested as follows (check one):

☐      Invested in **Wealth Management Money Market Account II ("WMMA II")**

◼      Held in **Non-Interest Bearing Demand Deposit Account** and shall not be invested

*NOTE: Failure to check one of the above boxes shall mean that funds on deposit in the Escrow Account shall be held in a **Non-Interest Bearing Demand Deposit Account** and shall not be invested.*

The Other Parties may elect to invest funds on deposit in the Escrow Account in an investment instrument other than WMMA II by providing the Escrow Agent with joint written notice of such election, but solely to the extent that such investment method is acceptable to the Escrow Agent.

Escrow Agent hereby agrees to act as escrow agent and to hold and disburse (i) the Indemnification Escrow Amount <u>plus</u> any interest, dividends, earnings, gains or other income which may be earned with respect thereof ("**Interest**") <u>minus</u> any payments made hereunder (hereinafter collectively referred to as the "**Indemnification Escrow Funds**") pursuant to the terms and conditions hereof and, as between the Other Parties, the Purchase Agreement and (ii) the Working Capital Escrow Amount <u>plus</u> any Interest thereon (if any) <u>minus</u> any payments made hereunder (hereinafter collectively referred to as the "**Working Capital Escrow Funds**" and, together with the Indemnification Escrow Funds, the "**Escrow Funds**") pursuant to the terms and conditions hereof and, as between the Other Parties, the Purchase Agreement.  Escrow Agent shall not distribute or release the Escrow Funds except in accordance with the express terms and conditions of this Escrow Agreement and, as between the Other Parties, the Purchase Agreement.

Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge and agree that, for federal, state, and local income tax purposes, Seller shall be treated as owning the assets that comprise the Escrow Amount and thus, in computing Seller's income tax liability, Seller will take into account all Interest, if any, in accordance with the Internal Revenue Code of 1986, as amended and the regulations thereunder.

e.      <u>Termination</u>.  This Escrow Agreement shall terminate on the earliest to occur of the date on which: (i) the Escrow Agent shall have been notified jointly in writing by the Other Parties that this Escrow Agreement shall be terminated; or (ii) the Escrow Agent shall have delivered the entirety of the Escrow Funds in accordance with Section 2 below.  Upon such termination this Escrow Agreement shall have no further force and effect, except that the provisions of this Section 1(e), Section 5 and Sections 7(a) through (r) shall survive such termination and the resignation or removal of the Escrow Agent.

2.      <u>Escrow Term; Release of Escrow Amount.</u>

a.      <u>Working Capital Escrow Amount</u>.  On the date that is no later than five (5) Business Days after the final determination of the Net Adjustment Amount pursuant to Section 1.06(e) of the Purchase Agreement, Buyer and Seller shall deliver to Escrow Agent joint written instructions executed by each of the Other Parties in the form attached hereto as <u>Exhibit A</u> (the "**Joint Instructions**") directing the Escrow Agent to make payment from the Working Capital Escrow Funds to Buyer and/or Seller, as applicable (as required by Section 1.06(e) of the Purchase

Agreement), which such Joint Instructions shall set forth each recipient of a portion of the Working Capital Escrow Funds and the amount(s) and the account(s) to which such portion(s) of the Working Capital Escrow Funds shall be disbursed, and which disbursement shall be made by the Escrow Agent within three (3) Business Days after the Escrow Agent's receipt of such Joint Instructions. Any disbursements to Seller pursuant to this Section 2(a) shall be via wire transfer of immediately available funds to the account set forth on Annex 1 to the Joint Instructions, unless otherwise indicated in the Joint Instructions, and any disbursements to Buyer pursuant to this Section 2(a) shall be via wire transfer of immediately available funds to an account specified in the Joint Instructions.  Notwithstanding anything contained herein to the contrary, to the extent that the Net Adjustment Amount to be paid by Seller exceeds the Working Capital Escrow Amount and such difference (the "**Overage Amount**") is not paid by Sellers within five (5) Business Days of final determination of the Net Adjustment Amount, Buyer, at its discretion, may have such Overage Amount (or any portion thereof) paid from the Indemnification Escrow Amount, in which case Buyer shall deliver to Escrow Agent, with a copy concurrently delivered to Seller, written instructions executed by Buyer in the form attached hereto as Exhibit B (the "**Indemnification Offset Notice**") directing the Escrow Agent to make payment from the Indemnification Escrow Funds to Buyer, which such Indemnification Offset Notice shall set forth the amount and the account to which such portion of the Indemnification Escrow Funds shall be disbursed, and which disbursement shall be made by the Escrow Agent within three (3) Business Days after the Escrow Agent's receipt of such Indemnification Offset Notice.  Any disbursements to Buyer pursuant to the Indemnification Offset Notice shall be via wire transfer of immediately available funds to an account specified in the Indemnification Offset Notice. The Escrow Agent may conclusively presume that any Indemnification Offset Notice received by the Escrow Agent was concurrently received by Seller.

      b.     Indemnification Escrow Funds.

      (i)    Unless earlier disbursed as contemplated under the Purchase Agreement and pursuant to Joint Instructions delivered by Buyer and Seller to the Escrow Agent, on the date that is no later than three (3) Business Days following the Escrow Agent's receipt of Joint Instructions from Buyer and Seller following the eighteen (18) month period following the date hereof (the "**Disbursement Date**"), the Escrow Agent shall disburse to Seller via wire transfer of immediately available funds to the account set forth on Exhibit E attached hereto, the Indemnification Escrow Funds, if any, remaining in the Escrow Account less any Unresolved Claim Amount (as defined below).  For purposes hereof, the term "**Unresolved Claim Amount**" shall mean the aggregate amount of losses sought by Buyer with respect to all unresolved indemnification claims that have been properly asserted in accordance with this Escrow Agreement and, as between the Other Parties, the Purchase Agreement, as of the applicable date for which the Escrow Agent has received a Claim Notice (as defined below).  Any Unresolved Claim Amount shall remain in the Escrow Account until released in accordance with the provisions of Section 2(b)(iii) hereof.

      (ii)    In any event and at any time prior to a Disbursement Date (or after a Disbursement Date with respect to any Unresolved Claim Amount), the Indemnification Escrow Funds, or any portion thereof (including any Unresolved Claim Amount), shall be disbursed by Escrow Agent within three (3) Business Days after: (i) the Escrow Agent's receipt of a final, non-appealable order of a court of competent jurisdiction or binding arbitral award pursuant to which such court or arbitral body has determined whether and to what extent Buyer is entitled to the amount requested in a Claim Notice (a "**Final**

Order"); or (ii) the Escrow Agent's receipt of Joint Instructions advising Escrow Agent of the portion of the Indemnification Escrow Funds to be disbursed and the recipients thereof. Within three (3) Business Days following receipt of Joint Instructions or delivery of a Final Order, Escrow Agent shall promptly disburse amounts from the Indemnification Escrow Funds to Buyer or Seller, as applicable, in the amount set forth in either the Joint Instructions or Final Order, as the case may be, by wire transfer of immediately available funds to the account or accounts designated in the Joint Instructions or the notice accompanying a Final Order, as the case may be.

(iii)     In the event of an indemnity claim brought by any Buyer Indemnitee under Article VI of the Purchase Agreement (an "**Indemnity Claim**"), Buyer shall concurrently give written notice of such Indemnity Claim to Seller and to Escrow Agent (the "**Claim Notice**") stating in reasonable detail the amount or an estimated amount of such claim (to the extent known), and stating with reasonable specificity the facts and circumstances which form the basis (or bases) for such claim under Article VI of the Purchase Agreement.  Any such amounts set forth in the Claim Notice shall be retained by Escrow Agent until the earlier of (i) the Escrow Agent's receipt of evidence of a Final Order, at which time the Escrow Agent shall, within three (3) Business Days after the Escrow Agent's receipt of such Final Order, deliver the amounts set forth in such Final Order in accordance with the terms of such Final Order and the provisions hereof, or (ii) the Escrow Agent's receipt of Joint Instructions as to the disposition of the amounts set forth in the Claim Notice from the Indemnification Escrow Funds, at which time the Escrow Agent shall, within three (3) Business Days after the Escrow Agent's receipt of such Joint Instructions, deliver such amounts via wire transfer of immediately available funds to the account or accounts specified in the Joint Instructions.  The Escrow Agent may conclusively presume that any written notice regarding an Unresolved Claim Amount or any Claim Notice received by Escrow Agent from Buyer was concurrently received by Seller.

3.     Duties of the Escrow Agent.

a.     The Escrow Agent's sole responsibility hereunder shall be for the safekeeping, investment and disbursement of the funds in the Escrow Account in accordance with the terms of this Escrow Agreement.  The Escrow Agent shall have no implied duties or obligations, shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein, and shall not be bound by the provisions of any agreement among the parties hereto except this Escrow Agreement.  Subject to Section 7(r), the Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent in good faith believes to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement, provided that such instrument is signed by an authorized signatory of the applicable party, which authorized signatories are set forth on Exhibit D.  In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Account, any account in which the Escrow Amount is deposited, or this Escrow Agreement, or to appear in, prosecute or defend any such legal action or proceedings.  The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to: (i) issues that may arise between or among the parties hereto with respect to the disposition or disbursement of any of the assets held hereunder, (ii) the application of any federal or state law or regulation; (iii) the construction of any of the provisions hereof or of any

other agreement; or (iv) the performance of any of the Escrow Agent's responsibilities and duties hereunder, and shall incur no liability for any action taken in good faith in accordance with the opinion or instruction of such counsel.

b.      The Escrow Agent shall have no responsibility or liability for any diminution in value of any assets held hereunder which may result from any investments or reinvestment made in accordance with the provisions contained herein.

c.      The Escrow Agent shall have only those duties as are specifically provided herein, which shall be deemed purely ministerial in nature, and shall under no circumstance be deemed a fiduciary of any of the Other Parties.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document between the Other Parties. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred from the terms of any other agreement, instrument or document.  In no event shall the Escrow Agent be liable, directly or indirectly, for any (i) damages or expenses arising out of the services provided hereunder, other than damages which result from the Escrow Agent's gross negligence, willful misconduct, or failure to act in accordance with the standards set forth in this Agreement, or (ii) special or consequential damages, even if the Escrow Agent has been advised of the possibility of such damages.

d.      The Escrow Agent shall have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees.

e.      Any banking association or corporation into which the Escrow Agent may be merged, converted or with which the Escrow Agent may be consolidated, or any banking association or corporation resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any banking association or corporation to which all or substantially all of the corporate trust business and assets (as a whole or substantially as a whole) of the Escrow Agent shall be transferred, shall succeed to all of the Escrow Agent's rights, obligations and immunities hereunder.

f.      The Escrow Agent shall, upon prior notice to the Other Parties, have the right to liquidate any investments of the Escrow Account held by the Escrow Agent hereunder in order to provide funds necessary to make required payments hereunder.

g.      No provision of this Escrow Agreement shall require the Escrow Agent to pay an amount in excess of the then-current balance of the Escrow Account.

h.      In the event the Escrow Agent is required to disburse any amounts hereunder on a day that is not a Business Day, such amounts shall be disbursed by the Escrow Agent on the next succeeding Business Day.

4.      <u>Resignation and Removal of the Escrow Agent.</u>

a.      The Escrow Agent may resign as escrow agent at any time, with or without cause, by giving prior written notice to the Other Parties, such resignation to be effective at the time specified in the notice, which may not be sooner than thirty (30) days following the date such notice is delivered (the "**Notice Period**"), or upon the earlier appointment of a successor, if applicable.  In addition, the Other Parties may jointly remove the Escrow Agent as escrow agent at any time, with or without cause, by an instrument (which may be executed in counterparts)

delivered to the Escrow Agent, which instrument shall designate the effective date of such removal.  In the event of any such resignation or removal, a successor escrow agent shall be appointed by the Other Parties within the Notice Period.  If the Other Parties do not appoint a successor escrow agent, the Escrow Agent may apply to a court of competent jurisdiction in the State of Illinois to do so.  Any such successor escrow agent shall deliver to the Other Parties a written instrument accepting such appointment and the terms and conditions of this Escrow Agreement, and thereupon it shall succeed to all the rights and duties of the Escrow Agent hereunder and shall be entitled to receive the Escrow Amount pursuant to the terms hereof.

       b.     Upon receipt of written notice from the Other Parties, informing it of the appointment of the successor escrow agent, the Escrow Agent shall deliver the balance of the Escrow Account then held hereunder to the successor escrow agent. Upon such delivery and the confirmation thereof by the successor escrow agent, the Escrow Agent shall have no further duties, responsibilities or obligations hereunder and all such duties, responsibilities and obligations shall be binding upon the successor escrow agent.

       c.     In the event the Escrow Agent is removed, the Escrow Agent shall be paid a pro rata portion of all fees earned hereunder but not paid through the date of such removal, and the Escrow Agent shall have no obligation to refund or remit any portion of such fees received by the Escrow Agent prior to the date of such removal.

5.      <u>Fees</u>.  The Escrow Agent shall be compensated for its services hereunder in accordance with <u>Exhibit C</u>, which Fixed Annual Account Fee and any one-time documentation fee, if any, shall be paid in advance on the date hereof and subsequent annual account fees and other expenses shall be billed and be due and payable annually thereafter.  As between the Other Parties, the payment of such fees and expenses shall be paid one-half (1/2) by Buyer and one-half (1/2) by Seller, in each case directly to the Escrow Agent. If any amount due to the Escrow Agent in accordance with Section 7(l) or <u>Exhibit C</u> is not paid within thirty (30) calendar days of the due date, the Escrow Agent may set off and deduct any unpaid fees, non-reimbursed expenses, or unsatisfied indemnification claims from the Escrow Amount; provided, however, that the Escrow Agent shall provide prior written notice to the Other Parties prior to exercising any such offset right and, with respect to unpaid fees and non-reimbursed expenses, shall only be entitled to offset for such unpaid fees and non-reimbursed expenses (other than the Fixed Annual Account Fee set forth on <u>Exhibit C</u>) to the extent that such fees or expenses are reasonably and directly related to the administration of this Escrow Agreement.  Without limiting the generality of the foregoing, any fees owed to the Escrow Agent as of the date hereof that are not paid to the Escrow Agent concurrently with the execution of this Escrow Agreement shall be debited directly from the Escrow Account.

6.      <u>Actions by the Escrow Agent.</u>

       a.     In the event conflicting demands are made upon, or conflicting notices delivered to, the Escrow Agent with respect to the Escrow Amount or any portion thereof, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all demands or instructions with respect to such assets so long as such conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Other Parties for failure or refusal to comply with such conflicting claims, demands or instructions.  The Escrow Agent shall be entitled to refuse to act until (i) such conflicting claims or demands shall have been resolved by a final non-appealable judgment of a court of competent jurisdiction, in which event the Escrow Agent shall be authorized to disburse the Escrow Amount in accordance with such final non-appealable judgment, (ii) the

Escrow Agent receives Joint Instructions executed by each of the Other Parties involved in such dispute or disagreement directing delivery of the Escrow Amount, in which event the Escrow Agent shall be authorized to disburse the Escrow Amount in accordance with such Joint Instructions, or (iii) the Escrow Agent files an interpleader in any court of competent jurisdiction, and upon filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Amount and shall be entitled to cover and/or recover costs and expenses (including reasonable attorney's fees and expenses) incurred in connection with any such interpleader action in accordance with Section 7(l) hereof.

b.      Notwithstanding anything to the contrary contained herein, this Escrow Agreement shall not be construed to require the Escrow Agent to refer to, or interpret, any provisions of any other document in connection with carrying out the Escrow Agent's duties under this Escrow Agreement.

7.      General.

a.      Notices.  Any notice given hereunder shall be in writing and shall be deemed received upon the earlier of: (i) as of the date delivered if delivered personally or by a nationally recognized overnight courier service; or (ii) when sent by facsimile or e-mail if sent prior to 5:00 p.m. (CST) on a Business Day and on the next Business Day if sent after 5:00 p.m. (CST) on a Business Day or on any day that is not a Business Day.  In each case, any notice given shall be sent to the parties at the following addresses, e-mail addresses or facsimile numbers (or at such other address, e-mail address or facsimile number for a party as shall be specified by like notice, except that notices of changes of address shall be effective upon receipt):

If to Seller:

Rocky Mountain West Telecom, Inc.                With a copy to:
22 North Sheep Lane Drive                        Bennett Tueller Johnson & Deere, LLC
P.O. Box 331                                     3165 East Millrock Drive, Suite 500
Nephi, UT 84648                                  Salt Lake City, Utah 84121
Attention: Kyle Garrett                          Attention: Jeffrey E. Matson, Esq.
Email: kgarrett@rmwt.com                         Email: jmatson@btjd.com

If to Buyer:

                                                 With a copy to:
RMWT Consulting LLC                              Becker Legal Group, LLC
c/o Mill Point Capital LLC                       99 Madison Avenue, Fifth Floor
1177 Avenue of the Americas                      New York, NY 10016
45th Floor                                       Attention:  David M. Becker
New York, NY 10036                               E-Mail:  dbecker@beckerlg.com
Attention:  Ben Rogers
E-mail: brogers@millpoint.com

If to the Escrow Agent:

CIBC National Trust Company
120 South LaSalle Street
Chicago, IL 60603
Attention: Ann Bolognani
Phone: (312) 564-1424
Facsimile No.: (312) 800-9728
ann.bolognani@cibc.com

and

Attention: Hallie Banach
Phone: (312) 564-2054
Facsimile No.: (312) 800-9728
hallie.banach@cibc.com

or to such other address as the applicable Other Party may have furnished in writing to the Escrow Agent in the manner provided above. Notwithstanding the foregoing, (x) notices addressed to the Escrow Agent shall be effective only upon receipt, (y) all notices to the Escrow Agent shall be required to be sent via e-mail in order to be effective for purposes of this Escrow Agreement, and (z) any notices sent by Escrow Agent to the e-mail addresses set forth above shall be effective as of the date such e-mail correspondence was sent. When any notice, claim, objection to a claim or document of any kind is required to be delivered to the Escrow Agent and any other person or entity, the Escrow Agent shall forward such notice, claim or other document within three Business Days after the date on which it was received by the Escrow Agent to the parties hereto, and such notice shall be subject to the provisions of this Section 7(a). The Escrow Agent shall send statements to each of the Other Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month. For purposes of this Escrow Agreement, a "**Business Day**" shall be defined as any day, other than a Saturday or Sunday, on which the NYSE is open for business. Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

b.    Captions. The captions in this Escrow Agreement are for convenience only and shall not be considered a part of, or affect the construction or interpretation of any provision of this Escrow Agreement.

c.    Counterparts. This Escrow Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be one agreement. This Escrow Agreement, to the extent signed and delivered by means of a facsimile machine or via electronic mail of a .pdf or .tif or similar file format, shall be treated in all manners and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

d.    Amendments. The provisions of this Escrow Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by the Escrow Agent and each of the Other Parties.

e.    Assignability. Subject to Section 3(e), no party may, without the prior written consent of each other party, assign this Escrow Agreement in whole or in part. Subject to the foregoing, this Escrow Agreement shall be binding upon, and inure to the benefit of, the respective

successors and assigns of the parties hereto. No assignment by Buyer or Seller shall be binding unless and until written consent to such assignment is delivered by the other and unless and until notice of such assignment is delivered to and acknowledged in writing by the Escrow Agent

     f.    <u>Governing Law</u>.  This Escrow Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of Delaware, without regard to conflicts of law principles.

     g.    <u>Warranty</u>.  Each party hereto hereby represents and warrants that this Escrow Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation and is enforceable against it in accordance with its terms.

     h.    <u>Severability</u>.  The parties hereto hereby agree that: (i) the provisions of this Escrow Agreement shall be severable in the event that for any reason whatsoever any of the provisions hereof are invalid, void or otherwise unenforceable; (ii) such invalid, void or otherwise unenforceable provisions shall be automatically replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions but are valid and enforceable; and (iii) the remaining provisions shall remain enforceable to the fullest extent permitted by law.

     i.    <u>Force Majeure</u>.  Notwithstanding any other provision of this Escrow Agreement, the Escrow Agent shall not be obligated to perform hereunder and shall not incur any liability for the nonperformance or breach of any obligation hereunder to the extent that the Escrow Agent is delayed in performing, unable to perform or breaches such obligation because of acts of God, war, terrorism, fire, floods, strikes, electrical outages, equipment or transmission failures, or other causes or circumstances reasonably beyond its control, it being understood that the Escrow Agent shall (i) give the Other Parties written notice of such circumstances, stating the period of time the failure and/or delay is expected to continue (if known), and (ii) use commercially reasonable efforts to resume performance as soon as reasonably practicable under the circumstances.

     j.    **<u>JURISDICTION AND VENUE; WAIVER OF JURY TRIAL</u>.  THE PARTIES HERETO IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS ESCROW AGREEMENT, SHALL BE LITIGATED ONLY IN COURTS HAVING SITUS WITHIN CHICAGO, ILLINOIS.  EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED THEREIN AND WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO TRANSFER THE VENUE OF ANY SUCH LITIGATION.**

**EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS ESCROW AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS ESCROW AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS ESCROW AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE**

**FOREGOING WAIVER, (II) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS ESCROW AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

k.     <u>Compliance with Court Orders</u>.  In the event that the Escrow Amount shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Amount, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

l.     <u>Indemnity</u>.  The Other Parties shall, jointly and severally, indemnify, defend and save harmless the Escrow Agent and its successors, permitted assigns, directors, officers, and employees (the "**Indemnitees**") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, reasonable costs or expenses (including, without limitation, the reasonable and documented attorneys' fees and expenses) (collectively "**Losses**") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Escrow Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Escrow Agreement, or as may arise by reason of any act, omission or error of the Indemnitees, except to the extent that such Losses are caused by, or arise from, the fraud, gross negligence or willful misconduct of such Indemnitees, or (b) its following any instructions or other directions from the Other Parties properly provided in accordance with the terms of this Escrow Agreement.  The Other Parties acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Escrow Agreement.  The Other Parties hereby grant the Escrow Agent a right of set-off against the Escrow Amount for the payment of any claim for indemnification, expenses and amounts due hereunder.  In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Escrow Amount for its own account or for the account of an Indemnitee any amounts due to the Escrow Agent or to an Indemnitee under this <u>Section 7(l)</u>. The obligations contained in this <u>Section 7(l)</u> shall survive the termination of this Escrow Agreement and the resignation, replacement or removal of the Escrow Agent.

m.     <u>Entire Agreement</u>.  This Escrow Agreement and the Exhibits and Annexes hereto (and the Purchase Agreement as it pertains to the Other Parties) embody the entire agreement and understanding of the parties hereto with respect to the Escrow Amount and supersedes all other prior commitments, arrangements or understandings, both oral and written, among the parties with respect thereto.

n.     <u>USA Patriot Act Notice</u>: **IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT UNDER THE USA PATRIOT ACT OF 2001.**

The USA Patriot Act establishes minimum standards of account information to be collected and maintained by the Escrow Agent and its subsidiaries. To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity opening an account.

What this means for you: When you open an account, the Escrow Agent will ask for your legal name or the name of your legal entity, address, date of birth, government issued ID number, and any other information that will allow the Escrow Agent to identify you or the entity. The Escrow Agent may also ask to see a form of identification with your photograph or other identifying documents.

        o.    <u>Publication; Disclosure</u>.  By executing this Escrow Agreement, the Other Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related exhibits and annexes) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement.  The parties hereto further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement.

        p.    <u>No Other Third Party Beneficiaries</u>. Nothing herein expressed or implied is intended or shall be construed to confer upon or to give any Person other than the Escrow Agent, the Other Parties and their permitted assigns any rights or remedies under or by reason of this Escrow Agreement.

        q.    <u>No Waiver</u>. No failure or delay by a party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise thereof shall preclude any right of further exercise or the exercise of any other right, power or privilege. The right of the Other Parties to receive all or a portion of the Escrow Funds under the circumstances described in Section 2 above is in addition to, and not in lieu of, any other remedies that any Person may have against another Person pursuant to the Purchase Agreement in the event of a breach of, or other liability under, the Purchase Agreement.

        r.    <u>Callback Confirmations</u>.  Upon receipt of Joint Instructions, or in the event any other funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by fax or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call back to the persons designated in Exhibit D annexed hereto as authorized signatories, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing actually received and acknowledged by the Escrow Agent.  The Other Parties agree to notify the Escrow Agent of any errors, delays or other problems within thirty (30) calendar days after receiving notification that a transaction has been executed. The Other Parties understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to telephone call-back by an Other Party may result in a delay in

accomplishing such funds transfer to such Other Party, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

s.      <u>Electronic Signatures</u>.  The parties agree that electronic signatures hereto, whether digital or encrypted, have the same binding force and effect as manual signatures.  Delivery of a copy of this Escrow Agreement or any other document contemplated hereby bearing an original or electronic signature by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.  In addition, counterparts may be delivered via electronic signature complying with the U.S. federal ESIGN Act of 2000, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

By providing any electronic signature for this Escrow Agreement, each party (a) agrees that it intends to be bound by its electronic signature, (b) acknowledges that the Escrow Agent will rely on the electronic signature, and (c) waives any defenses to the enforcement of this Escrow Agreement and the documents effecting the transactions contemplated by this Escrow Agreement based on the fact that a signature was sent by electronic means only.  Each party further agrees that acceptance of any electronic signature will be at the discretion of the Escrow Agent, and that the Escrow Agent may request additional information or take additional actions to verify or validate any electronic signature provided by any party.

[*Signature Page Follows.*]

**IN WITNESS WHEREOF**, each of the parties has executed this Escrow Agreement as of the date first above written.

**ESCROW AGENT:**

CIBC NATIONAL TRUST COMPANY, as Escrow Agent

By: _Hallee Banach_

Name: Hallie Banach
Title: Associate Vice President

**SELLER:**

ROCKY MOUNTAIN WEST TELECOM, INC.

By:_____
Name: Kyle Garrett
Title: President

**BUYER:**

RMWT CONSULTING LLC

By:_____
Name: Tom Barnes
Title: CFO

[Signature Page to RMWT Escrow Agreement]

DocuSign Envelope ID: D950E489-88C7-443E-9271-9368B7474C8B

**IN WITNESS WHEREOF**, each of the parties has executed this Escrow Agreement as of the date first above written.

**ESCROW AGENT:**

CIBC NATIONAL TRUST COMPANY, as Escrow Agent

By:_____
Name:
Title:

**SELLER:**

ROCKY MOUNTAIN WEST TELECOM, INC.



By:_____
Name: Kyle Garrett
Title: President

**BUYER:**

RMWT CONSULTING LLC

By:_____
Name: Tom Barnes
Title: CFO

[Signature Page to RMWT Escrow Agreement]

**IN WITNESS WHEREOF**, each of the parties has executed this Escrow Agreement as of the date first above written.

**ESCROW AGENT:**

CIBC NATIONAL TRUST COMPANY, as Escrow Agent

By:_____
Name:
Title:

**SELLER:**

ROCKY MOUNTAIN WEST TELECOM, INC.

By:_____
Name: Kyle Garrett
Title: President

**BUYER:**

RMWT CONSULTING LLC

By:_____
Name: Tom Barnes
Title: CFO

**EXHIBIT A**

**JOINT INSTRUCTIONS TO ESCROW AGREEMENT**

CIBC National Trust Company
Attn: Ann Bolognani/Hallie Banach
120 South LaSalle Street
Chicago, Illinois  60603
(312) 564-1424 Phone
(312) 564-1799 Fax
ann.bolognani@cibc.com
hallie.banach@cibc.com


_____, _____


Joint Instructions

Ladies and Gentlemen:

Reference is made to the Escrow Agreement dated as of March 10, 2023 (the "Escrow Agreement"), among CIBC National Trust Company (the "Escrow Agent"), Rocky Mountain West Telecom, Inc., a Utah corporation ("**Seller**") and RMWT Consulting LLC, a Delaware limited liability company ("**Buyer**").

Pursuant to the Escrow Agreement, the undersigned hereby instruct the Escrow Agent to disburse from the [Indemnification Escrow Funds/Working Capital Escrow Funds] (as defined in the Escrow Agreement), account number _____, to _____ the amount of $_____, by wire transfer to the account identified on Annex I hereto.

*[Signature Page Follows]*

**ANNEX I TO JOINT INSTRUCTIONS**

[*Insert Wire Transfer Instructions*]

**EXHIBIT B**

**<u>INDEMNIFICATION OFFSET NOTICE</u>**

**[Date]**

CIBC National Trust Company
Attn: Ann Bolognani/Hallie Banach
120 South LaSalle Street
Chicago, Illinois  60603
(312) 564-1424 Phone
(312) 564-1799 Fax
ann.bolognani@cibc.com
hallie.banach@cibc.com

Ladies and Gentlemen:

This notice is being delivered pursuant to Section 2(a) of the Escrow Agreement, dated March 10, 2023 (the "Escrow Agreement"), by and among CIBC National Trust Company (the "Escrow Agent"), Rocky Mountain West Telecom, Inc., a Utah corporation ("**Seller**") and RMWT Consulting LLC, a Delaware limited liability company ("**Buyer**").  Capitalized terms in this letter that are not otherwise defined shall have their meanings set forth in the Escrow Agreement.

Buyer hereby gives notice, pursuant to Section 2(a) of the Escrow Agreement, of an Overage Amount which has not been paid by Seller and therefor Buyer hereby directs the Escrow Agent to disburse to Buyer (at the wire instructions set forth on Annex I to this notice) from the Indemnification Escrow Amount the amount of such Overage Amount.  The amount of the Overage Amount is $_____.

Buyer hereby certifies to Escrow Agent that this notice was delivered to Seller.

**RMWT CONSULTING LLC**

By: _____
Name: Tom Barnes
Title: CEO

## ANNEX I TO INDEMNIFICATION OFFSET NOTICE

[*Insert Wire Transfer Instructions*]

                                   CIBC PRIVATE WEALTH

**EXHIBIT C**

# Annual Fees for Business Escrow Services

***Fee options for Business Escrow Services based on how funds are invested per the terms of the Escrow Agreement (effective June 1, 2019)***

| INVESTMENT | ANNUAL FEE |
|---|---|
| All funds deposited in the CIBC National Trust Company **Non-Interest Bearing Demand Deposit Account ("DDA")** | No fee* |
| All funds deposited in the CIBC National Trust Company **Wealth Management Money Market Account II ("WMMA II")** | $2,500 |

*To qualify for the no annual fee, non-interest bearing escrows must maintain a minimum balance of $200,000 or more for a duration of 12 months or more. Escrows not meeting both of these requirements will incur a $2,500 annual fee.

➢ Fees will be collected annually in advance, unless otherwise provided in the escrow agreement.

➢ A minimum account fee equal to the above stated "Annual Fee" will be charged and collected, even for accounts open less than twelve months.

➢ This fee schedule applies provided the CIBC National Trust Company standard form escrow agreement is used.

➢ Fees calculated pursuant to this fee schedule cover the following standard escrow services including up to a maximum of ten (10) administrative hours annually ("Standard Escrow Services"):

- Account set-up and investment of funds per the terms of the escrow agreement
- Custody/safekeeping of assets
- Collection of dividends, interest and other income
- Daily reconciliation of directed transactions
- Transaction services include five (5) transfers annually (e.g. checks, domestic wires or ACH transactions). The number of transactions will be pro-rated for partial years
- Monthly or quarterly reporting with on-line account access
- Two (2)IRS Form 1099s per calendar year

➢ Account services beyond the Standard Escrow Services will be charged additional fees based on the services provided. Additional fees will also be charged for the following:

- Notice by overnight courier service expense to be charged to the Escrow Account at $35 per mailing
- Distributions beyond the five (5) transfers annually will be charged $50/per transaction
- Additional 1099s per calendar year will be charged $150/form
- Preparation of 1042 (Foreign Withholding for US Source Income) will be charged at $200/form
- Foreign Wire Fee of $50/per transaction
- Costs of any additional or unusual services, including legal fees, will be determined and charged separately based upon the time, complexity, and responsibilities involved
- Returned Wire Fee of $50/returned wire



CIBC PRIVATE WEALTH

# THE WEALTH MANAGEMENT MONEY MARKET ACCOUNT (WMMA II)

The Wealth Management Money Market Account II ("WMMA II") is a money market deposit account with CIBC Bank USA (the "Bank") a CIBC-affiliated entity, used for cash balances in escrow accounts. WMMA II ensures that cash balances earn interest promptly, that cash is readily available to make distributions from these accounts, and that cash balances are not exposed to features or risks associated with some money market mutual funds (e.g., floating net asset value, redemption fees, or hold-back provisions).

Deposits held in WMMA II are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000 per depositor. Other deposits you maintain with CIBC Bank USA either directly or through another intermediary will be aggregated with your cash in WMMA II for purposes of determining the amount of deposits covered by FDIC insurance. The rate paid on balances in WMMA II is a percentage of the rate paid on the Bank's CIBC Cash Reserve Wealth Management Money Market account ("Cash Reserve Account"). The Cash Reserve Account is the sweep vehicle typically used for cash balances held in discretionary investment management accounts. The cash reserve rate is derived from New York Fed Fund published rate (see link https://www.newyorkfed.org/markets/reference-rates/effr.

The yield on WMMA II is equal to 90% of the published rate.

Once calculated, the resulting yield on WMMA II may be reduced by a portion of the FDIC's charge for the insurance coverage and regulatory oversight it provides for WMMA II deposits in the Bank.

The Bank currently offers, and may in the future offer, sweep vehicles and money market account products for other types of clients or accounts that have differing interest rates, which may be higher or lower than the interest rate offered for WMMA II.

Additional information regarding the calculation of daily rates for WMMA II, the safety of deposits in the Bank and FDIC insurance coverage is available upon request.

**Exhibit D**

**Authorized Signatories**

If from the Buyer:

|  | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Tom Barnes | (571) 334-9272 | |
| 2. | Ben Rogers | (212) 416-5864 | |

If from Seller:

|  | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Kyle Garrett | | |

[Signature Page to Escrow Agreement Exhibit D]

**Exhibit D**

**Authorized Signatories**

If from the Buyer:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Tom Barnes | | _____ |
| 2. | Ben Rogers | (212) 416-5864 | _____ |

If from Seller:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Kyle Garrett | (801) 319-1337 | Kyle R. Garrett |

[Signature Page to Escrow Agreement Exhibit D]

**Exhibit E**

**Indemnification Escrow Funds Release Wire Instructions**